No. 23-1013

# In the United States Court of Appeals for the Federal Circuit

MERCK SHARP & DOHME, LLC,

*Plaintiff-Appellee,*

*v.*

MYLAN PHARMACEUTICALS INC.,

*Defendant-Appellant.*

Appeal from the U.S. District Court for the Northern District of West Virginia No. 1:19-cv-00101-IMK, Hon. Irene M. Keeley

## NON-CONFIDENTIAL OPENING BRIEF FOR THE APPELLANT

Robert T. Smith
Eric T. Werlinger
KATTEN MUCHIN ROSENMAN LLP
2900 K Street, NW – Suite 200
Washington, DC 20007
(202) 625-3500

Deepro R. Mukerjee
Lance A. Soderstrom
KATTEN MUCHIN ROSENMAN LLP
50 Rockefeller Plaza
New York, NY 10020
(212) 940-6330
deepro.mukerjee@katten.com

*Counsel for Appellant Mylan Pharmaceuticals Inc.*
*(Additional counsel on the signature block)*

January 19, 2023

## PATENT CLAIMS AT ISSUE

### U.S. Patent No. 7,326,708: Claims 1-3, 19 (Appx123)

1.    A dihydrogenphosphate salt of 4-oxo-4-[3-(trifluoromethyl)-5,6-

dihydro[1,2,4]triazolo[4,3-a]pyrazin-7(8H)-yl]-1-(2,4,5-

trifluorophenyl)butan-2-amine of structural formula I:

(I)

or a hydrate thereof.

2.    The salt of claim 1 of structural formula II having the (R)-

configuration at the chiral center marked with an *

(II)

3.    The salt of claim 1 of structural formula III having the (S)-configuration at the chiral center marked with an *



19.    A method for the treatment of type 2 diabetes comprising administering to a patient in need of such treatment a therapeutically effective amount of the salt according to claim 2 or a hydrate thereof.

### U.S. Patent No. 8,414,921: Claim 1 (Appx140)

1.    A pharmaceutical composition comprising:

(a) about 3 to 20% by weight of sitagliptin, or a pharmaceutically acceptable salt thereof;

(b) about 25 to 94% by weight of metformin hydrochloride;

(c) about 0.1 to 10% by weight of a lubricant;

(d) about 0 to 35% by weight of a binding agent;

(e) about 0.5 to 1% by weight of a surfactant; and

(f) about 5 to 15% by weight of a diluent.

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number**     2023-1013

**Short Case Caption**     Merck Sharp & Dohme, LLC v. Mylan Pharmaceuticals Inc.

**Filing Party/Entity**     Mylan Pharmaceuticals Inc.

---

**Instructions:** Complete each section of the form.  In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.  **Please enter only one item per box; attach additional pages as needed and check the relevant box**.  Counsel must immediately file an amended Certificate of Interest if information changes.  Fed. Cir. R. 47.4(b).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 01/19/2023        Signature:    /s/ Deepro R. Mukerjee

                              Name:        Deepro R. Mukerjee

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities.  Do not list the real parties if they are the same as the entities.  ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.  ☐ None/Not Applicable |
| Mylan Pharmaceuticals Inc. | | Mylan, Inc.; Viatris Inc. |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐   Additional pages attached

iv

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐   None/Not Applicable          ☐   Additional pages attached

| Brian J. Sodikoff (Katten Muchin Rosenman) | Alissa M. Pacchioli (Katten Muchin Rosenman) | William J O'Brien (Steptoe & Johnson PLLC) |
|---|---|---|
| Jillian M. Schurr (Katten Muchin Rosenman) | Joseph M. Janusz (Katten Muchin Rosenman) | |
| Matthew M. Holub (Katten Muchin Rosenman) | Gordon H. Copland (Steptoe & Johnson PLLC) | |

**5. Related Cases.** Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). See also Fed. Cir. R. 47.5(b).

☐   None/Not Applicable          ☐   Additional pages attached

| Mylan Pharms. Inc. v. Merck Sharp & Dohme Corp., CAFC No. 2021-2121 | | |
|---|---|---|
| | | |
| | | |

**6. Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑   None/Not Applicable          ☐   Additional pages attached

| | | |
|---|---|---|
| | | |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES..........................................................................ix

STATEMENT OF RELATED CASES .............................................xiv

INTRODUCTION ...........................................................................1

JURISDICTIONAL STATEMENT ................................................5

STATEMENT OF THE ISSUES ....................................................5

STATEMENT OF THE CASE.........................................................6

    A.    The Reference Patent and the Prior Art. ...........................6

    B.    The Asserted Patents.........................................................10

    C.    Procedural History. ...........................................................14

    D.    The District Court's Opinion. .........................................16

SUMMARY OF THE ARGUMENT.................................................21

ARGUMENT .......................................................................................25

I.    Obviousness-Type Double Patenting Precludes Merck from Extending Its Monopoly Over Sitagliptin DHP. ........................................25

    A.    Sitagliptin Salts Made With Phosphoric Acid Are Claimed and Described by the '871 Patent and the Prior Art. ..........................27

        1.    The district court erred by disqualifying WO'498 because § 103(c)(1) does not apply in obviousness-type double patenting.................................................................................29

        2.    The district court erred by refusing to consider the full description of "pharmaceutically acceptable salts" in the '871 patent. ...........................................................................33

B.    Asserted Claims 1 and 2 Are Obvious Variants of Reference Claim 17. ......................................................................40

C.    Asserted Claims 3 and 19 Do Not Contain Any Other Patentably Distinct Elements. ............................................................44

    1.    The optical isomer of sitagliptin recited in asserted claim 3 is obvious. ......................................................44

    2.    The method for treating type 2 diabetes recited in asserted claim 19 is obvious. ...............................................45

D.    Secondary Considerations Do Not Save the District Court's Decision. ............................................................47

II.    Merck Described and Enabled One Monohydrate of (R)-Sitagliptin DHP, Not an Entire Genus of Sitagliptin DHP Hydrates. ...................48

A.    The Asserted Claims Lack an Adequate Written Description. .49

    1.    Merck cannot possibly describe hydrates that it cannot make. ......................................................49

    2.    The specification does not adequately describe a genus of hydrates. ......................................................51

B.    The Asserted Claims Are Not Enabled. ........................54

    1.    Merck claims sitagliptin hydrates that it admittedly did not possess. ......................................................54

    2.    The district court misapplied the law of enablement. .......56

    3.    The district court's misapplication of the law infects its *Wands* analysis. ......................................................59

III.    Mylan's Sitagliptin/Metformin Product Does Not Infringe the Surfactant Limitation of Claim 1 of the '921 Patent. ..................60

A.    The Word "About" Allows for No More Than a 5% Variance on the Stated Range in the Surfactant Limitation. ...............61

B.    The District Court Misconstrued the Word "About" to Allow for a 20% Variance on the Stated Range. ...........................................66

CONCLUSION ..................................................................................................70

## CONFIDNETIAL INFORMATION STATEMENT

Details regarding the composition of Appellant Mylan Pharmaceuticals Inc.'s ANDA products were placed under seal by order of the district court. On the following pages, such information has been highlighted in Mylan's Confidential Opening Brief and redacted in Mylan's Non-Confidential Opening Brief: **2, 16, 17, 61, 66, and 69**.

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*AbbVie Deutschland GmbH & Co., KG v. Janssen Biotech, Inc.,*
  759 F.3d 1285 (Fed. Cir. 2014) ..................................................49, 50

*Abbvie Inc. v. Mathilda & Terence Kennedy Inst. of Rheumatology
  Tr.,* 764 F.3d 1366 (Fed. Cir. 2014) ..........................................25, 30, 36, 38, 39

*Adams Respiratory Therapeutics, Inc. v. Perrigo Co.,*
  616 F.3d 1283 (Fed. Cir. 2010) ........................................................35

*Amgen Inc. v. Sanofi,*
  143 S. Ct. 399 (2022) ........................................................................59

*Ariad Pharms., Inc. v. Eli Lilly & Co.,*
  598 F.3d 1336 (Fed. Cir. 2010) (en banc) ..............................4, 48, 52

*Bai v. L & L Wings, Inc.,*
  160 F.3d 1350 (Fed. Cir. 1998) ........................................................60

*Biogen Int'l GMBH v. Mylan Pharms. Inc.,*
  18 F.4th 1333 (Fed. Cir. 2021) ........................................................50

*Bos. Sci. Corp. v. Johnson & Johnson,*
  647 F.3d 1353 (Fed. Cir. 2011) ..................................................53, 54

*Brenner v. Manson,*
  383 U.S. 519 (1966) ....................................................................58, 59

*Caminetti v. United States,*
  242 U.S. 470 (1917) ..........................................................................31

*Cannon v. Univ. of Chi.,*
  441 U.S. 677 (1979) ..........................................................................31

*Cohesive Techs., Inc. v. Waters Corp.,*
  543 F.3d 1351 (Fed. Cir. 2008) ........................................................63

ix

*Cybor Corp. v. FAS Techs., Inc.,*
138 F.3d 1448 (Fed. Cir. 1998) (en banc)......................................60

*Deering Precision Instruments, L.L.C. v. Vector Distribution Sys.,*
*Inc.*, 347 F.3d 1314 (Fed. Cir. 2003)...........................................61

*Ecolab, Inc. v. Envirochem, Inc.,*
264 F.3d 1358 (Fed. Cir. 2001) ................................................62

*Eli Lilly & Co. v. Barr Labs., Inc.,*
251 F.3d 955 (Fed. Cir. 2001) .................................................25

*Eli Lilly & Co. v. Teva Parenteral Medicines, Inc.,*
689 F.3d 1368 (Fed. Cir. 2012) ......................................19, 37, 38

*Genentech, Inc. v. Novo Nordisk A/S,*
108 F.3d 1361 (Fed. Cir. 1997) ................................................57

*Geneva Pharms., Inc. v. GlaxoSmithKline PLC,*
349 F.3d 1373 (Fed. Cir. 2003)......................................26, 36, 47

*Great Atl. & Pac. Tea Co. v. Supermarket Equip. Corp.,*
340 U.S. 147 (1950)............................................................48

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.,*
381 F.3d 1111 (Fed. Cir. 2004) ................................................69

*Jeneric/Pentron Inc. v. Dillon Co. Inc.,*
205 F.3d 1377 (Fed. Cir. 2000) ................................................64

*Juno Therapeutics, Inc. v. Kite Pharma, Inc.,*
10 F.4th 1330, 1340 (Fed. Cir. 2021)..........................................53

*Kaneka Corp. v. Xiamen Kingdomway Grp. Co.,*
790 F.3d 1298 (Fed. Cir. 2015) ................................................69

*Litton Sys., Inc. v. Honeywell, Inc.,*
140 F.3d 1449 (Fed. Cir. 1998) ................................................61

*In re Bartfeld*,
925 F.2d 1450 (Fed. Cir. 1991) .......................................2, 30, 33

*In re Basell Poliolefine Italia S.P.A.*,
    547 F.3d 1371 (Fed. Cir. 2008) ............................................34, 36, 38

*In re Goodman*,
    11 F.3d 1046 (Fed. Cir. 1993) .................................................................57

*In re Hitachi Metals, Ltd.*,
    603 F. App'x 976 (Fed. Cir. 2015) ......................................................36

*In re Longi*,
    759 F.2d 887 (Fed. Cir. 1985) ...............................................31, 32, 33

*In re Vaeck*,
    947 F.2d 488 (Fed. Cir. 1991) .................................................................57

*In re Vogel*,
    422 F.2d 438 (C.C.P.A. 1970) ...............................................34, 36, 38

*In re Wands*,
    858 F.2d 731 (Fed. Cir. 1988) ...............................................55, 59

*Linear Tech. Corp. v. ITC*,
    566 F.3d 1049 (Fed. Cir. 2009) .............................................................62

*LizardTech, Inc. v. Earth Res. Mapping*,
    424 F.3d 1336 (Fed. Cir. 2005) ...............................................51, 54, 58

*McRO, Inc. v. Bandai Namco Games Am. Inc.*,
    959 F.3d 1091 (Fed. Cir. 2020) ...............................................54, 55

*Morgan v. Principi*,
    327 F.3d 1357 (Fed. Cir. 2003) .............................................................31

*Mylan Pharms. Inc. v. Merck Sharp & Dohme Corp.*,
    50 F.4th 147 (Fed. Cir. 2022) ...............................................14, 15

*Nuvo Pharms. (Ir.) Designated Activity Co. v. Dr. Reddy's Lab'ys
    Inc.*, 923 F.3d 1368 (Fed. Cir. 2019) ................................................49

*Nystrom v. TREX Co.*,
    424 F.3d 1136 (Fed. Cir. 2005) .............................................................67

*Oddzon Prods., Inc. v. Just Toys, Inc.,*
    122 F.3d 1396 (Fed. Cir. 1997) ........................................................32

*On-Line Tech. v. Bodenseewerk Perkin-Elmer,*
    386 F.3d 1133 (Fed. Cir. 2004) .......................................................35

*Ortho–McNeil Pharm., Inc. v. Caraco Pharm. Labs., Ltd.,*
    476 F.3d 1321 (Fed. Cir. 2007) ..............................................63, 68

*Pall Corp. v. Micron Separations, Inc.,*
    66 F.3d 1211 (Fed. Cir. 1995) ................................................62, 63

*Par Pharm., Inc. v. Hospira, Inc.,*
    835 F. App'x 578 (Fed. Cir. 2020) .........................................62, 63

*Phillips v. AWH Corp.,*
    415 F.3d 1303 (Fed. Cir. 2005) (en banc).....................................63

*Pfizer, Inc. v. Apotex, Inc.,*
    480 F.3d 1348 (Fed. Cir. 2007)............................26, 40, 41, 44

*Pfizer, Inc. v. Teva Pharms. USA, Inc.,*
    518 F.3d 1353 (Fed. Cir. 2008).......................................25, 26, 39, 47

*Quantum Corp. v. Rodime, PLC,*
    65 F.3d 1577 (Fed. Cir. 1995)................................................68, 69

*Regents of the Univ. of California v. Eli Lilly & Co.,*
    119 F.3d 1559 (Fed. Cir. 1997) .......................................................53

*Sakraida v. Ag Pro, Inc.,*
    425 U.S. 273 (1976).........................................................................48

*Sun Pharm. Indus., Ltd. v. Eli Lilly & Co.,*
    611 F.3d 1381 (Fed. Cir. 2010) ...............................................*passim*

*Trustees of Bos. Univ. v. Everlight Elecs. Co.,*
    896 F.3d 1357 (Fed. Cir. 2018).................................................*passim*

*UltimatePointer, L.L.C. v. Nintendo Co.,*
    816 F.3d 816 (Fed. Cir. 2016) .........................................................67

*United States v. Ron Pair Enters., Inc.,*
    489 U.S. 235 (1989)..................................................................30, 31

*Vitronics Corp. v. Conceptronic, Inc.,*
    90 F.3d 1576 (Fed. Cir. 1996) .................................................27, 35

*Western Union Co. v. MoneyGram Payment Sys., Inc.,*
    626 F.3d 1361 (Fed. Cir. 2010) ..........................................................47

*Wyers v. Master Lock Co.,*
    616 F.3d 1231 (Fed. Cir. 2010) ........................................................48

**Statutes**

35 U.S.C. 102(a) (pre-AIA) .................................................................15

35 U.S.C. § 102(e) (pre-AIA) ........................................................15, 30

35 U.S.C. § 103(c)(1) (pre-AIA) .....................................................*passim*

35 U.S.C. § 112..............................................................................*passim*

**Regulatory Materials**

Manual of Patent Examining Procedure
    § 2146 (9th ed., June 2020 rev.) ..............................................31, 32

Manual of Patent Examining Procedure
    § 2146.01 (9th ed., June 2020 rev.)............................................. 32

**BPAI Decisions**

*Ex parte Germeyer,*
    No. 2009-10347, 2010 WL 1253701 (B.P.A.I. Mar. 29, 2010) .................31, 32

*In re Hrkach,*
    No. 2010-380, 2011 WL 514313 (B.P.A.I. Feb. 9, 2011)................................32

## STATEMENT OF RELATED CASES

No other appeal in or from this action was previously before this or any other appellate court. The following cases may be affected by the Court's decision: *Mylan Pharms. Inc. v. Merck Sharp & Dohme Corp.*, No. 2021-2121 (Fed. Cir.).

## INTRODUCTION

This appeal concerns a pair of patents designed to prolong Merck's monopoly over two drugs that utilize sitagliptin to treat type 2 diabetes: Januvia® and Janumet®. Merck first patented sitagliptin and its pharmaceutically acceptable salts in the now-expired U.S. Patent No. 6,699,871 ("the '871 patent"). Particularly preferred were salts made using phosphoric acid. Dissatisfied with one patent's worth of exclusivity, Merck later obtained U.S. Patent No. 7,326,708 ("the '708 patent") and U.S. Patent No. 8,414,921 ("the '921 patent"). These patents would extend Merck's grip on Januvia and Janumet until 2026 and 2028, respectively.

Merck did nothing to deserve the extra time. The '708 patent claims 1:1 sitagliptin dihydrogen phosphate ("sitagliptin DHP") salts that are nothing more than obvious variants of claims from Merck's expired '871 patent. The '708 patent also flunks 35 U.S.C. § 112. It claims *all* hydrates that might be formed from 1:1 sitagliptin DHP, despite describing only *one* hydrate that is no longer contested in this case. As for the '921 patent, Mylan's accused product does not infringe this patent. The '921 patent recites a composition of sitagliptin and metformin comprising of "about 0.5 to 1% by weight of a

surfactant." Mylan's product does not fall within this limitation because it contains ███████ by weight of surfactant.

The district court came out the wrong way on both patents in a post-trial decision marred by legal error. It rejected Mylan's double-patenting argument against the '708 patent because it put on blinders to what was claimed and described in the prior art and the reference claims of the '871 patent. A prior-art publication, WO 03/004498 ("WO'498"), highlighted phosphate salts as particularly preferred among "pharmaceutically acceptable salts" for sitagliptin. But the district court disqualified WO'498 as prior art pursuant to 35 U.S.C. § 103(c)(1) (pre-AIA).

That was legal error. By its plain text, the preclusive scope of § 103(c)(1) is limited to statutory obviousness arguments brought "under this section"—*i.e.*, § 103. Obviousness-type double patenting is a nonstatutory ground for invalidity. This Court has carefully contained § 103(c)(1) to the express boundaries placed on it by Congress. *In re Bartfeld*, 925 F.2d 1450, 1452-53 (Fed. Cir. 1991). The district court ignored the statutory text, ignored precedent, and reflexively applied § 103(c)(1) to nonstatutory double-patenting based upon a decision from the Board of Patent Appeals and Inteferences. But agency decisions do not displace statutory text. The district

CONFIDNETIAL MATERIAL REDACTED

court should have considered WO'498, which renders sitagliptin DHP obvious when combined with the reference claims from the '871 patent.

Separately, the district court refused to consider the full description of "pharmaceutically acceptable salts" contained in the '871 patent—namely, the list of particularly preferred acids. Relying upon extrinsic testimony, the district court believed this crucial information was unnecessary to construe the reference claims. It also believed that precedent forbade consideration of the specification in these circumstances. That's doubly wrong. It is elementary that *extrinsic* testimony cannot trump the *intrinsic* record. Moreover, precedent allows courts to use a reference patent's specification to assess utility and determine the coverage of the reference claims. That is all Mylan asked for: look at the specification and see that Merck has described and claimed the *exact* pharmaceutically acceptable salt that it has tried to patent anew in the '708 patent.

The district court's § 112 analysis is legally flawed too. Merck indisputably possessed only one hydrate of sitagliptin DHP. It didn't even know whether other hydrates existed. The district court nonetheless found that the chemical structure of *anhydrous* sitagliptin adequately described a genus of sitagliptin *hydrates*. But the structure of anhydrous sitagliptin is

3

legally irrelevant. It does not "distinguish the genus from other materials," such that the public knows that Merck had "invented a genus and not just a species" of hydrates. *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1352 (Fed. Cir. 2010) (en banc). Worse, the district court applied the wrong standard to enablement. Rather than ask whether Merck told the public "how to make and use the full scope of the claimed invention," *Trustees of Bos. Univ. v. Everlight Elecs. Co.*, 896 F.3d 1357, 1364 (Fed. Cir. 2018), the district court assessed only whether it "enable[ed] every *known* form of the 1-to-1 DHP salt of sitagliptin." Appx114 (emphasis added). That is not the law.

The district court's infringement analysis of the '921 patent is likewise tainted by legal error. On its face, Mylan's sitagliptin/metformin product does not infringe claim 1's "about 0.5 to 1% by weight of a surfactant" limitation. Whatever variance the word "about" allows from the endpoints must be minimal in the context of this patent. Yet the district court construed "about" to permit a massive *20% variance* from stated endpoints. It did so by accepting a convoluted interpretation from Merck built upon multiple deviations from the stated endpoints, which find no support in the intrinsic record and stretch "about" far past its breaking point.

4

These legal errors are fatal. As discussed below, the district court's decisions on invalidity and infringement should be vacated, if not reversed.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1295(a)(1). The district court entered final judgment against Mylan on September 21, 2022, and an amended final judgment on September 29, 2022. Appx1-2. Mylan filed a notice of appeal on September 30, 2022. Appx4207.

## STATEMENT OF THE ISSUES

1.    Did the district court err in its double-patenting analysis by failing to consider a list of particularly preferred acids for making sitagliptin salts because it: (a) disqualified WO'498 as prior art under 35 U.S.C. § 103(c)(1); or (b) refused to consider the full description of "pharmaceutically acceptable salts" contained in the reference patent's specification?

2.    Do the asserted claims of the '708 patent, which encompass all hydrate forms of sitagliptin DHP, satisfy the written description and enablement requirements of 35 U.S.C. § 112 by describing and teaching how to make a single crystalline monohydrate?

3.    Did the district court err in its construction of the word "about,"
in the limitation "about 0.5 to 1% by weight of a surfactant" in claim 1 of the
'921 patent?

**STATEMENT OF THE CASE**

**A.    The Reference Patent and the Prior Art.**

Sitagliptin and its pharmaceutically acceptable salts have been around
for decades.[1] They belong to a class of compounds called dipeptidyl
peptidase-IV ("DP-IV") inhibitors, which may be "useful in the treatment of
diabetes, and particularly type 2 diabetes." Appx14205 (2:31-34); Appx14209
(9:20-41). Sitagliptin is weakly basic, so skilled artisans would look to acids
to form pharmaceutically acceptable salts of sitagliptin. *See* Appx3001
(956:13-14). Chief among these would be phosphoric acid, which has long
been one of the most popular anions for salt formation.

**1.    The expired '871 patent.**

Merck first patented sitagliptin and its pharmaceutically acceptable
salts in the United States by the '871 patent. Appx14225 (41:1-14). The '871
patent issued in March 2004 and claims priority to U.S. Provisional

---

[1] Sitagliptin is known as 4-oxo-4-[3-trifluorom-ethyl)-5,6-dihyrdo[1,2,4]
triazolo[4,3-a]pyrazin-7(8H)-yl]-1-(2,4,5-trifluorophenyl)butan-2-amine.
Appx6.

6

Application No. 60/303,474 (filed July 6, 2001) Appx2581-2582. The Orange

Book entries for Januvia and Janumet list the '871 patent. Appx2582. The '871

patent expired on July 26, 2022. Appx2582.

The '871 patent taught the structures of various DP-IV inhibitors.

Formula I is relevant here:



I

Appx14206 (3:11-23). The '871 patent further identified sitagliptin as a

compound that can be produced using Formula I:



Appx14223 (37:35-42). Claim 17 specifically claimed freebase (R)-sitagliptin

or "a pharmaceutically acceptable salt thereof." Appx14225 (41:1-14); *see also*

Appx14208 (7:5-7) ("[R]eferences to the compounds of Formula I are meant to also include the pharmaceutically acceptable salts."). Claim 20 further recited a "pharmaceutical composition" of claim 17 and an inert carrier. Appx14225 (41:21-22).[2]

The specification taught that "'pharmaceutically acceptable salts' refers to salts prepared from pharmaceutically acceptable non-toxic bases or acids including inorganic or organic bases and inorganic or organic acids." Appx14207 (6:38-41). When the compound is basic like sitagliptin, "salts may be prepared from pharmaceutically acceptable non-toxic acids, including inorganic and organic acids." Appx14207 (6:61-63). Significantly, the specification identified eight "[p]articularly preferred" acids for preparing pharmaceutically acceptable salts: "citric, hydrobromic, hydrochloric, maleic, *phosphoric*, sulfuric, fumaric, and tartaric acids." Appx14208 (7:2-4) (emphasis added).

## 2.   WO'498.

Merck internationally published sitagliptin in WO'498. Merck filed WO'498 in July 2002, which claims priority to U.S. Provisional Application

---

[2] Initially, Claim 20 was erroneously drawn as dependent of Claim 16. It was later corrected to be dependent of Claim 17. Appx14226.

No. 60/303,474 (filed July 6, 2001). Appx13078. The claims and disclosures are similar to those of the '871 patent. WO'498 claimed sitagliptin and its "pharmaceutically acceptable salts" among 33 compounds that could be made using the same Formula I as the '871 patent. Appx13133 (bottom compound); Appx13138 (60:5). The publication further stated that "references to the compounds of Formula I are meant to also include the pharmaceutically acceptable salts." Appx13088 (10:16-17). Like the '871 patent, WO'498 instructed that DP-IV inhibitors "may be useful in the treatment of diabetes, particularly type 2 diabetes." Appx13080 (2:33-35).

WO'498 contained a description of "pharmaceutically acceptable salts" that was the same as that appearing in the specification of the '871 patent. Appx13087-13088 (9:27-10:15). For basic compounds like sitagliptin, WO'498 identified the same list of "[p]articularly preferred" anions: "citric, hydrobromic, hydrochloric, maleic, *phosphoric*, sulfuric, fumaric, and tartaric acids." Appx13088 (10:14-15) (emphasis added). WO'498 exemplified a sitagliptin salt made using hydrochloric acid (HCl), in a 1:1 stoichiometry. Appx13124 (46:1-26).

3.     **Bastin and Bighley**.

Skilled artisans have used phosphoric acid to prepare pharmaceutical salts for many years. It has long been known that, "[f]or weakly basic drug substances," skilled artisans may consider "salts of an inorganic acid (e.g., hydrochloride, sulphate, or phosphate)." Appx12722 ("Bastin"). And while hydrochloride is often the first choice for weakly basic drugs, "potential disadvantages of hydrochloride salts," such as "unacceptably high acidity," "the risk of corrosion," "less than optimal solubility," and "poor stability" may lead skilled artisans to look for popular alternatives like phosphate. Appx12722. Further, it was known at the time of the patents in suit that phosphoric acid salts were among the top ten salt forms. Appx12752 ("Bighley") (showing 2.48 percent of salt forms as phosphate salts, which equates to approximately 35 marketed products).

B.     **The Asserted Patents.**

Against this backdrop, Merck later obtained the '708 and '921 patents. The '708 patent issued on February 5, 2008, claims priority to U.S. Provisional Application No. 60/482,161 (filed June 24, 2003), and is set to expire in November 2026. Appx2575. The '921 patent claims priority to U.S.

Provisional Application No. 60/750,954 (filed Dec. 16, 2005), and is set to expire in July 2028. Appx2576

### 1. The '708 patent.

The '708 patent claims sitagliptin DHP in a 1:1 stoichiometry, as well as pharmaceutical compositions and methods of using sitagliptin DHP to treat type 2 diabetes. Appx123 (Abstract). The written description acknowledges that the prior art describes sitagliptin as a potent DP-IV inhibitor that is "useful for the treatment of Type 2 diabetes" and admits that "[p]harmaceutically acceptable salts of this compound are generically encompassed within the scope" of the art. Appx129 (1:49-52, 1:55-57). But the written description goes on to say that "there is no specific disclosure in the [prior art] of the newly discovered monobasic dihydrogenphosphate salt." Appx129 (1:58-62).

Though the '708 patent claims this salt is "new," Appx129 (1:59, 1:66), the main addition of the '708 patent over the prior art is instructions on how to prepare a specific sitagliptin DHP crystalline monohydrate salt. Appx136-137 (16:47-17:20, 18:13-36) (claims 4-16, 24); *see* Appx131-136 (6:35-15:9). This monohydrate salt is not at issue on appeal.

Only claims 1-3, and 19 are at issue here. Claims 1-3 claim sitagliptin DHP salts or hydrates thereof in the (R) or (S) configuration. Appx136 (15:64-16:46). Claim 19 is directed to a method for treating type 2 diabetes using a therapeutically effective amount of (R)-sitagliptin phosphate salt or its hydrate. Appx137 (17:29-32). Each claim requires the recited sitagliptin DHP salt to have a 1:1 stoichiometry. Appx136-137.

### 2.    The '921 patent.

The '921 patent claims various pharmaceutical compositions of sitagliptin combined with metformin, another drug long used to treat type 2 diabetes. Only claim 1 is at issue here, which recites a "pharmaceutical composition" of sitagliptin, metformin, and (among other things) "about 0.5 to 1% by weight of a surfactant." Appx146 (12:48-57).

Merck struggled to obtain the '921 patent. It suffered repeated rejections on grounds of novelty and obviousness. The surfactant limitation was critical to Merck overcoming these issues and obtaining the patent. As initially drafted, claim 1 did not require a surfactant at all. Appx10340. Merck added it—"about 0 to 3% by weight of a surfactant"—following the PTO's initial rejection, Appx11530, apparently believing that listing specific excipients at specific values would help. Appx11537-11544. It didn't.

Appx11548-11563. And neither did narrowing the initially claimed range down to "about 0.5 to 1% by weight." Appx11572-11592; *see* Appx11628-11650 (final rejection).

What eventually worked was an unexpected-results argument that Merck asserted when it narrowed the proposed surfactant range. It "surprisingly found" that, due to the large dose of metformin in the combined composition, formulations lacking surfactant had a relatively slow "dissolution rate for the sitagliptin in sitagliptin/metformin tablets." Appx11584. This threatened the bioavailability of sitagliptin. Appx11584. According to Merck, "[t]he addition of a surfactant (0.5% of sodium lauryl sulfate) . . . enhanced the dissolution rate of the sitagliptin/metformin tablet, and also minimized changes in stability." Appx11584. Merck backed this claim with a slide show. Appx11596-11620.

In its final rejection, the examiner invited Merck to back this claim with a sworn declaration, saying it "would be persuasive in the proper form." Appx11642. Merck then presented an affidavit from a Merck researcher stating that the addition of 0.5% of sodium lauryl sulfate (SLS) "significantly enhanced the dissolution rate," "provided more consistent dissolution profiles, and enhanced formulation robustness and stability." Appx11670.

Merck's declarant labeled this result "surprising and unexpected." Appx11671. The declaration got Merck over the hump, with the examiner allowing the claims because "[t]he declaration show[ed] that SLS as a surfactant unexpectedly increased" dissolution and stability. Appx11682 (quotation marks omitted).

### C.    Procedural History.

Mylan submitted abbreviated new drug applications for generic sitagliptin and sitagliptin/metformin products, and filed Paragraph IV certifications on the '708 and '921 patents. Appx2583. Merck sued Mylan in the Northern District of West Virginia in May 2019.[3] Several months later, the case was consolidated with 13 others in multi-district litigation in Delaware for discovery and pretrial proceedings. Appx1102-1105.

Meanwhile, Mylan petitioned for *inter partes* review of the '708 patent. *See Mylan Pharms. Inc. v. Merck Sharp & Dohme Corp.*, 50 F.4th 147, 150 (Fed. Cir. 2022). Mylan argued, among other things, that claims 1-3 and 19 of the '708 patent were anticipated by both the '871 patent and WO'498, and obvious over WO'498 in view of other prior art. Appx2579-2580. The PTAB

---

[3] Merck initially named Mylan Inc. as a co-defendant in this suit, but Mylan Inc. was dismissed by stipulation in July 2019. Appx1098-1101.

rejected those ground in a final written decision in May 2021. Appx2580. Among other things, the Board agreed with Merck that WO′498 was not prior art for statutory obviousness. Merck claimed WO′498 was unavailable under pre-AIA § 102(a) due to antedation, and unavailable under pre-AIA § 102(e) due to common ownership. *Mylan Pharms. Inc.*, 50 F.4th at 152. A panel of this Court affirmed the Board's decision. *Id.* at 157. Mylan has filed a combined petition for rehearing or rehearing *en banc*. This Court invited a response by Merck, which Merck recently filed. The petition is pending as of the filing of this brief.

Mylan and other defendants proceeded through discovery in the MDL. In August 2021, this case was transferred back to the Northern District of West Virginia. Appx1106-1109. Through a series of stipulations, the parties narrowed the issues for trial. Mylan stipulated to infringement of claims 1, 2, and 19 of the′708 patent, while Merck dropped its infringement argument as to the crystalline monohydrate recited in claims 4-7 of the ′708 patent. Appx2859-2861; Appx2898-2900. The parties then proceeded with a four-day trial to present evidence on whether Mylan's accused products

infringed claim 1 of the '921 patent, and whether claims 1-3 and 19 of the '708 patent were invalid.[4]

Mylan's positions were straightforward: Its products did not infringe claim 1 the '921 patent because they did not contain "about 0.5 to 1% by weight of a surfactant." Claims 1-3 and 19 of the '708 patent were invalid for obviousness-type patenting over claims 17 and 20 of the '871 patent, in view of WO'498 or of the knowledge of the skilled artisan. Separately, claims 1-3 and 19 of the '708 patent were invalid under § 112; they claim all hydrates of sitagliptin DHP, but the specification describes and enables only a single monohydrate of (R)-sitagliptin DHP.

## D.    The District Court's Opinion.

After post-trial briefing and closing arguments, the district court issued a decision in September 2022 finding claim 1 of the '921 patent infringed and holding claims 1-3 and 19 of the '708 patent not invalid.

### 1.    Infringement.

The district court held that Mylan's sitagliptin/metformin product contained Mylan ANDA by weight of surfactant. Appx50-51. But the district

---

[4] The district court also considered whether Mylan's products infringed claim 3 of the '708 patent, but that is not relevant to this appeal.

CONFIDENTIAL MATERIAL REDACTED

court nonetheless concluded Mylan's product fell within the "about 0.5 to 1% by weight of a surfactant" limitation by construing the word "about" to drastically expand the reach of the range. Appx52-62. It adopted the interpretation offered by Merck's expert witness, Dr. Steven Little. Appx54-55.

Before even considering the word "about," Dr. Little concluded that the endpoint of the recited range encompassed numbers that would round to the stated values. Appx3295-3296 (215:24-216:10). He focused specifically on the bottom of the range. Under Dr. Little's view, 0.5% encompassed 0.45 to 0.54. Appx3296 (216:8-10). This presumption controlled his definition of the word "about." He said the values must deviate even further, or else "about" would be superfluous. Appx3296 (216:11-18). He maintained that the best way to do this was to deviate the stated values by one significant digit—*i.e.*, from 0.5% to 0.4% for the bottom of the range. Appx3296 (216:19-23). From there, Dr. Little rounded again, claiming that any figure that would round to the already-deviated value would fall within the limitation. Appx3296-3297 (216:24-217:3). Because **Mylan ANDA** 0.4%, Dr. Little believed—and the district court agreed—that Mylan's product infringed.

CONFIDENTIAL MATERIAL REDACTED

### 2.    Obviousness-type double patenting.

The district court concluded that the asserted claims of the '708 patent were not invalid for obviousness-type double patenting. That outcome hinged upon the district court's framing of the reference claims in the first step of the double-patenting analysis. It observed that reference claim 17 of the '871 patent "covers the sitagliptin free base compound . . . 'or a pharmaceutically acceptable salt thereof.'" Appx74. It also acknowledged "[t]here is no dispute that the 1-to-1 DHP salt of sitagliptin is a pharmaceutically acceptable salt." Appx75. Still, the district court concluded that the reference and asserted claims were "differen[t]" because the asserted claims "cover a particular species of sitagliptin salt encompassed by the broad genus of sitagliptin salts described in reference claim 17." Appx74-75.

Significantly, the district court did not consider the list of particularly preferred acids contained in the specification's description of "pharmaceutically acceptable salts." Appx78-82. The district court acknowledged the specification's description of "pharmaceutically acceptable salts." Appx78. But it ultimately concluded that "the reference patent's list of particularly preferred acids is not needed to construe the term." Appx80. The district court pointed to witness testimony that

18

"pharmaceutically acceptable salts" is a "commonly used term" that "a POSA would have understood . . . without needing to consult the specification." Appx80. Similarly, the district court determined that it would be inappropriate to consider the specification as outlined in *Sun Pharm. Indus., Ltd. v. Eli Lilly & Co.*, 611 F.3d 1381 (Fed. Cir. 2010), concluding that *Sun* applied only when "an earlier patent claims a compound" and "a later patent claims a method of using that compound for a particular use described in the specification of the earlier patent." Appx81 (quoting *Eli Lilly & Co. v. Teva Parenteral Medicines, Inc.*, 689 F.3d 1368, 1378-79 (Fed. Cir. 2012)).

Accordingly, the district court required Mylan to show that a skilled artisan would have been motivated to "abandon the free base form of sitagliptin to go in search of an acid-addition salt," and further show motivation "to select the specific 1-to-1 DHP salt." Appx82. WO'498 provided the same list of particularly preferred acids for sitagliptin salts that the district court refused to consider in framing the scope of the '871 patent. But the district court disqualified WO'498 as prior art based solely upon the parties' pre-trial stipulation that WO'498 was commonly owned by Merck

19

and unavailable as prior art *only* under a statutory § 103 analysis. Appx83; Appx2589.[5]

These legal determinations drove the remainder of the district court's double-patenting analysis. For asserted claims 1 and 2, it found inadequate motivation in the prior art to create a pharmaceutical salt from freebase sitagliptin, inadequate motivation to include phosphoric acid as part of a salt screen in any event, and no reasonable expectation of success in creating a 1:1 sitagliptin DHP salt. Appx85-95. The district court relied upon its reasoning for claims 1 and 2 to reject Mylan's double-patenting argument on claim 3 and 19. Appx97-100. It further held there was no motivation or reasonable expectation of success to treat patients using sitagliptin. Appx100-102.

### 3. Section 112.

The district court also upheld the validity of the '708 patent under § 112 to the extent it claimed hydrates of sitagliptin DHP. The district court noted that "[m]ost of the facts" relevant to written-description and enablement inquiries were "undisputed." Appx108. Importantly, it was

---

[5] This stipulation applies only to this action. Appx2573. As part of its ongoing IPR appeal, Mylan maintains that WO'498 is available prior art under § 103.

undisputed that Merck possessed only the one crystalline monohydrate recited in claim 4 of the '708 patent and it didn't know whether other hydrates existed. Appx108. Yet, Merck maintained that its asserted claims covered *all* hydrates of sitagliptin DHP—including those not yet discovered, to the extent they even exist. Appx108. The district court nevertheless found that the '708 patent adequately described broad genera of hydrates based upon the patent's description "common chemical formula" for *anhydrous* sitagliptin DHP. Appx110. It further concluded that the specification satisfied the enablement requirement because it "enabl[es] every known form of the 1-to-1 DHP salt of sitagliptin." Appx114.

## SUMMARY OF THE ARGUMENT

**I.A.** Both WO'498 and the '871 patent describe and claim pharmaceutically acceptable salts of sitagliptin made with phosphoric acid. The district court did not factor this critical disclosure into its obviousness-type double patenting analysis because it disqualified WO'498 as prior art and refused to consider the description of "pharmaceutically acceptable salts" contained in the '871 patent. Both of those decisions are wrong as a matter of law.

The district court believed that, because § 103(c)(1) disqualified WO'498 as prior art for a *statutory* obviousness analysis, that meant the application was disqualified for a *nonstatutory* double-patenting analysis too. Wrong. By its plain text, § 103(c)(1) applies to invalidation arguments made "under this section"—*i.e.*, § 103. This Court has previously held that Congress said what it meant and meant what it said in drawing the boundaries of § 103(c)(1). The district court failed to acknowledge this Court's precedent, much less engage with the text of the statute. WO'498 is prior art and, when read in combination with the reference claims, renders sitagliptin DHP obvious.

Sitagliptin DHP is separately invalid over the reference claims of the '871 patent alone. The district court said it did not need to look at the full description of "pharmaceutically acceptable salts" in the reference patent's specification because Merck's witness at trial said it didn't need to. That violated a cardinal rule of claim construction. Extrinsic evidence does not trump the intrinsic record. Further the district court believed this Court's precedent did not permit it to consider the '871 patent's specification as part of a double-patenting analysis. Far from it. Precedent allows courts to use a reference patent's specification to determine the coverage of the reference

claims, which is all Mylan asked for here. The district court distinguished relevant authority on grounds that do not withstand scrutiny.

**I.B.**  Had the district court looked at the list of particularly preferred salts—by properly considering WO'498 or the '871 patent—it would have seen that Merck has described and claimed the *exact* pharmaceutically acceptable salt that it has tried to patent anew in the '708 patent. That would have made an easy call of double-patenting for asserted claims 1 and 2. A skilled artisan would have been highly motivated to combine sitagliptin and phosphoric acid, and would have had a reasonable expectation of success in creating sitagliptin DHP in the claimed 1:1 stoichiometry. The district court's holding to the contrary is skewed by its failure to consider the particularly preferred list of acids.

**I.C.**  None of the remaining asserted claims from the '708 patent is patentably distinct. The district court found asserted claim 3 nonobvious based entirely on its decision regarding asserted claims 1 and 2. That decision also animated its nonobviousness holding as to asserted claim 19. To the extent it further held there would be no motivation or reasonable expectation of success in creating the method of treating type 2 diabetes recited in asserted claim 19, that too fails. Both WO'498 or the '871 patent

describe the usefulness of DP-IV inhibitors like sitagliptin in the treatment of type 2 diabetes.

**I.D.** Though the district court engaged in a short analysis of a single secondary consideration (unexpected results), it did not assign any weight to that analysis. Nor did it say this one factor could support the entirety of its double-patenting decision. Accordingly, it is not enough to save the district court's judgment from reversal or remand.

**II.** The asserted claims of the '708 patent are separately invalid under 35 U.S.C. § 112. They fail both the written-description and enablement requirements. Merck claims *all* hydrates that might be formed from 1:1 sitagliptin DHP, despite describing and teaching how to make only *one* hydrate. Specifically as to enablement, the district court openly applied the wrong law. Rather than assessing whether Merck enabled the full scope of what it claimed, it required Merck to show only that it enabled the full scope of what it knew at the time (*i.e.*, the one monohydrate).

**III.** Mylan did not infringe claim 1 of the '921 patent because its sitagliptin/metformin product does not infringe the "about 0.5 to 1% by weight of a surfactant" limitation. The district court held otherwise by misconstruing the word "about." It credited an interpretation offered by

Merck's expert witness that is divorced from the specification of the patent.

Likewise, it rejected an alternative interpretation from Mylan's expert

witness for reasons that cannot be squared with this Court's precedent.

## ARGUMENT

### I. OBVIOUSNESS-TYPE DOUBLE PATENTING PRECLUDES MERCK FROM EXTENDING ITS MONOPOLY OVER SITAGLIPTIN DHP.

*Standard of review*: Obviousness-type double patenting is a

"judicially created doctrine that prevents a later patent from covering a

slight variation of an earlier patented invention." *Sun Pharm.*, 611 F.3d 1381

at 1384. The analysis consists of two steps. "First, 'a court construes the

claim[s] in the earlier patent and the claim[s] in the later patent and

determines the differences.'" *Pfizer, Inc. v. Teva Pharms. USA, Inc.*, 518 F.3d

1353, 1363 (Fed. Cir. 2008) (quoting *Eli Lilly & Co. v. Barr Labs., Inc.*, 251 F.3d

955, 968 (Fed. Cir. 2001)). "Second, it determines whether those differences

render the claims patentably distinct." *Id.* A later-filed claim is not

patentably distinct if it would have been obvious to a skilled artisan in view

of the earlier claim alone or in combination with the prior art. *Sun Pharm.*,

611 F.3d at 1385; *Abbvie Inc. v. Mathilda & Terence Kennedy Inst. of

Rheumatology Tr.*, 764 F.3d 1366, 1374 (Fed. Cir. 2014).

"Double patenting is a question of law, which [this Court] review[s] without deference." *Pfizer v. Teva*, 518 F.3d at 1363. This Court reviews the district court's underlying factual findings for clear error. *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1359 (Fed. Cir. 2007). Invalidity must be proven by clear and convincing evidence. *Geneva Pharms., Inc. v. GlaxoSmithKline PLC*, 349 F.3d 1373, 1377 (Fed. Cir. 2003).

This case principally comes down to whether the sitagliptin DHP salt recited in claims 1 and 2 of the '708 patent renders those claims nonobvious over Merck's now-expired '871 patent. The answer is no. Reference claim 17 of the '871 patent recites pharmaceutically acceptable salts of sitagliptin, and both WO'498 and the specification of the '871 patent describe phosphoric acid as being a particularly preferred anion for making such salts. The district court refused to consider either of those highly probative disclosures for reasons that are wrong as a matter of law. And because there is no other patentably distinct element in any of the asserted claims, the district court's error on the sitagliptin DHP salt brings down the entirety of its double-patenting analysis.

### A.    Sitagliptin Salts Made With Phosphoric Acid Are Claimed and Described by the '871 Patent and the Prior Art.

The Court must first construe reference claim 17. Claim construction begins with the intrinsic record, particularly the claim language and the specification. Courts look to the specification of the reference patent "to learn the meaning of [those] terms, and to interpret[ ] the coverage of [the] claim." *Sun Pharm.*, 611 F.3d at 1387 (quotation marks omitted). When the meaning of a claim term can be resolved using the patent text and specification, "it is improper to rely on extrinsic evidence." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996).

Relevant here is "pharmaceutically acceptable salts." The inventors of the '871 patent provided explicit, detailed guidance on the meaning of that term. It "refers to salts prepared from pharmaceutically acceptable non-toxic bases or acids including inorganic or organic bases and inorganic or organic acids." Appx14207 (6:38-41). The specification then explains what constitutes "pharmaceutically acceptable non-toxic bases or acids." Significantly, it lists eight "[p]articularly preferred" acids for making "pharmaceutically acceptable salts"—among them "phosphoric" acid. Appx14208 (7:2-4).

27

Claim construction should end there, and so too should the double-patenting analysis for sitagliptin DHP salt. The '871 patent explicitly says "pharmaceutically acceptable salts" include those made of phosphoric acid. That's enough to disclose and claim phosphoric acid salts of sitagliptin, which is all that is required at step one. In any event, the same information is available through WO'498, which is prior art for the double-patenting analysis. The Court may combine the teachings of WO'498 with the reference claims from the '871 patent. Regardless of which path the Court chooses, the list of particularly preferred acids should be considered as part of the obviousness-type double-patenting analysis. And once considered, the sitagliptin DHP salt falls as an obvious variant of reference claim 17. *See infra* § I.B.

The district court read things differently. It refused to consider the particularly preferred list of acids because it disqualified WO'498 as prior art and refused to consider the '871 patent's full explanation of "pharmaceutically acceptable salts." Both of those conclusions are wrong as a matter of law. These legal errors tainted the entirety of the district court's double-patenting analysis and require reversal—or at least vacatur, so that

the district court may reconsider obviousness-type double patenting in view of all relevant disclosures.

### 1.   The district court erred by disqualifying WO'498 because § 103(c)(1) does not apply in obviousness-type double patenting.

The district court refused to consider WO'498 in its double-patenting analysis, pointing to pre-AIA 35 U.S.C. § 103(c). Appx83. That provision states:

> Subject matter developed by another person, which qualifies as prior art only under one or more of subsections (e), (f), and (g) of section 102, shall not preclude patentability *under this section* where the subject matter and the claimed invention were, at the time the claimed invention was made, owned by the same person or subject to an obligation of assignment to the same person.

35 U.S.C. § 103(c)(1) (pre-AIA) (emphasis added). Below, the parties stipulated that WO'498 was not available to prove *statutory* obviousness under § 103 because of Merck's common ownership of WO'498 and the '708 patent. Appx2589. They also stated that "[n]othing [in the stipulation] is a statement by either party as to whether . . . WO '498 can be used as part of an obviousness-type double patenting invalidity challenge." Appx2589. Still, the district court held "because WO '498 is disqualified as an

obviousness reference, it is also disqualified as an obviousness-type double patenting prior art reference." Appx83.

That's wrong. By its plain terms § 103(c) can disqualify certain prior art *only* for a claim of invalidity "under this section"—*i.e.*, § 103. This case involves nonstatutory double patenting. True, "obviousness-type double patenting is grounded in the text of the Patent Act." *Abbvie Inc.*, 764 F.3d at 1372. But it is "grounded" in § 101, not § 103. *Id.*

Significantly, this Court has carefully limited the scope of § 103(c) to its plain language. Consider *In re Bartfeld*, 925 F.2d 1450 (Fed. Cir. 1991). The Court rejected an argument that would have expanded a prior version of § 103(c)—which, at the time, disqualified references "only under subsection (f) or (g) of section 102"—to reach references under § 102(e). *Id.* at 1452-53. The Court refused: "We may not disregard the unambiguous exclusion of § 102(e) prior art from the statute's purview." *Id.* at 1453.

The same logic holds here. Section 103(c) did not apply to a § 102(e) reference in *Bartfled* because, at the time, the plain text of the statute only applied to references under § 102(f) and (g). Here, § 103(c) does not apply to nonstatutory double patenting because the plain text of the statute only applies to patentability challenges brought "under this section." "[W]here,

30

as here, the statute's language is plain, 'the sole function of the courts is to enforce it according to its terms.'" *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989) (quoting *Caminetti v. United States*, 242 U.S. 470, 485 (1917)).

Congress expressly limited § 103(c) to "this section" despite being fully aware of the existence of nonstatutory double patenting. *See Morgan v. Principi*, 327 F.3d 1357, 1361 (Fed. Cir. 2003) ("Congress is presumed to legislate against the backdrop of existing law.") (citing *Cannon v. Univ. of Chi.*, 441 U.S. 677, 698-99 (1979)). In fact, the Court observed in *In re Longi*, 759 F.2d 887 (Fed. Cir. 1985), that the statutory history of § 103(c) shows that it "was not intended to affect the doctrine of double patenting, but seems rather to reaffirm its viability." *Id.* at 895. If Congress wanted to alter this Court's existing doctrine of obviousness-type double patenting, it would not have expressly limited the sweep of § 103(c) to "this section."

The Board of Patent Appeals and Inteferences has previously faced this very issue and agreed that § 103(c)(1) does not apply to obviousness-type double patenting. *Ex parte Germeyer*, Appeal No. 2009-10347, 2010 WL 1253701, at *5 (B.P.A.I. Mar. 29, 2010). The Manual of Patent Examining Procedure ("MPEP") likewise says: "pre-AIA 35 U.S.C. 103(c) applies ***only***

to consideration of prior art for purposes of obviousness under 35 U.S.C. 103.

*It does not apply to or affect subject matter which is applied in a rejection under 35 U.S.C. 102 or a double patenting rejection*." MPEP § 2146 (9th ed., June 2020 rev.). Punctuating this point, the MPEP goes on to say: "Pre-AIA 35 U.S.C. 103(c) applies only to prior art usable in an obviousness rejection under 35 U.S.C. 103. . . . *[D]ouble patenting rejections, based on subject matter now disqualified as prior art in amended pre-AIA 35 U.S.C. 103(c), should still be made as appropriate*." *Id.* § 2146.01.

The district court offered no contrary analysis. It instead backed its flawed conclusion with a passing citation to *In re Hrkach*, Appeal No. 2010-380, 2011 WL 514313 (B.P.A.I. Feb. 9, 2011). Appx83. Apart from the fact that *Hrkach* is not binding on any court, the decision is simply unpersuasive. *Hrkach* does not grapple with the language of the statute. Nor does it address the logic of *Barfeld*, *Longi*, or *Germeyer*. Instead, *Hrkach* points to the policy behind § 103(c)(1) as applied to *statutory* obviousness. 2011 WL 514313 at *4 ("'[T]his provision was intended to avoid the invalidation of patents under § 103 on the basis of the work of fellow employees engaged in team research.'") (quoting *Oddzon Prods., Inc. v. Just Toys, Inc.*, 122 F.3d 1396, 1403 (Fed. Cir. 1997)). But Congress expressed its policy in the plain language of

§ 103(c)(1), and that policy has no application to obviousness-type double patenting. This Court said as much in *Bartfeld* and *Longi*.

The district court committed legal error by disqualifying WO'498 as prior art for purposes of obviousness-type double patenting. Had the district court addressed WO'498, it would have considered the application's description of "pharmaceutically acceptable salts" of sitagliptin—in particular, the list of particularly preferred acids. As explained below in Section I.B., reading that list from WO'498 in combination with reference claim 17 from the '871 patent would have rendered the claimed sitagliptin DHP salt obvious.

> **2.    The district court erred by refusing to consider the full description of "pharmaceutically acceptable salts" in the '871 patent.**

Separately, the district court should have considered the list of particularly preferred salts based upon the '871 patent alone. The list is a critical part of the reference's description of "pharmaceutically acceptable salts." But the district court refused to consider it. The district court first held, based upon *extrinsic expert testimony*, that the specification's full description of "pharmaceutically acceptable salts" was irrelevant to claim construction. Appx80. It further stated it could not otherwise consider the list of

particularly preferred acids to determine whether the claimed sitagliptin–phosphate salt was an obvious variant of reference claim 17, because that would be an improper use of the reference patent's specification. Appx81. Both conclusions are legally wrong.

Generally, "it is impermissible to treat a '[reference] patent disclosure as though it were prior art' in a double patenting inquiry." *In re Basell Poliolefine Italia S.P.A.*, 547 F.3d 1371, 1378 (Fed. Cir. 2008) (quoting *In re Vogel*, 422 F.2d 438, 442 (C.C.P.A. 1970)). But there are important exceptions. "Specifically, the specification's disclosure may be used to determine whether a claim 'merely define[s] an obvious variation of what is earlier disclosed and claimed,' 'to learn the meaning of [claim] terms,' and to 'interpret [ ] the coverage of [a] claim.'" *Sun Pharm.*, 611 F.3d at 1387 (quoting *Basell*, 547 F.3d at 1378)).

The claim-construction exception applies here. The district court violated foundational claim-construction law by rejecting the reference patent's explanation of what "pharmaceutically acceptable salts" are, and looking instead to expert testimony of the skilled artisan's "common understanding" of the term. Appx80. When construing a claim, courts look first to the intrinsic record, not expert testimony. If the meaning of a claim

term can be resolved using the patent text and specification, the claim-construction exercise is over: "it is improper to rely on extrinsic evidence." *Vitronics Corp.*, 90 F.3d at 1583. Further, "[e]xtrinsic evidence . . . cannot be used to alter a claim construction dictated by a proper analysis of the intrinsic evidence." *On-Line Tech. v. Bodenseewerk Perkin-Elmer*, 386 F.3d 1133, 1139 (Fed. Cir. 2004).

Pointing again to expert testimony, the district court held that "the reference patent's list of particularly preferred acids is not needed to construe the term 'pharmaceutically acceptable salts.'" Appx80. That too is wrong. Courts can—indeed, *must*—consider preferred embodiments when construing a claim term. *See Adams Respiratory Therapeutics, Inc. v. Perrigo Co.*, 616 F.3d 1283, 1290 (Fed. Cir. 2010) ("A claim construction that excludes the preferred embodiment 'is rarely, if ever, correct.'") (quoting *Vitronics Corp.*, 90 F.3d at 1583-84).

The fact that this case concerns obviousness-type double patenting is of no moment. As just explained, using the specification for claim construction is perfectly fine in a double-patenting analysis. Importantly, this Court has blessed the use of examples from the reference patent's specification in determining the scope and meaning of reference claims in a

double-patenting analysis. *E.g.*, *Abbvie Inc.*, 764 F.3d at 1375 (looking to "[t]he specification's discussion of [ ] three examples" and various embodiments of the invention to construe the reference patent's claim language and scope in an obviousness-type double-patenting analysis); *In re Hitachi Metals, Ltd.*, 603 F. App'x 976, 980 (Fed. Cir. 2015) (affirming rejection of claims under obviousness-type double patenting based upon examples of the earlier invention discussed in the reference patent's specification).

Separate from claim construction, "the specification's disclosure may be used to determine whether a claim 'merely define[s] an obvious variation of what is earlier disclosed and claimed.'" *Sun Pharm.*, 611 F.3d at 1387 (quoting *Basell*, 547 F.3d at 1378). As this Court has repeatedly said, "a court considering a claim to a compound must examine the patent's specification to ascertain the coverage of the claim, because a claim to a compound '[s]tanding alone . . . does not adequately disclose the patentable bounds of the invention.'" *Id.* (quoting *Geneva Pharms., Inc.*, 349 F.3d at 1385).

This Court's predecessor explained the rationale behind this rule: "[I]t is most difficult, if not meaningless, to try to say what is or is not an obvious variation of a claim. A claim is a group of words defining only the boundary of the patent monopoly." *Vogel*, 422 F.2d at 442. "The disclosure, however,

sets forth at least one tangible embodiment within the claim, and it is less difficult and more meaningful to judge whether that thing has been modified in an obvious manner." *Id.* So "use of the disclosure [in this manner] is not in contravention of the cases forbidding its use as prior art, nor is it applying the patent as a reference under 35 U.S.C. § 103, since only the disclosure of the invention claimed in the patent may be examined." *Id.*

So too here. The '871 patent provides not just one example, but a list of *particularly preferred* examples, of acids with which to make "pharmaceutically acceptable salts." This should scream out that any sitagliptin salt made using one of these acids is "an obvious variation of what is earlier disclosed and claimed" in the '871 patent. *See Sun Pharm.*, 611 F.3d at 1387 (quotation marks omitted).

But the district court refused to consider the reference specification in this manner. It believed that *Sun* limited such use of the specification to "the 'situation in which an earlier patent claims a compound, disclosing the utility of that compound in the specification, and a later patent claims a method of using that compound for a particular use described in the specification of the earlier patent.'" Appx81 (quoting *Eli Lilly v. Teva*, 689 F.3d at 1378-79).

37

Respectfully, that's a facile distinction. Yes, *Sun* involved an earlier-filed claim to a compound and a later-filed claim to a method for using that compound. But nothing in the Court's opinion suggests that *Sun's* legal teachings are somehow limited to this circumstance. To the contrary, *Sun* is grounded in a number of cases that do not fit this mold—namely, *Basell* and *Vogel*. 611 F.3d at 1387.

Moreover, *Eli Lilly* does not limit the legal reach of *Sun*, much less *Basell* and *Vogel* (which aren't even cited). Rather, *Eli Lilly* turned upon a factual distinction. In *Sun* and other cases like it, "the claims held to be patentably indistinct had in common the same compound or composition." 689 F.3d at at 1380. But the claims in *Eli Lilly* involved "a *different compound* altogether"; *Sun* and analogous cases "therefore d[id] not govern." *Id.* Here, the '871 patent and the '708 patent "ha[ve] in common the **same** compound or composition"—a pharmaceutically acceptable salt of sitagliptin. *See id.* (emphasis added). That is why it is vital to consider the reference specification's description of "pharmaceutically acceptable salts" in its entirety, just like *Sun*, *Basell*, and *Vogel* instruct courts to do.

In fact, the rationale of *Sun* in the compound-to-method context maps neatly onto the genus-to-species context here. True, "obviousness is not

demonstrated merely by showing that an earlier expiring patent dominates a later expiring patent," *Abbvie Inc.*, 764 F.3d at 1379, just like a compound patent isn't necessarily preclusive of a later method-of-treatment patent. But sometimes it is. *E.g., id.* ("[N]ot every species of a patented genus is separately patentable."). As this Court has explained in the compound-to-method context: It would "shock one's sense of justice" if an inventor could patent a compound, "setting out at length in the specification the useful purposes of such composition," and then extend its monopoly over "any beneficial use of such product by securing [later] patents upon each of the uses to which it may be adapted." *Sun Pharm.*, 611 F.3d at 1387 (quoting *Pfizer v. Teva*, 518 F.3d at 1363 n.8). Here, the ***exact species of salts claimed in the '708 patent is explicitly described, claimed, and labeled "[p]articularly preferred" in the '871 patent***. That should "shock one's sense of justice" just as much as patenting the beneficial use of a composition described and claimed in an earlier compound patent. *See id.*

Nothing about obviousness-type double patenting requires the Court to put on judicial blinders to these hard facts. The district court should have considered the list of particularly preferred acids described and claimed in

the reference patent. Failing to do so was legal error and, as explained below, that error infected the district court's double-patenting analysis.

### B.    Asserted Claims 1 and 2 Are Obvious Variants of Reference Claim 17.

Reference claim 17 of the '871 patent expressly recites pharmaceutically acceptable salts of sitagliptin. That claim indisputably encompasses salts made from phosphoric acid, which are described as particularly preferred in both in the prior art (WO'498) and in the reference patent's description of pharmaceutically acceptable salts. On top of this, both WO'498 and the '871 patent describe the utility of DP-IV inhibitors like sitagliptin in the treatment of type 2 diabetes. Appx13080 (2:33-35); Appx14205 (2:31-34); Appx14209 (9:34-35). And it has long been understood that creating pharmaceutically acceptable salts is beneficial for such usage. Appx12721; Appx3277-3278 (287:8-288:2); *Pfizer v. Apotex*, 480 F.3d at 1353. As Mylan argued, these teachings would have highly motivated a skilled artisan to combine sitagliptin and phosphoric acid to create pharmaceutically acceptable salts.

*Pfizer v. Apotex* is illustrative. There, the Court found sufficient motivation to create a "[t]he besylate salt of amlodipine" based upon a prior-

art patent claiming pharmaceutically acceptable salts of amlodipine and a "list of [53] FDA-approved anions to produce a drug formulation," which included the key anion (benzene sulphonic acid). 480 F.3d at 1353, 1356, 1363-64. Additional prior art winnowed that list to "a few" acids, "including benzene sulphonate." *Id.* at 1363. Armed with this list, the Court not only overturned the trial court's finding of non-obviousness, but ***outright invalidated*** the challenged patents on appeal. *Id.* at 1364, 1372.

This case should be even easier than *Pfizer v. Apotex*. The starting point is not a generally applicable list of 50+ acids that might work with the compound. Whether through the WO'498 or the '871 patent's description of pharmaceutically acceptable salts, the starting point is *eight* acids that are *specifically* identified as *particularly preferred* to be combined with basic DP-IV inhibitors like sitagliptin to create pharmaceutically acceptable salts. If that were not enough, additional pieces of prior art describe phosphoric acid as one of the most popular anions for pharmaceutically acceptable salts. Appx12722 (showing that phosphoric acid was a "common pharmaceutical salt[]."); Appx12752 (showing 2.48 percent of salt forms were phosphate salts, which equates to approximately 35 marketed products and makes it a top-ten salt-forming acid). Short of showing them in combination, it is hard

to imagine what more could be said to motivate a skilled artisan to combine sitagliptin and phosphoric acid.

A skilled artisan would also have had a reasonable expectation of success creating sitagliptin DHP in the claimed 1:1 stoichiometry. The skilled artisan would have started with a simple salt screen—one that an entry-level chemist could (and, here, did) prepare. Appx3635-3637 (727:16-729:2). A skilled artisan would then start the salt selection process with equal amounts of sitagliptin to phosphoric acid. Appx12722; Appx3192 (156:6-10); Appx3195 (159:9-12); Appx3291-3293 (301:23-303:1); Appx3624-3625 (716:25-717:24); *see* Appx2997 (952:12-20). The pKa of sitagliptin is 7.7, Appx12694, and the pKa of the first proton on phosphoric acid is 1.96, Appx12998. Given that the difference is more than three, a skilled artisan would reasonably expect the DHP salt to form. Appx3304-3305 (314:16-315:11) ("The difference is way more than three . . . you're going to predict that's going to form a salt."); *see also* Appx3000 (955:10-18).

All experts agreed that a 1-to-1 DHP salt would be expected to form— that is, where only the first proton is transferred from phosphoric acid. Appx3304-3305 (314:16-315:11); *see* Appx2997-3000 (952:21-953:13, 954:12-955:18). And the 1-to-1 arrangement would be far and away the most likely

42

stoichiometry to form. Nobody even knew that other remote stoichiometries existed until *after* the filing of the '708 patent. Appx94-95. Moreover, Example 7 of WO'498 teaches that when an excess amount of HCl is used in a reaction with sitagliptin freebase, only a 1:1 sitagliptin salt forms. Appx13124; Appx3318 (328:7-22). This matters because HCl is a much stronger acid; if sitagliptin could accept more than one proton under the conditions described in WO'498, a skilled artisan would expect a non 1:1 stoichiometry. This suggests phosphoric acid would also result in the 1:1 DHP salt. Appx13030; Appx3318 (328:7-22).

The district court came to the wrong conclusion on these issues because it started in the wrong place. Every bit of its double-patenting analysis is distorted by its failure to consider the totality of what WO'498 and the '871 patent claimed and described. For example, the district court repeatedly questioned why a skilled artisan would be motivated to move off freebase sitagliptin and make a salt at all. Appx82, Appx84-87. But that's irrelevant. The '871 patent expressly claims pharmaceutically acceptable salts of sitagliptin, and teachings discussed above (which the district court ignored) provide ample motivation. The district court further doubted that, even if a skilled artisan wanted to make a sitagliptin salt, she would choose

phosphoric acid. Appx87-91. Again, that choice is already made (or at least highly motivated) by the critical disclosures in WO'498 and the '871 patent. Lastly, the district court brushed aside strong evidence of a reasonable expectation of success in light of the "unpredictable" nature of salt formation. Appx91, Appx93. Legally, that's a dubious assertion. *Pfizer v. Apotex*, 480 F.3d at 1364 ("[C]ase law is clear that obviousness cannot be avoided simply by a showing of some degree of unpredictability in the art so long as there was a reasonable probability of success."). In all events, this conclusion is tainted by the district court's refusal to consider the particularly preferred list of acids in WO'498 and the '871 patent.

There is no way to salvage the district court's holding on obviousness-type double patenting as to asserted claims 1 and 2 in light of its legal errors discussed in Section I.A. above. Reversal, or at least remand, is required.

C. **Asserted Claims 3 and 19 Do Not Contain Any Other Patentably Distinct Elements.**

1. **The optical isomer of sitagliptin recited in asserted claim 3 is obvious.**

Asserted claim 3 is dependent upon asserted claim 1. The only difference between the two is that asserted claim 3 is the (S)-configuration of the compound, as opposed to the (R)-configuration. Even the district court

recognized this was not enough to garner a patentably distinct claim. Appx97-98. It nonetheless upheld asserted claim 3 because its "obviousness-type double patenting analysis of asserted claims 1 and 2 also applies to asserted claim 3." Appx97. That analysis is wrong, as previously discussed.

> **2.    The method for treating type 2 diabetes recited in asserted claim 19 is obvious.**

Asserted claim 19 is likewise obvious in light of the teachings of the expired patent and the prior art. It covers a "method for the treatment of type 2 diabetes comprising the administering to a patient in need of such treatment a therapeutically effective amount of the salt according to claim 2." Appx137 (17:29-32). Reference claim 20 recites "[a] pharmaceutical composition which comprises an inert carrier and a compound of claim [17]"—*i.e.*, sitagliptin or "a pharmaceutically acceptable salt thereof." WO'498 and the '871 patent describes these compounds as useful "in the treatment of type II diabetes." Appx14209 (9:35).

The district court's analysis of asserted claim 19 was infected by its erroneous view of the underlying composition claims. Appx99-100. For the reasons discussed above, that is wrong. This error alone warrants reversal or vacatur.

Additionally, the district court erred in claiming that a skilled artisan would not have had a motivation or a likelihood of success in using a pharmaceutically acceptable salt of sitagliptin to treat type II diabetes. Appx100-104. In doing so, the district court misread claim 19 as embracing a requirement of "clinical efficacy" and held that a skilled artisan needed to be able to "predict the human body's reaction to the compound." Appx102. Hanging its hat on the asserted patent's use of "administering," the district court reasoned that, "[w]ithout additional information related to the 1-to-1 DHP salt of sitagliptin, a [skilled artisan] could not have known if it was safe, nor would she have been motivated to advance it into clinical development, a prerequisite for administration." Appx102.

But asserted claim 19 merely covers a claimed use of a prior compound that had been described as having the same use. Nor does asserted claim 19 reduce to practice a clinically safe amount for treatment. It merely states a "therapeutically effective amount" without defining what that means. Appx137 (17:29-32). And the '708 patent includes no clinical data whatsoever—just an assertion that it would be effective in the treatment of type II diabetes.

46

On these facts, Merck cannot extend patent life simply by claiming that a compound can be "administer[ed]" in a therapeutically effective amount to treat the same disease disclosed in the reference patent. *Pfizer v. Teva*, 518 F.3d at 1363; *Geneva*, 349 F.3d at 1386. Here, too, the district court's judgment should be reversed or vacated for reconsideration.

### D.    Secondary Considerations Do Not Save the District Court's Judgment.

The district court briefly addressed one secondary consideration: Merck's claim that the 1:1 sitagliptin DHP salt exhibited unexpected and favorable properties. Appx104-107. It did not assign independent weight to this factor, nor did it state this one secondary consideration could support the entirety of its judgment. *See Western Union Co. v. MoneyGram Payment Sys., Inc.*, 626 F.3d 1361, 1373 (Fed. Cir. 2010) ("[W]eak secondary considerations generally do not overcome a strong prima facie case of obviousness."). To the contrary, it was simply another datapoint that the district court "consider[ed]" in "determining whether Mylan has met its burden of proof" on double-patenting. Appx104; *see* Appx107 (noting that Merck's secondary-consideration evidence "support[s] the conclusion that the asserted claims are non-obvious").

47

Because the district court's secondary-considerations analysis cannot be disentangled from the rest of its double-patenting decision, it is not an impediment to reversal or remand. Secondary considerations "without invention will not make patentability." *Sakraida v. Ag Pro, Inc.*, 425 U.S. 273, 283 (1976) (quoting *Great Atl. & Pac. Tea Co. v. Supermarket Equip. Corp.*, 340 U.S. 147, 153 (1950)). This Court has reversed flawed obviousness rulings, notwithstanding findings on secondary considerations. *E.g.*, *Wyers v. Master Lock Co.*, 616 F.3d 1231, 1244-46 (Fed. Cir. 2010) (collecting cases). It should reverse or vacate the judgment here as well.

## II. MERCK DESCRIBED AND ENABLED ONE MONOHYDRATE OF (R)-SITAGLIPTIN DHP, NOT AN ENTIRE GENUS OF SITAGLIPTIN DHP HYDRATES.

*Standard of review:* The asserted claims of the '708 patent are separately invalid under 35 U.S.C. § 112. To satisfy § 112, a patent's specification must "contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art . . . to make and use the same." 35 U.S.C. § 112. This imposes two distinct requirements: written description and enablement. *Ariad Pharms.*, 598 F.3d at 1344. Whether a patent contains an adequate written description is a question of fact subject

48

to clear-error review. *Nuvo Pharms. (Ir.) Designated Activity Co. v. Dr. Reddy's Lab'ys Inc.*, 923 F.3d 1368, 1376 (Fed. Cir. 2019). Conversely, enablement is a question of law subject to *de novo* review. *Trustees of Bos. Univ.*, 896 F.3d at 1361.

The asserted claims flunk both requirements of § 112 and both for the same root problem. The '708 patent claims *all* hydrates of sitagliptin DHP made from using *all* formulas recited in the patent. But it only describes and teaches how to make a *single* crystalline monohydrate made from the (R)-sitagliptin DHP formula.

### A.    The Asserted Claims Lack an Adequate Written Description.

#### 1.    Merck cannot possibly describe hydrates that it cannot make.

The written description "requirement is satisfied only if the inventor conveys with reasonable clarity to those skilled in the art that, as of the filing date sought, he or she was in possession of the invention, and demonstrates that by disclosure in the specification of the patent." *Nuvo Pharms.* 923 F.3d at 1376 (alterations and quotation marks omitted).

"The essence of the written description requirement is that a patent applicant, as part of the bargain with the public, must describe his or her

invention so that the public will know what it is and that he or she has truly made the claimed invention." *AbbVie Deutschland GmbH & Co., KG v. Janssen Biotech, Inc.*, 759 F.3d 1285, 1298 (Fed. Cir. 2014). The "written-description requirement limits patent protection only to individuals who perform the difficult work of producing a complete and final invention featuring all its claimed limitations and publicly disclose the fruits of that effort." *Biogen Int'l GMBH v. Mylan Pharms. Inc.*, 18 F.4th 1333, 1344 (Fed. Cir. 2021).

The asserted claims of the '708 patent run afoul of these principles, and the district court's factual findings show why. Merck claims (and the district court agreed) that the '708 patent claims *all* hydrates of sitagliptin DHP—known and unknown—made using *all* three formulas of sitagliptin DHP described in the patent. Appx109-110. All of the asserted claims recite or are dependent upon claims that recite sitagliptin DHP "or a hydrate thereof"—a broad and unqualified claim. Appx136-137 (15:63-18:36). The specification, however, describes only *one* particular hydrate—the crystalline monohydrate of (R)-sitagliptin recited in claim 4. Merck openly admitted (and the district court again agreed) that it did not possess any other hydrate at the time it filed for the '708 patent. Appx108. In fact, to this day, Merck doesn't know whether other hydrates even existed. Appx108.

50

So Merck concedes that the '708 patent lacks precisely what § 112 requires: a specification that "describe[s] the invention sufficiently to convey to a person of skill in the art that the patentee had possession of the claimed invention at the time of application, *i.e.*, that the patentee invented what is claimed." *LizardTech, Inc. v. Earth Res. Mapping*, 424 F.3d 1336, 1345 (Fed. Cir. 2005). Merck did not and could not show that it possessed any hydrate other than the single crystalline monohydrate species claimed in the narrower, unasserted claims 4-16.

## 2. The specification does not adequately describe a genus of hydrates.

In holding to the contrary, the district court characterized the asserted claims as claiming a genus of hydrates. Appx107-108.. Pointing to trial testimony from both experts, the district court observed that "every form of the DHP salt of sitagliptin, whether hydrous or anhydrous, shares the common chemical formula disclosed in the '708 patent." Appx109-110. From there, the district court concluded: "Based on this chemical structure, a POSA using routine techniques would be able to recognize any form of the 1-to-1 DHP salt of sitagliptin and distinguish it from other

compounds. . . . And this would be true even if the form is a hydrate." Appx110.

But even accepting all of that, the legal conclusion that the district court drew from these facts is wrong. For genus claims based upon a chemical structure, "merely drawing a fence around the outer limits of a purported genus is not an adequate substitute for describing a variety of materials constituting the genus and ***showing that one has invented a genus and not just a species***." *Ariad Pharms.*, 598 F.3d at 1350 (emphasis added). Thus, "an adequate written description requires a precise definition, such as by structure, formula, chemical name, physical properties, or other properties, of species falling within the genus ***sufficient to distinguish the genus from other materials***." *Id.* (emphasis added).

Here, the district court relied upon "common chemical formula" to describe a genus of sitagliptin DHP hydrates, but that formula was ***not*** "sufficient to distinguish the genus from other materials." *Ariad Pharms.*, 598 F.3d at 1350. As the district court itself acknowledged, it is the exact same chemical structure shared by anhydrous sitagliptin DHP. Appx110. It therefore does nothing to show that Merck "has invented a genus and not just a species." *Ariad Pharms.*, 598 F.3d at 1350.

52

Scrutiny of the specification confirms that Merck possessed and described only a single species of sitagliptin DHP hydrates. There's plenty of detail about how to make the crystalline monohydrate described in claim 4. Appx131-136 (6:35-15:9). Merck will keep that claim after this case is over. Conversely, there is *nothing* in the specification about any other hydrate—no description of the structure of any other hydrate, no instructions on how to make any other hydrate, no description of the properties of any other hydrate. Nothing at all. As previously noted, Merck cannot even confirm whether other hydrates existed. Without such information, "[o]ne skilled in the art therefore cannot . . . visualize or recognize the identity of the members of the genus," in the same way she could "with a fully described genus." *Regents of the Univ. of California v. Eli Lilly & Co.*, 119 F.3d 1559, 1568 (Fed. Cir. 1997).

Put simply, there is no way to tell whether Merck possessed an entire genus or just a single hydrate of (R)-sitagliptin DHP. In similar cases, in which the patent describes only one purported species and provides no further detail about the alleged genus, this Court has not hesitated to invalidate patents under § 112. *E.g.*, *Juno Therapeutics, Inc. v. Kite Pharma, Inc.*, 10 F.4th 1330, 1340 (Fed. Cir. 2021); *Bos. Sci. Corp. v. Johnson & Johnson*, 647

F.3d 1353, 1363 (Fed. Cir. 2011); *LizardTech*, 424 F.3d at 1345. The asserted

claims of the '708 patent should meet the same fate.

## B.    The Asserted Claims Are Not Enabled.

### 1.    Merck claims sitagliptin hydrates that it admittedly did not possess.

For similar reasons, the asserted claims are not enabled. The

specification "must teach those skilled in the art how to make and use the

full scope of the claimed invention without undue experimentation."

*Trustees of Bos. Univ.*, 896 F.3d at 1364 (quotation marks omitted). That means

if a patent claims six permutations, then the specification must enable all six;

anything less is unacceptable. *Id.* Here, the '708 patent claims a vast and

unknown range of hydrates, yet it only teaches the public how to make and

use one.

The enablement inquiry starts by assessing the breadth of the claim

language. *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 959 F.3d 1091, 1100

(Fed. Cir. 2020). As noted above, Merck isn't shy about the breadth of its

claim language—*all* hydrates of sitagliptin DHP, known and unknown.

"Once the precise scope of the claimed invention is defined, the question is

whether undue experimentation is required to make and use the full scope

of embodiments of the invention claimed." *McRO, Inc.*, 959 F.3d at 1100. This requires analysis of the specification. Here, it is undisputed that the specification only instructs the public how to make *one* particular hydrate — the crystalline monohydrate of (R)-sitagliptin DHP recited in claim 4.

Importantly, Merck has long asserted that hydrate formation is "unpredictable" — a claim that the district court credited as part of its § 112 analysis. Appx119. So while true that the specification need not describe "how to make and use every possible variant of the claimed invention," *McRO, Inc.*, 959 F.3d at 1100 (quotation marks omitted), this is not a case where the specification merely omits information about obvious and easy-to-make variants of what is actually taught. That being so, there is a gulf between what the '708 patent monopolizes through its claim language and what it teaches through its specification. To be blunt, "[Merck] created its own enablement problem." *Trustees of Bos. Univ.*, 896 F.3d at 1365.

Viewed correctly, this should have been an easy call of non-enablement under the eight-factor *Wands* analysis. *In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988). The claim language is remarkably broad, *id.*, there is no guidance or working examples of sitagliptin DHP hydrates outside of the crystalline monohydrate, *id.* at 740, and Merck has repeatedly argued that

hydrate formation is "unpredictable." *Id*. at 739. It's hard to imagine how the amount of experimentation required to overcome these obstacles would be anything but "undue." *Id*. at 737.

Merck was free to draw these patent claims as narrowly or as broadly as it pleased. It could have easily stuck to what it actually possessed, which is the crystalline monohydrate in claim 4. But it instead elected to use expansive language. That's fine, but Merck needed to back that broad language up with a detailed-enough specification that teaches skilled artisan how to make and use the full scope of that broad claim language. It did not.

### 2.     The district court misapplied the law of enablement.

The district court came to the wrong conclusion because it applied the wrong law. Instead of determining whether the '708 patent enabled "the full scope of the claimed invention," *Trustees of Bos. Univ.*, 896 F.3d at 1364, the district court asked only whether "the '708 patent specification enables the full scope of the asserted claims *by enabling every **known** form of the 1-to-1 DHP salt of sitagliptin*." Appx114 (emphasis added). That's a small but critically important caveat. It adds a limitation on the test for enablement that appears *nowhere* in this Court's canon on § 112.

Tellingly, the district court's explanation of the law is devoid of any citation. *See* Appx114. That's because the law is squarely at-odds with district court's view of the law. The fact that the inventor may have a "relatively incomplete understanding" of the patented subject matter does not excuse the inventor from enabling the full scope of what she claims. *In re Vaeck*, 947 F.2d 488, 495 (Fed. Cir. 1991). If an inventor can provide only a "narrow disclosure" for the invention, then she must draw her claims to have a "reasonable correlation" with that narrow disclosure. *Id.* "Patent protection is granted in return for an enabling disclosure of an invention, not for vague intimations of general ideas that may or may not be workable." *Genentech, Inc. v. Novo Nordisk A/S*, 108 F.3d 1361, 1366 (Fed. Cir. 1997). "Tossing out the mere germ of an idea does not constitute enabling disclosure." *Id.* Yet, under the district court's standard, a "mere germ of an idea" (and frankly less than that) would be enough to enable broad claim language—and all because there is nothing more "known" to commit to paper at the time of the patent. Appx114. Respectfully, that's wrong.

On a more practical level, this Court rarely finds that a single embodiment of an invention can, standing alone, enable a broad genus. *E.g.*, *In re Goodman*, 11 F.3d 1046, 1050 (Fed. Cir. 1993). To paraphrase the Court's

apt analogy in *LizardTech*, the fact that an inventor enables one "fuel-efficient automobile engine" does not give her license to "broad[ly] claim [ ] every possible type of fuel-efficient engine." 424 F.3d at 1346. A "single embodiment would support such a generic claim only if the specification would reasonably convey to a person skilled in the art that [the inventor] had possession of the claimed subject matter at the time of filing" and "would enable one of ordinary skill to practice the full scope of the claimed invention." *Id.* (quotation marks omitted).

The district court's new enablement standard also undermines the fundamental purpose of enablement. As noted above, a patentee can exclude the public from practicing a claimed invention only if it tells the public how to make and use that invention. In this Court's words, it's "part of the *quid pro quo* of the patent bargain." *Trustees of Bos. Univ.*, 896 F.3d at 1365 (quotation marks omitted). The district court's new standard fundamentally alters that bargain in Merck's favor by letting it claim hydrates that it admittedly did not possess and could not make. *See Brenner v. Manson*, 383

58

U.S. 519, 536 (1966) (stating that "a patent is not a hunting license. It is not a reward for the search, but compensation for its successful conclusion").[6]

### 3. The district court's misapplication of the law infects its *Wands* analysis.

The district court's error of law is not harmless. Its entire *Wands* analysis is irredeemably tainted by its failure to apply the correct legal standard. Throughout its analysis, the district court came back to the flawed legal proposition that Merck only needed to enable what was "known," as opposed to what it actually claimed. Appx116 ("But adopting Mylan's position would require Merck to enable technology that was not available as of the date of filing, or even today."); Appx118 ("Merck had reduced to practice and enabled every known species of the 1-to-1 DHP salt of sitagliptin."); Appx119 ("No other hydrates are known, and Merck is not required to enable hydrates that might be discovered in the future."); Appx120 ("[T]he *Wands* factors support a finding of enablement. The

---

[6] The Supreme Court has granted a writ of certiorari in a case challenging the prevailing standard for enablement. *Amgen Inc. v. Sanofi*, 143 S. Ct. 399 (2022). Even if the Supreme Court fashions a new enablement standard, that would not automatically redeem the district court's analysis. Neither party in *Amgen* advocates for the standard applied by the district court here.

asserted claims cover all physical forms of the 1-to-1 DHP salt of sitagliptin, and the '708 patent enables every known form of this compound.").

There is no way to disentangle the district court's factual analysis from its legal errors. And, as explained above, this issue should have come out the other way under the appropriate view of the law. Reversal or remand is required.

## III.   MYLAN'S SITAGLIPTIN/METFORMIN PRODUCT DOES NOT INFRINGE THE SURFACTANT LIMITATION OF CLAIM 1 OF THE '921 PATENT.

*Standard of review*: Mylan's sitagliptin/metformin product does not infringe the '921 patent. A determination of patent infringement requires a two-step analysis. The Court first interprets the claims to determine their scope and meaning. *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1454 (Fed. Cir. 1998) (en banc). It then compares the properly construed claims to the allegedly infringing device. *Id.* The first step, claim construction, is a matter of law the Court reviews *de novo. Id.* at 1451. The second step is a factual question the Court reviews for clear error. *Bai v. L & L Wings, Inc.*, 160 F.3d 1350, 1353 (Fed. Cir. 1998).

To prove infringement, the patentee must show that the accused device meets each claim limitation, either literally or under the doctrine of

equivalents. *Deering Precision Instruments, L.L.C. v. Vector Distribution Sys., Inc.*, 347 F.3d 1314, 1324 (Fed. Cir. 2003). Here, Merck has waived any argument under the doctrine of equivalents, Appx2579, so its burden is to show that the accused product "contain[s] *each limitation of the claim exactly*; any deviation from the claim precludes a finding of literal infringement." *Litton Sys., Inc. v. Honeywell, Inc.*, 140 F.3d 1449, 1454 (Fed. Cir. 1998) (emphasis added).

Only claim 1 of the '921 patent is at issue here, which is limited to "about 0.5 to 1% by weight of a surfactant." Mylan's accused product contains ██Mylan ANDA██ by weight of a surfactant. The district court nonetheless found that Mylan's product literally infringed this limitation by stretching the stated range more than *20%*, pointing to the word "about" prefacing the limitation. The district court's massive divergence from the stated range is unsupported by the text of the patent, contrary to Federal Circuit law, and reversible legal error.

## A.    The Word "About" Allows for No More Than a 5% Variance on the Stated Range in the Surfactant Limitation.

Mylan's challenge to the district court's infringement analysis is a pure issue of law. It goes to the scope of the asserted claim (step one of the

CONFIDENTIAL MATERIAL REDACTED

Case: 23-1013    Document: 13    Page: 77    Filed: 01/19/2023

analysis, reviewed *de novo*), which necessarily presents a question of claim construction (also reviewed *de novo*). That is true notwithstanding the fact that the district court said it did not engage in claim construction. Appx52. Claim construction is exactly what it did. The question it purported to answer is: "how far does the term 'about' extend the lower end of the 'about 0.5 to 1% by weight of a surfactant' range?" Appx52. Answering that question required the district court to "defin[e] the outer reaches of 'about' in a claimed range," which "can be"—and, here, is—"a matter of claim construction." *Par Pharm., Inc. v. Hospira, Inc.*, 835 F. App'x 578, 584 (Fed. Cir. 2020). Even though the district court did not construe "about" as part of a formal claim construction, its infringement analysis "effectively construed the limitation." *Linear Tech. Corp. v. ITC*, 566 F.3d 1049, 1059 (Fed. Cir. 2009). So this Court should "address the parties' dispute regarding this limitation as a claim construction issue." *Id.*

The analysis here follows the same claim-construction principles outlined above. *See supra* p. 27. The word "about" denotes approximation. *Ecolab, Inc. v. Envirochem, Inc.*, 264 F.3d 1358, 1367 (Fed. Cir. 2001) (quotation marks omitted). It "does not have a universal meaning in patent claims, and [its] meaning depends on the technological facts of the particular case." *Pall*

*Corp. v. Micron Separations, Inc.*, 66 F.3d 1211, 1217 (Fed. Cir. 1995). "About" must be "interpreted in its technologic and stylistic context." *Cohesive Techs., Inc. v. Waters Corp.*, 543 F.3d 1351, 1368 (Fed. Cir. 2008). "In determining how far beyond the claimed range the term 'about' extends the claim, '[the Court] must focus . . . on the criticality of the [numerical limitation] to the invention.'" *Id.* (quoting *Ortho-McNeil Pharm., Inc. v. Caraco Pharm. Labs., Ltd.*, 476 F.3d 1321, 1327 (Fed. Cir. 2007). Any deviation should be "modest" relative to the criticality of the limitation. *Par Pharm.*, 835 F. App'x at 584. All that being true, courts construe the word "about" just like any other claim term. There's no special test. *Cohesive Techs.*, 543 F.3d at 1368 (observing that courts must "follow[] guidance of *Phillips* [*v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc)]" to construe "about").

Importantly here, the surfactant limitation is critical to the claimed invention. Though labeled an "optional" ingredient, Appx143 (5:37-39), the prosecution history shows the surfactant was the make-or-break element that helped Merck overcome multiple obviousness rejections during patent prosecution. As discussed above, *supra* p. 12-14, Merck swore to the patent office that the "addition of a surfactant (0.5% of sodium lauryl sulfate) . . . significantly enhanced the dissolution rate" of sitagliptin,

63

"provided more consistent dissolution profiles, and enhanced formulation robustness and stability." Appx11670. Merck's declarant labeled this result "surprising and unexpected." Appx11671. The patent examiner expressly relied upon the declaration in allowing claim 1. Appx11682.

Given the criticality shown at 0.5% of surfactant, any wiggle room afforded by the word "about" must be slight. To hold otherwise would allow Merck to renege on the arguments it made to the patent office in order to get through prosecution, which this Court has already said patentees may not do. *Jeneric/Pentron Inc. v. Dillon Co. Inc.*, 205 F.3d 1377, 1382 (Fed. Cir. 2000) (holding a patent owner "may not rely on [a narrowing construction] to distinguish itself from prior art during prosecution and then later construe the ranges more broadly during an infringement action").

The most sensible way to read "about" is to allow for a margin of error from the end points to reflect the degree of accuracy with which surfactant can be measured. Generally speaking, errors in measurement should be no more than 5% under prevailing standards for pharmaceutical manufacturing. Appx16396 ("Remington"); *see* Appx3584 (583:3-20). Reading "about" this way lines up with the example compositions contained in the '921 patent's specification. Mylan's expert (Dr. Crowley) explained

how. First, Dr. Crowley took the measured weight of each component, and increased and decreased the last significant figure by one unit. Appx3586 (585:2-13). He then calculated a percentage variance associated with the range. To illustrate, the 3.45 mg of surfactant from Example 1 yields a range of 3.44-3.46 mg, which is a 0.29% variance. Appx3587-3588 (586:21-587:17). Dr. Crowley repeated that same calculation for every compound in all seven examples. Appx3588-3591 (587:18- 590:20). This resulted in a variance of no higher than 3.85%. Appx3591 (590:21-24), Appx3585-3586 (584:19-585:3). Dr. Crowley's framework is consistent with the analysis performed by Merck's expert (Dr. Little), who—as noted above, *supra* p. 17—likewise concluded that deviating the last significant digit by one unit is the most conservative approach for assessing the allowable variance.

Even if the Court were to spot Merck a full 5% margin of error, that would take the bottom of the range to 0.475%—or 0.48%, if you round to two significant digits. That does not help. Nor does reading "about" to sweep up any figure that rounds to 0.5%.[7] That would only broaden the end point to

---

[7] The whole point of significant figures is to reflect the "maximum degree of accuracy" with which a value can be measured. Appx16399. If rounding principles were to apply to a value, it makes sense to apply them to the actual *measured* weights of surfactant and other components stated in the examples

0.45%. At ▉▉▉▉▉ by weight, Mylan's ANDA product is far outside the limitation. Because Mylan's ANDA product does not meet this limitation, it does not infringe claim 1 of the '921 patent.

### B. The District Court Misconstrued the Word "About" to Allow for a 20% Variance on the Stated Range.

The district court rejected all of this and accepted Merck's invitation to deviate the end points of the range by over 20%. It is hard to fathom how such a drastic deviation is "modest" relative to the criticality of the stated endpoints of the range. More important, the justification for this expansion of the claimed range is legally flawed.

The district court relied upon the testimony of Dr. Little to construe "about." The cornerstone of Dr. Little's analysis is an off-the-bat presumption that the inventors of the '921 patent intended all values in the patent claims to round to the nearest significant digit. Appx3925-3926 (215:24-216:2). From there, Dr. Little does the following: he deviated the stated end points by applying rounding principles (so 0.5% becomes 0.45 to 0.54%); he then deviated these values further in order to give meaning to the

---

in the specification. A percentage-by-weight range is a function of the components' measured values. This is why Dr. Crowley rooted his reading of "about" in the examples from the specification.

CONFIDENTIAL MATERIAL REDACTED

word "about" (so 0.5% now becomes 0.4 to 0.6%); and he then applied rounding principles yet again to sweep up any value that would round to the twice-deviated endpoints (0.5% becomes 0.35% to 0.64%). Appx3926-3927 (216:11-217:6).

There is not one word in the patent that supports Dr. Little's double-rounding interpretation of the surfactant limitation. Significantly, Dr. Little admitted that he did not consult the specification to come up with his "round, deviate, and round again" understanding of the limitation. He pulled it all out of the abstract. Appx3489 (488:15-25) This Court has repeatedly rejected constructions that are divorced from the intrinsic record. *E.g. UltimatePointer, L.L.C. v. Nintendo Co.*, 816 F.3d 816, 823-24 (Fed. Cir. 2016); *Nystrom v. TREX Co.*, 424 F.3d 1136, 1144-45 (Fed. Cir. 2005).

Importantly, Dr. Little's approach also makes a hash of the surfactant limitation as a whole. "About" applies to *both* the bottom *and* the top end of the claimed range. The problem is, Dr. Little's reading of "about" makes no sense at the top end of the range, which is not drawn to the same degree of precision as the bottom end. It says 1%, not 1.0%. So reading "about" to deviate the top of the range by one significant digit—in the same way he applies the term to the bottom of the range—would result in "1%"

67

encompassing values between 0% and 2%. Appx3599 (598:15-2); Appx3479 (478:14-16). That would make the claimed range meaningless, in violation of settled circuit law. *Ortho-McNeil Pharm.*, 476 F.3d at 1327 (explaining that "about" cannot be interpreted "to encompass a range of ratios that could potentially render meaningless another claim's limitation.").

Put directly, Dr. Little's understanding of "about" was legally erroneous. It was therefore legal error for the district court to credit it. And to make matters worse, the district court's justification for discrediting Mylan's expert (Dr. Crowley) is rife with errors of law. Four points are notable:

*First*, the district court discredited Dr. Crowley's understanding of "about"—which limited the word to errors in measurement—because it believed the claim language "indicates flexibility in the amount of surfactant the inventors believed to be necessary in the claimed invention." Appx55. True, the inventors wanted flexibility. But they achieved the desired level of flexibility by stating the limitation as a range. Reading a sub-range into one of the end points of an existing range is legally unsound. *See Quantum Corp. v. Rodime, PLC*, 65 F.3d 1577, 1581 (Fed. Cir. 1995) ("[I]t is unnecessary to read in an implicit range when interpreting 'at least 600 tpi' because this

limitation as a whole already expressly represents an open-ended range, i.e. 600 tpi and up."). Nothing in the intrinsic record suggests that an expansive reading of "about" is necessary to achieve flexibility.

*Second*, the district court accused Mylan of trying to limit the invention to its embodiments. Far from it. Mylan's construction reads the patent *consistent* with its embodiments, just like this Court's well-settled law requires. *See Kaneka Corp. v. Xiamen Kingdomway Grp. Co.*, 790 F.3d 1298, 1304 (Fed. Cir. 2015) (a construction "that excludes all disclosed embodiments . . . is especially disfavored").

*Third*, the district court further accused Mylan of reading "about" out of the patent, because the proposed variance would be captured by "ordinary rules of rounding." Appx57. But this merely echoes Dr. Little's errors discussed above.

*Fourth*, the district court supported its flawed reasoning with a document internal to *Mylan* that showed **Mylan ANDA** ███████ it conducted *after* the '921 patent issued. A document confidential to Mylan (*i.e.*, not public) that post-dates the asserted claims has no bearing whatsoever on claim construction. *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004).

CONFIDENTIAL MATERIAL REDACTED

The intrinsic record does not support reading "about" to allow for an over 20% divergence from the endpoints of the surfactant limitation. The district court's decision—and the testimony upon which it is built—is divorced from the intrinsic evidence. That was legal error. Properly understood, Mylan's product does not infringe the'921 patent.

## CONCLUSION

The district court's judgment should be vacated and remanded, if not reversed.

Date: January 19, 2023                    Respectfully submitted,

                                          /s/ Deepro R. Mukerjee

Jitendra Malik                            Deepro R. Mukerjee
KATTEN MUCHIN ROSENMAN LLP                Lance A. Soderstrom
550 S. Tryon Street – Suite 2900          KATTEN MUCHIN ROSENMAN LLP
Charlotte, NC 28202                       50 Rockefeller Plaza
(704)-444-2000                            New York, NY 10020
                                          (212) 940-6330
                                          deepro.mukerjee@katten.com

                                          Robert T. Smith
                                          Eric T. Werlinger
                                          KATTEN MUCHIN ROSENMAN LLP
                                          2900 K Street, NW – Suite 200
                                          Washington, DC 20007
                                          (202) 625-3500

*Counsel for Mylan Pharmaceuticals Inc.*

# ADDENDUM

# TABLE OF CONTENTS

**Description**                                                                 **Page**

Final Judgment ...................................................................... Appx1

Amended Final Judgment .................................................... Appx2

Post-Trial Opinion ............................................................... Appx3

U.S. Patent No. 7,326,708 ........................................................ Appx123

U.S. Patent No. 8,414,921 ....................................................... Appx140

## CONFIDNETIAL INFORMATION STATEMENT

Details regarding the composition of Appellant Mylan Pharmaceuticals Inc.'s ANDA products were placed under seal by order of the district court. On the following pages of the district court's post-trial (Appx3-122) opinion, such information has been highlighted in Mylan's Confidential Opening Brief and redacted in Mylan's Non-Confidential Opening Brief: **Appx22-23, Appx40-41, Appx 50-52, Appx54, and Appx 59-72.**

# UNITED STATES DISTRICT COURT
for the
Northern District of West Virginia

| Merck Sharpe & Dohme LLC | |
|---|---|
| *Plaintiff(s)* | |
| v. | Civil Action No.  1:19-cv-101 |
| Mylan Pharmaceuticals, Inc. | |
| *Defendant(s)* | |

## JUDGMENT IN A CIVIL ACTION

The court has ordered that:

☐ Judgment award    ☐ Judgment costs    ☒ Other

other:

This action was:

☐ tried by jury    ☐ tried by judge    ☒ decided by judge

decided by Judge    Irene M. Keeley

The Court FINDS that Merck has demonstrated by a preponderance of the evidence that Mylan's ANDA products will infringe claim 3 of the '708 patent and claim 1 of the '921 patent, and that Mylan has not demonstrated by clear and convincing evidence that the asserted claims of the '708 patent are invalid under the obviousness-type double patenting doctrine or pursuant to 35 U.S.C. § 112 for lack of written description or lack of enablement.

Date:    September 21, 2022

*CLERK OF COURT*
Cheryl Dean Riley
/s/ D. Kinsey
*Signature of Clerk or Deputy Clerk*

Appx1

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
AT CLARKSBURG**

MERCK SHARP & DOHME CORP.,

               *Plaintiff*,

      v.

MYLAN PHARMACEUTICALS INC.,

              *Defendant*.

C.A. No. 1:19-cv-00101 (IMK)

**<u>AMENDED FINAL JUDGMENT</u>**

For the reasons set forth in the Court's Memorandum Opinion and Order Following

Bench Trial, Dkt. 193, IT IS HEREBY ORDERED THAT:

1.      Pursuant to 35 U.S.C. § 271(e)(4)(A), the effective date of any final approval of

ANDA No. 202473 shall be a date that is not earlier than the latest date of expiration of U.S.

Patent No. 7,326,708, including any extensions or additional periods of exclusivity.

2.      Pursuant to 35 U.S.C. § 271(e)(4)(A), the effective date of any final approval of

ANDA No. 202478 shall be a date that is not earlier than the latest date of expiration of U.S.

Patent Nos. 7,326,708 and 8,414,921, including any extensions or additional periods of

exclusivity.

3.      Judgment is entered in favor of Plaintiff and against Defendant.

Date:  September 29, 2022

                                    HON. IRENE M. KEELEY
                                    UNITED STATES DISTRICT JUDGE

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

**MERCK SHARP & DOHME LLC,**

            **Plaintiff,**

**v.**                                          **CIVIL ACTION NO. 1:19CV101**
                                                     **(Judge Keeley)**

**MYLAN PHARMACEUTICALS INC.,**

            **Defendant.**

**\*\*SEALED\*\***

**MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL**

## I.   INTRODUCTION

In this patent infringement action, the plaintiff, Merck Sharp & Dohme LLC ("Merck"), and the defendant, Mylan Pharmaceuticals Inc. ("Mylan"),[1] dispute whether Mylan has infringed claim 3 of Merck's U.S. Patent No. 7,326,708 ("the '708 patent") and claim 1 of Merck's U.S. Patent No. 8,414,921 ("the '921 patent"). They also dispute whether claims 1, 2, 3, and 19 of '708 patent are valid and enforceable.

The '708 patent and the '921 patent ("the patents-in-suit") are associated with Januvia® and Janumet®, Merck's New Drug Application ("NDA") products approved by the Food and Drug Administration ("FDA") and directed to the dihydrogenphosphate

---

[1] Although Merck originally included Mylan Inc. as a defendant in this action, the parties previously stipulated to its dismissal from this civil action (Dkt. No. 43).

MERCK SHARPE & DOHME LLC V. MYLAN PHARM. INC          1:19CV101

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

salt of the compound known as sitagliptin for the treatment of type 2 diabetes. Mylan seeks to market two Abbreviated New Drug Applications products ("the ANDA products") that are the bioequivalent to Januvia® and Janumet® prior to the expiration of the patents-in-suit.

The Drug Price Competition and Patent Term Restoration Act of 1984, Pub. L. No. 98-417, 98 Stat. 1585 (otherwise known as the "Hatch-Waxman Act"), seeks to encourage "pioneering research and development of new drugs," as well as the "production of low-cost, generic copies of those drugs." Eli Lilly & Co. v. Teva Pharm. USA, Inc., 557 F.3d 1346, 1348 (Fed. Cir. 2009). To that end, a manufacturer may obtain FDA approval to market a generic drug by making a certification regarding patents listed in the FDA's Approved Drug Products with Therapeutic Equivalence Evaluations ("the Orange Book") as covering the NDA drug, and certifying that those patents are "invalid or will not be infringed by the manufacture, use, or sale of the new generic drug for which the ANDA is submitted" ("paragraph IV certification"). Id. (citing 21 U.S.C. § 355(j)(2)(A)(vii)(IV)). Following an applicant's paragraph IV certification, a patentee may sue the applicant for patent infringement within 45 days, thus delaying FDA approval of the ANDA. Id. (citing 21 U.S.C. § 355(j)(5)(B)(iii)).

MERCK SHARPE & DOHME LLC V. MYLAN PHARM. INC                    1:19CV101

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

In this case, where Merck has sued Mylan under the Hatch-Waxman Act for infringement of the patents-in-suit, the Court is tasked with deciding the following: (1) do Mylan's ANDA products infringe claim 3 of the '708 patent or claim 1 of the '921 patent; (2) are claims 1, 2, 3, and 19 of the '708 patent invalid under the judicially created obviousness-type double patenting doctrine; and (3) are claims 1, 2, 3, and 19 of the '708 patent invalid under 35 U.S.C. § 112 for lack of written description or enablement. Following a five-day bench trial, the parties submitted their memoranda of law, and the case is ripe for the Court's decision.

## II.  BACKGROUND

### A.  The Parties, Jurisdiction, and Venue

Merck Sharp & Dohme Corporation, a corporation organized under the laws of the State of New Jersey, with its principal place of business at One Merck Drive, Whitehouse Station, New Jersey 08889, commenced this action on May 2, 2019 (Dkt. No. 123 at 1). Due to a later transfer of ownership, however, the Court granted Merck's unopposed motion to substitute Merck Sharp & Dohme, LLC as the plaintiff in this civil action (Dkt. No. 190).[2] Merck Sharp & Dohme LLC is organized under the laws of the State of New Jersey,

---

[2] Effective May 1, 2022, Merck Sharp & Dohme Corporation merged into Merck Sharp & Dohme, LLC, with the latter emerging as the surviving entity (Dkt. No. 189).

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

with its principal place of business at 126 East Lincoln Avenue, P.O. Box 20000, Rahway, New Jersey 07065. Id. at 6. Mylan is a company organized under the laws of the State of West Virginia with its principal place of business at 781 Chestnut Ridge Road, Morgantown, West Virginia 26505. Id. The Court has subject matter and personal jurisdiction, and venue in this District is proper.

## B.  Factual and Procedural Background

The Court begins its analysis with a review of the chemical compound known as sitagliptin, how and why pharmaceutical salts are formed, Merck's synthesis and development of the dihydrogenphosphate salt of sitagliptin, the asserted claims of the patents-in-suit, other relevant patents and patent applications, and the parties' prior art references.

### 1.  Sitagliptin

The patents-in-suit relate to the basic compound known as "sitagliptin," 4-oxo-4-[3-trifluorom-ethyl)-5,6-dihyrdo[1,2,4]triazolo[4,3-a]pyrazin-7(8H)-yl]-1-(2,4,5-trifluorophenyl)butan-2-amine, belonging to a class of compounds that act as dipeptidyl peptidase-IV ("DPP-IV") inhibitors (Dkt. No. 123 at 2; JTX 001.0001; JTX 002.0002; Trial Trans. 55:5-11, 309:7-9 (Buckton)). DPP-IV is an enzyme produced by the human body to raise glucose, or blood sugar (Trial Trans. 55:5-11). Sitagliptin inhibits production of the DPP-IV enzyme to improve glycemic control in

MERCK SHARPE & DOHME LLC V. MYLAN PHARM. INC              1:19CV101

**SEALED**

<u>MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL</u>

adults with type 2 diabetes (Dkt. No. 123 at 2; Trial Trans. 268:9-13). Sitagliptin has one chiral center, or one carbon atom around which the molecule can orient itself (Trial Trans. 281:7-16 (Buckton); 535:21-23 (Shupe); 689:2-5 (Cockcroft)). Because it has one chiral center, sitagliptin has two isomers, or configurations, the (R)-configuration and the (S)-configuration. <u>Id.</u>

### 2.   Salt Formation

The patents-in-suit relate to a particular salt form of sitagliptin synthesized by Merck. Pharmaceutical salts are formed by reacting an active compound with a counterpart acid or base. When a basic compound is combined with a counterpart acid, a salt forms when the acid donates a hydrogen ion to the base. <u>Id.</u> at 9:22-10:5. If the acid used in this reaction is polyprotic, or capable of donating multiple hydrogen ions, salts in different ratios or stoichiometries may form. <u>Id.</u> at 820:7-24 (Myerson).

But whether a salt will form is highly unpredictable (Trial Trans. 837:22-838:17, 840:4-841:3, 883:17-884:9 (Myerson); Dkt. No. 104-1 at 55, 58). Also unpredictable are what pharmaceutical properties any resulting salt might display (Trial Trans. 110:13-15 (Hansen); 344:18-22 (Buckton); 927:16-22 (Myerson); 740:3-6 (Wenslow)).

After selecting a chemical compound for development, pharmaceutical manufacturers may create one or more salt forms of

5

MERCK SHARPE & DOHME LLC V. MYLAN PHARM. INC                1:19CV101

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

the compound in the hope that one such salt will possess pharmaceutical properties suitable for manufacturing, such as increased solubility, increased stability, and block-like morphology. Id. at 92:3-6 (Hansen); 287:10-19 (Buckton); 743:5-11 (Wenslow). To find salt forms of a basic compound, the manufacturer conducts a "salt screen" in which it pairs various acids and solvents with the single basic compound to determine whether a resulting salt, if any, possesses better pharmaceutical properties than the free form of the basic compound. Id. at 109:20-110:6, 113:5-14 (Hansen); 293:14-19 (Buckton); 951:11-15 (Myerson).

### 3. Merck's Development of the Dihydrogenphosphate Salt of Sitagliptin

In 2001, Merck set out to market the first DPP-IV inhibitor for the treatment of type 2 diabetes. Id. at 94:17-23 (Hansen). While several DPP-IV inhibitors were known in the literature, none had been approved by the FDA to treat non-insulin dependent diabetes. Id. at 94:17-18 (Hansen); 757:18-23, 773:4-7 (MacMillan)). Merck classified two lead compounds for development in its DPP-IV project, L221869 and L224715. Id. at 95:8-13 (Hansen). Compound L224715 is now known as sitagliptin. Id. at 95:24-25 (Hansen).[3]

---

[3] Merck first synthesized the sitagliptin free base compound in early 2001. Id. at 96:11-13 (Hansen).

MERCK SHARPE & DOHME LLC V. MYLAN PHARM. INC          1:19CV101

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

To begin, Dr. Leigh Schulz conducted a preliminary assessment of the pharmaceutical properties of sitagliptin free base. Id. at 98:18-21, 99:7-25 (Hansen). According to that assessment, sitagliptin presented several hurdles to pharmaceutical development. Id. at 102:2-14, 103:10-104:4, 104:15-105:11 (Hansen). Although it had "great" solubility, it also had needle-like morphology (which is not preferred for the production of pharmaceutical tablets) and exhibited degradation and deamination (indicating instability in both solution and bulk powder). Id. As a consequence, Merck prioritized finding a salt form of sitagliptin in the hope that it would exhibit superior properties. Id. at 106:20-107:7 (Hansen).

Next, Vicky Vydra conducted a salt screen by reacting the sitagliptin free base with eleven different acids in a variety of solutions to determine if any salts would form. Id. at 110:16-25, 114:1-3, 115:10-11 (Hansen); 715:7-8 (Vydra). If a salt formed, she used x-ray powder diffraction ("XRPD") to characterize the salt as either crystalline or amorphous.[4] Id. at 115:3-11 (Hansen); 721:19-23 (Vydra).

---

[4] In a crystalline salt, the molecules are arranged in a repeating pattern that does not exist in an amorphous salt (Trial. Trans. 114:9-11 (Hansen); 277:7-10 (Buckton)).

MERCK SHARPE & DOHME LLC V. MYLAN PHARM. INC          1:19CV101

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

During Vydra's salt screen, a salt was produced from the reaction of sitagliptin with five acids, including phosphoric acid, sulfuric acid, tartaric acid, benzene sulphonic acid, and toluene sulphonic acid. Id. at 115:5-9 (Hansen); 722:5-14 (Vydra). Vydra included hydrochloric acid in this screen, but despite the fact that another Merck employee had previously formed a hydrochloride ("HCL") salt of sitagliptin, no salt formed. Id. at 108:4-14, 114:15-115:4 (Hansen).

Thereafter, Dr. Karl Hansen performed "scaleup reactions" in which he generated larger quantities of the known sitagliptin salts to determine their viability for further development. Id. at 116:8-17 (Hansen). He replicated the phosphate salt of sitagliptin but because it appeared to be amorphous, he prioritized other salts. Id. at 117:4-19 (Hansen). After recommending the besylate and tartrate salts for further development, he returned to the phosphate salt. Id. at 122:10-17 (Hansen).

Following "a number of trial and error" experiments, Dr. Hansen synthesized a crystalline phosphate salt of sitagliptin, the dihydrogenphosphate ("DHP") salt, which he also recommended for development. Id. at 122:10-17 (Hansen). Because phosphoric acid can donate up to three protons and sitagliptin can receive up to two protons, salts from this reaction may form in different stoichiometries. Id. at 820:8-9, 821:11-13, 821:17-20, 879:4-7

8

MERCK SHARPE & DOHME LLC V. MYLAN PHARM. INC        1:19CV101

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

(Myerson); 157:11-13 (Hansen). In the DHP salt of sitagliptin formed by Dr. Hansen, phosphoric acid and sitagliptin exist in a 1-to-1 ratio (Dkt. No. 104-1 at 3). Later, Dr. Hansen also synthesized an HCL salt of sitagliptin after "a lot of experimentation" but he did not recommend it for development due to its instability and needle-like morphology (Trial Trans. 116:25-117:3, 128:12-24 (Hansen)).

These salts recommended by Dr. Hansen were referred back to Dr. Schulz to undergo a preliminary assessment. Id. at 118:20-119:1 (Hansen). Her assessment allowed Merck's DPP-IV team to compare the pharmaceutical properties of each salt. Ultimately, that comparison established that the DHP salt was superior to the besylate and tartrate salts because it had good solubility, was the most stable, and eliminated several of the hurdles the other salts presented. Id. at 118:20-119:1, 120:11-22 (Hansen). And, unlike the besylate and tartrate salts, the DHP salt showed no signs of degradation in a bulk powder. Id. at 120:25-122:8, 124:13-126:5 (Hansen). It also presented the lowest risk of liquifying at a higher humidity; appeared to only have one polymorph, or distinct crystalline structure; and exhibited a "flake-like" morphology, rather than the "needles and rods" morphology known to inhibit production. Id. Surprised to discover this unique set of favorable

9

**Appx11**

MERCK SHARPE & DOHME LLC V. MYLAN PHARM. INC          1:19CV101

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

properties,[5] the members of Merck's DPP-IV team selected the DHP salt for continued development. Id. at 129:2-5 (Hansen).

Initially, the DPP-IV team believed the DHP salt existed in one form only, an anhydrous crystalline polymorph that did not contain water in the crystal lattice. Id. at 126:7-10; 129:10-13 (Hansen); 278:23-25 (Buckton). But later the team discovered several other anhydrous forms, id., and in April 2003 Stephen Cypes unexpectedly synthesized a hydrated form of the DHP salt. Id. at 129:18-130:1 (Hansen). Before this, Merck's DPP-IV team had believed no hydrated DHP salt could exist.[6] Id. at 132:18-133:10 (Hansen).

Merck's DPP-IV team then determined that the newly discovered, crystalline monohydrate[7] form of the DHP salt possessed exceptional pharmaceutical properties, superior even to the properties of its anhydrous forms. Id. Its morphology was more

---

[5] In an email to other members of the DPP-IV team discussing the properties of DHP salt of sitagliptin, Ivan Santos, the head of Merck's physical measurements team stated: "I too recommend the phosphate salt. Given the data we have to date, we have a simple solid-state system, good solubility and stability, a workable morphology. This is incredible. Not often do we see these." (PTX 082.0001; Trial Trans. 126:19-22 (Hansen)).

[6] Prior to Cypes's synthesis of the crystalline monohydrate, Dr. Hansen had unsuccessfully attempted to create a hydrated form of the DHP salt. Id. at 132:18-25, 133:10. Determining whether hydrated forms of the salt could be synthesized was important to Merck because hydrated salt forms could have presented additional hurdles its development program. Id.

[7] In the crystalline monohydrate form, water and the DHP salt exist in a 1-to-1 ratio in the crystal lattice.

MERCK SHARPE & DOHME LLC V. MYLAN PHARM. INC          1:19CV101

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

suitable to manufacturing and it had only one polymorph. Id. at
133:12-134:22 (Hansen). Notably, as of 2021, the crystalline
monohydrate remains the only known hydrate of the DHP salt of
sitagliptin. Id. at 134:23-135:1 (Hansen).

Based on all this, Merck's DPP-IV team chose to commercialize
the crystalline monohydrate form of the DHP salt of sitagliptin.
Id. at 136:12-14, 147:17-148:10 (Hansen). After clinical studies
indicated that it could be effective in the treatment of diabetes,
this salt became the active ingredient in the first FDA approved
DPP-IV inhibitor to treat diabetes, Merck's Januvia® product. Id.
at 97:15-98:5 (Hansen). It also became the active ingredient in
Merck's Janumet® product, which combines sitagliptin with
metformin to treat diabetes and hypertension. Id. at 180:23-181:1
(Alani).

4.   **The Asserted Claims**

The '708 patent covers the 1-to-1 DHP salt of sitagliptin and
methods of use. The '921 patent describes pharmaceutical
compositions of the 1-to-1 DHP salt of sitagliptin in combination
with metformin.

a.   **The '708 Patent**

The '708 patent, filed on June 23, 2004, is titled "Phosphoric
Acid Salt of a Dipeptidyl Peptidase-IV Inhibitor" (JTX 001.0001).
It lists Stephen Cypes, Alex Chen, Russell Ferlita, Karl Hansen,

11

**Appx13**

MERCK SHARPE & DOHME LLC V. MYLAN PHARM. INC                    1:19CV101

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

Ivan Lee, Vicky Vydra, and Robert Wenslow, Jr. as inventors and

Merck as the assignee. Id. Issued on February 5, 2008, the patent,

with pediatric exclusivity, expires on March 24, 2027[8] (Dkt. No.

123 at 2-3). The asserted claims are as follows:

1.    A   dihydrogenphosphate   salt   of   4-oxo-4-[3-
      trifluorom-ethyl)-5,6-dihyrdo [1,2,4]triazolo[4,3-
      a]pyrazin-7(8H)-yl]-1-(2,4,5-trifluorophenyl)
      butan-2-amine of structural formula I:



(I)

      or a hydrate thereof.

2.    The salt of claim 1 of structural formula II having
      the (R)-configuration at the chiral center marked
      with an *



(II)

3.    The salt of claim 1 of structural formula III having
      the (S)-configuration at the chiral center marked
      with an *

---

[8] Without pediatric exclusivity, the '708 patent expires on November 24,
2026 (Dkt. No. 123 at 3).

MERCK SHARPE & DOHME LLC V. MYLAN PHARM. INC          1:19CV101

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL



19.   A method for the treatment of type 2 diabetes
comprising administering to a patient in need of
such treatment a therapeutically effective amount
of the salt according to claim 2 or a hydrate
thereof.

JTX 001.0014-15. Claims 4 through 16 of the '708 patent, no longer
at issue in this case,[9] relate to the crystalline monohydrate form
of the 1-to-1 DHP salt of sitagliptin. Id. Merck alleges that
Mylan's ANDA products will infringe claim 3 of the '708 patent.
Mylan alleges that claims 1, 2, 3, and 19 of the '708 patent are
invalid and unenforceable.

        b.   The '921 Patent

     The '921 patent, filed on December 16, 2005, is titled
"Pharmaceutical Compositions of Combinations of Dipeptidyl
Peptidase-4 Inhibitors with Metformin" (Dkt. No. 123 at 3-4; JTX
002.0001). It lists Ashkan Kamali, Laman Alani, Kyle Fliszar,
Soumojeet Ghosh, and Monica Tijerina as inventors and Merck as the
assignee (JTX 002.0001). Issued on April 13, 2013, the patent,

_____

[9] Prior to trial, Merck withdrew its allegation that Mylan's ANDA products
infringe claims 4-16 of the '708 patent (Dkt. No. 152).

13

MERCK SHARPE & DOHME LLC V. MYLAN PHARM. INC                    1:19CV101

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

with pediatric exclusivity, expires on January 21, 2029 (Dkt. No. 123 at 4).[10] The following claim is asserted:

1. A pharmaceutical composition comprising:
   (a) about 3 to 20% by weight of sitagliptin, or a pharmaceutically acceptable salt thereof;
   (b) about 25 to 94% by weight of metformin hydrochloride;
   (c) about 0.1 to 10% by weight of a lubricant;
   (d) about 0 to 35% by weight of a binding agent;
   (e) about 0.5 to 1% by weight of a surfactant; and
   (f) about 5 to 15% by weight of a diluent.

(JTX 002.0007). Merck alleges that Mylan's ANDA products will infringe each element of this claim.

**5. Claim Construction**

On August 8, 2019, the United States Judicial Panel on Multidistrict Litigation granted Merck's request to centralize pretrial proceedings in this case with Merck's thirteen other lawsuits against generic manufacturers related to its Januvia® and Janumet® products then pending in the District of Delaware (Dkt. No. 49). In that litigation, Judge Richard Andrews construed several terms in the claims at issue before this Court. See generally, In re Sitagliptin Phosphate ('708 & '921) Pat. Litig., 2020 WL 6743022, at *3 (D. Del. Nov. 17, 2020).[11]

---

[10] Without pediatric exclusivity, the '921 patent expires on July 21, 2028 (Dkt. No. 123 at 4).

[11] Because Mylan had instigated an inter partes review of the '708 patent, it did not propose constructions of the disputed terms or join in the other defendants' proposed constructions. In re Sitagliptin, 2020 WL 6743022 at n.1.

14

MERCK SHARPE & DOHME LLC V. MYLAN PHARM. INC          1:19CV101

**SEALED**

<u>MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL</u>

As proposed by Merck, Judge Andrews construed the term "the salt of claim 1 [or 2]" in claims 2 and 3 of the '708 patent to include hydrates of the molecules described. <u>Id.</u> at *4. He construed the term "crystalline monohydrate" used in claims 4 and 24 of the '708 patent as "a repeating unit cell incorporating a 1:1 ratio of water to a dihydrogenphosphate salt of sitagliptin." <u>Id.</u> at *3. He also construed the term "surfactant" in claim 1 of the '921 patent as a "surfactant that works as a wetting agent to increase the dissolution of sitagliptin." <u>Id.</u> at *8, *11.

Judge Andrews rejected the generics' suggestion to limit the term "sitagliptin" in claim 1 of the '921 patent to "the dihydrogenphosphate salt of sitagliptin in the form of a monohydrate." <u>Id.</u> at *11-12. He was unpersuaded that Merck had thus limited the scope of the term during prosecution where it cited to the unexpected results of the specific crystalline monohydrate form of the DHP salt. <u>Id.</u> He found that this single comment in the prosecution history did not "rise to the level of clear and unmistakable disavowal." <u>Id.</u> at *12.

### 6.  Related Patents and Applications

#### a.  U.S. Patent Number 6,699,871

U.S. Patent Number 6,699,871 ("the '871 patent"), filed on July 5, 2002, is titled "Beta-Amino Heterocyclic Dipeptidyl Peptidase Inhibitors for the Treatment or Prevention of Diabetes"

**\*\*SEALED\*\***

**MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL**

(DTX 2054.0001). It lists Scott Edmonson, Michael Fisher, Dooseop Kim, Malcolm Maccoss, Emma Parmee, Anne Weber, and Jinyou Xu as inventors and Merck as the assignee. Id. Issued on March 2, 2004, with pediatric exclusivity, the patent expires on January 26, 2023 (Dkt. No. 123 at 9-10).[12]

The '871 patent is directed to DPP-IV inhibitors "which are useful in the treatment or prevention of diseases in which the [DPP-IV] enzyme is involved, such as diabetes and particularly type 2 diabetes" (DTX 2054.0001). It is also directed to "pharmaceutical compositions comprising of these compounds and the use of these compounds and compositions in the prevention or treatment of such diseases." Id. This patent discloses thirty-three (33) DPP-IV inhibiting compounds, including sitagliptin. Id. at .0019-21.

Claims 17 and 20 of the '871 patent are relevant to the issues in this case. Claim 17 depicts the sitagliptin compound in its (R)-configuration "or a pharmaceutically acceptable salt thereof." Id. at .0022. Claim 20 covers "[a] pharmaceutical composition which comprises an inert carrier and a compound of claim 17." Id.

The '871 patent specification defines "pharmaceutically acceptable salts" as those "prepared from pharmaceutically

---

[12] Without pediatric exclusivity, the '871 patent expires on July 26, 2022 (Dkt. No. 123 at 10).

MERCK SHARPE & DOHME LLC V. MYLAN PHARM. INC          1:19CV101

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

acceptable non-toxic bases or acids including inorganic or organic bases and inorganic or organic acids." Id. at .0004. The specification also states that "[w]hen the compound of the present invention is basic, salts may be prepared from pharmaceutically acceptable non-toxic acids, including inorganic and organic acids." Id. It then provides a list of twenty-six (26) acceptable acids and a list of eight (8) preferred acids, both of which include phosphoric acid. Id. at .0004-05.

The specification also provides that each of the claimed compounds has one chiral center that can produce two isomers "and it is intended that all of the possible optical isomers . . . are included within the ambit of this invention." Id. at .0004. Example 7 of the '871 patent depicts an HCL salt of sitagliptin, id. at .0018, but the '871 patent does not describe or exemplify any phosphate salt of sitagliptin, or any other compound.

**b.    W/O 03/004498**

W/O 03/004498 ("WO '498") is an international patent application filed by Merck prior to the patents-at-issue and is directed to DPP-IV inhibitors "which are useful in the treatment or prevention of diseases in which the [DPP-IV] enzyme is involved, such as diabetes and particularly type 2 diabetes" (DTX 036.0004). The specifications of the '871 patent and WO '498 are substantively identical (Trial Trans. 327:25-328:2 (Buckton)).

17

MERCK SHARPE & DOHME LLC V. MYLAN PHARM. INC          1:19CV101

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

### c.   Patent Application Publication No. 2006/0287528

Patent Application Publication No. 2006/0287528 ("the '528 publication"), filed on September 3, 2003, is titled "Novel Crystalline Forms of a Phosphoric Acid Salt of a Dipeptidyl Peptidase Inhibitor" and lists Robert Wenslow, Joseph Armstrong III, Alex Chen, Stephen Cypes, Russell Ferlita, Karl Hansen, Christopher Lindemann, and Evangelia Spartalis as inventors (DTX 2198.0001). On March 18, 2008, the USPTO issued a Notice of Abandonment of the '528 publication (Dkt. No. 123 at 9-11).

### d.   Common Ownership

Each inventor of the '708 patent, the '871 patent, and WO '498 assigned their inventions, patent applications, and patents to Merck. Id. at 17. Thus, the subject matter of the '708 patent, the '871 patent, and WO '498 were commonly owned by Merck at the time of the inventions claimed in the '708 patent. Id.

### 7.  Inter Partes Review

On May 7, 2021, the United States Patent Trial and Appeal Board ("PTAB") adjudicated Mylan's petition for inter partes review of claims 1, 2, 3, 4, 19, 21, 22, and 23 of the '708 patent (Dkt. No. 104-1). In this proceeding, Mylan raised anticipation and obviousness challenges to the asserted claims pursuant to 35 U.S.C. § 102 and § 103, respectively. Id. at 4-5.

18

Appx20

MERCK SHARPE & DOHME LLC V. MYLAN PHARM. INC        1:19CV101

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

The PTAB concluded that WO '498 did not expressly or inherently disclose the 1-to-1 DHP salt of sitagliptin used in Merck's Januvia® and Janumet® products. Id. at 41. And because no other prior art disclosed that phosphoric acid and sitagliptin could form non-1-to-1 salts, the PTAB concluded that Mylan's anticipation challenges based on WO '498 and the '871 patent failed. Id. at 41-43.

And because Merck had reduced to practice the subject matter of claims 1, 2, 17, 19, 21, 22, and 23 before WO '498 was published, and given that both the '708 patent and WO '498 were commonly owned by Merck, the PTAB concluded that WO '498 could not be used as a prior art reference under § 102(a). Id. at 69. As to claims 3 and 4 of the '708 patent that remained subject to Mylan's obviousness challenge, the PTAB determined that neither of these claims was obvious in view of the prior art. Id.

## 8.  Mylan's Accused ANDA Products

Mylan submitted ANDA No. 202473 to the FDA seeking approval to manufacture a generic version of Merck's Januvia® product prior to the expiration of the '708 patent (Dkt. No. 123 at 11). It also submitted ANDA No. 202478 to the FDA seeking approval to manufacture a generic version of Merck's Janumet® product prior to the expiration of the patents-in-suit. Id.

19

**Appx21**

MERCK SHARPE & DOHME LLC V. MYLAN PHARM. INC                    1:19CV101

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

One of the active pharmaceutical ingredients ("APIs") in

Mylan's ANDA products ███████████████████████████████████
█████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
██ ███ ████ ██ ████████ █ █ ███ ████
█████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
██████████████████████████

Mylan's Janumet® ANDA product is █████████████████████████
█████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████

────────────────────────
█ █████████████████████████████████████████████████████████
████████████████████████████████████████████████

**Appx22**

CONFIDENTIAL MATERIAL REDACTED

MERCK SHARPE & DOHME LLC V. MYLAN PHARM. INC          1:19CV101

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

██████████████████████████████████████████████████████████

████████████

### 9.  Prior Art

#### a.  Berge

Berge, a journal article published in 1977, teaches that salt formation is crucial to the pharmaceutical industry because it alters the properties of a new drug entity and allows the most suitable form of the drug to be developed (DTX 006.0004-05). But Berge warns that choosing the most suitable salt form is a "very difficult task, since each imparts unique properties to the parent compound" and there are numerous available salt forms. Id. at .0001-02. Further, salt formation is highly unpredictable and "there is no reliable way of predicting the influence of a particular salt species on the behavior of the parent compound." Id. at .0001.

Various salt forms of the same compound have different physical, chemical, and thermodynamic properties. Id. at .0001-02. Due to this unpredictability, "[s]alt-forming agents are often chosen empirically. Of the many salts synthesized, the preferred form is selected by pharmaceutical chemists primarily on a practical basis: cost of raw materials, ease of crystallization, and percent yield. Other basic considerations include stability,

21

CONFIDENTIAL MATERIAL REDACTED

MERCK SHARPE & DOHME LLC V. MYLAN PHARM. INC                1:19CV101

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

hygroscopicity, and flowability of the resulting bulk drug." Id. at .0001.

Berge also discloses a list of FDA approved salts of basic drugs. Chloric, hydrochloric, and dihydrochloric acids were the most frequently used acids, appearing in 47.66% of the salts of basic drugs. Id. at .0004. Phosphoric and diphosphoric acids were the fourth most frequently used acids, found in 3.16% of the salts of basic drugs. Id.

### b.   Gould

Gould, a journal article published in 1986, discusses salt selection for basic drugs and describes the ideal salt as "chemically stable, non-hygroscopic, not [the] cause [of] processing problems, and . . . quick[] [dissolving] from solid dosage forms" (DTX 012.0005). It also teaches that, based on its availability and pharmaceutical properties, hydrochloride salts are "by far the most frequent (~40%) choice" of all the available acids. Id. at .0005.

According to Gould, "there is clear precedent, and an overwhelming argument on many grounds to immediately process to the hydrochloride salt and evaluate other forms only if problems with the hydrochloride emerge." Id. Such problems may include a reduced dissolution rate in gastric fluid, a very low pH in aqueous solution, excessive hygroscopicity, and reduced stability. Id. at

22

MERCK SHARPE & DOHME LLC V. MYLAN PHARM. INC                    1:19CV101

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

.0005-06. Ultimately, Gould instructs that "progression of a hydrochloride salt should be a first move," but if issues arise other acids should be considered based on trends reported in the literature. Id. at .0006, .0015.

### c. Bighley

Bighley, the Encyclopedia of Pharmaceutical Technology, published in 1996, updates Berge's list of FDA approved salts of basic drugs (DTX 007.0003-05). Although twice as many salts existed, hydrochloric acid remained the most frequently chosen acid, appearing in approximately 48% of salts. Id. at .0003-04. The second and third most frequent chosen acids were sulfate and bromide, appearing in 5.85% and 3.79% of salts, respectively. Id. at .0004-05. Citrate, malleate, mesylate, tartrate, and phosphate were the next most frequently chosen acids, appearing in a similar percentage of salts. Id. Specifically, phosphoric acid, the eighth most frequently chosen acid, appeared in 2.48% of salts. Id.

Bighley also provides a "decision tree to create a prototype thought process whereby a suitable salt form can be chosen in an efficient and timely manner with few false starts and the minimum expenditure of resources." Id. at .0029-30. Pursuant to this tree, the chemist first determines if a salt form is needed, or if the compound is viable per se. Id. at .0030-31. Second, the chemist prepares the hydrochloric salt. Id. at .0034. At this step, Bighley

23

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

teaches that "the range of anions available for salt formation depends on the $pK_a$ of the conjugate acid relative to the basicity of the drug itself. There should be at least one unit of separation between the $pK_a$ of the basic drug and that of the anion."[14] Id. Accordingly, hydrochloric acid is popular because, with a $pK_a$ of -6, it is a very strong acid and can form a salt with most basic drugs. Id. Third, the chemist studies the physical properties of the hydrochloride salt to determine if it presents any known hurdles to development.[15] Id. at .0034-35. Fourth, the chemist prepares other mineral acid salts which are typically used to reduce hygroscopicity and acidity where necessary. Id. at .0035. Fifth, the chemist characterizes the chemical stability of the prepared salts. Id. at .0035-36. Sixth, the chemist prepares organic salts which can be used to resolve specific problems, such as high acidity, drug-excipient interactions, or low water solubility. Id. at .0036. Seventh, the chemist tests absorption to determine if a salt form with a greater aqueous solubility is needed. Id. at .0036-37. Finally, the chemist selects the salt

---

[14] The $pK_a$ value is a measurement of the acidity of a molecule whereby lower values indicate that the compound is a strong acid and higher values indicate that the compound is a strong base (Trial Trans. 157:2-4 (Hansen); 284:18-21 (Buckton)).

[15] The known risks of using hydrochloric acid to create pharmaceutical salts included the common ion effect, hygroscopicity, powder handling problems, and corrosion of machinery. Id. at .0034-35.

MERCK SHARPE & DOHME LLC V. MYLAN PHARM. INC        1:19CV101

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

form most suitable for commercialization based on its aggregate properties. Id. at .0037.

Bighley teaches that efficiency in salt selection is imperative because the decision "lies fairly and squarely on the critical path of the drug's development schedule." Id. at .0037. Accordingly, the chemist should narrow down the potential acids, then select and prepare "only several salt form[s] for experimentation" based on the known pharmaceutical properties of the basic compound. Id. Salt selection then "becomes a compromise situation, balancing the desirable attributes vs. the undesirable ones and making the decision process transparent to all." Id.

### d. Bastin

Bastin, a journal article published in 2000, discusses salt selection and procedures for optimizing new drug entities (DTX 005.0001). It reiterates that the benefit of salt selection is that it allows scientists to develop a dosage form with the best pharmaceutical properties, including solubility, melting point, hygroscopicity, chemical stability, dissolution rate, solution pH, and crystal form. Id. Bastin teaches that, after a chemist has identified a lead compound for development, "[i]nvariably, the first information generated for each candidate is the calculated pK$_a$ value." Id.

25

MERCK SHARPE & DOHME LLC V. MYLAN PHARM. INC          1:19CV101

**SEALED**

### MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

> Knowledge of the $pK_a$ value enables potential salt forming agents (counter[-]ions) to be selected, for each candidate, based on lists that are available in the literature. For the formation of a stable salt, it is widely accepted that there should be a minimum difference of about 3 units between the $pK_a$ value of the [compound] and that of its counter[-]ion, especially when the drug substance is a particularly weak acid or base. Occasionally, exceptions may be found where a salt has an acceptable stability, despite there being a smaller difference in the $pK_a$ values.

Id. at .0001-02. Having identified potential salt forms, the chemist then compares the properties of each and proposes "a single salt for further study, although . . . it is occasionally found that the overall properties of the free acid/base are much better than any of the salts." Id. at .0004.

According to Bastin, if the salt is being created to enhance aqueous solubility of weak basic drug substances, organic acids such as hydrochloride, sulphate, or phosphate should be considered. Id. at .0002. Hydrochloric acid is "the first choice for weakly basic drugs" because it can "nearly always" form a salt. Id. But it has potential disadvantages, such as high acidity in formulations, high risk of corrosion, suboptimal solubility, and poor stability if the drug is hygroscopic. Id. Bastin includes three examples of salt screens with basic compounds. Id. at .0004-06. In each example, the chemist either chose not to include phosphoric acid in the salt screen, or a phosphoric salt did not form. Id.

26

MERCK SHARPE & DOHME LLC V. MYLAN PHARM. INC          1:19CV101

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

### e.   Aulton

Aulton teaches the importance of determining the $pK_a$ value of a new drug entity (DTX 235). "[I]f nothing else is measured, the solubility and the $pK_a$ must be determined. These control all future work. . . The $pK_a$ allows the informed use of pH to maintain solubility and to choose salts should they be required to achieve good bioavailability from the solid state . . . and improve stability . . . and powder properties." Id. at .0008.

### f.   Stahl

Stahl, a textbook titled the Handbook of Pharmaceutical Salts: Properties, Selection, and Use published in 2002, teaches that half of all drug entities are administered as salts. Accordingly, finding an appropriate salt form of a drug molecule is an "essential step in drug development" (DTX 021.0001). Due to the important and often irreversible nature of salt selection in pharmaceutical development, "a rational strategy should be followed in order to guide the selection processing in an economic way." Id. at .0010.

But Stahl also teaches that "[n]o predictive procedure to determine whether a particular acidic or basic drug would form a salt with a particular counter-ion has been reported in the literature." Id. at .0062. Earlier research had suggested that salt formation depends on the acid's $pK_a$ value being at least two

27

MERCK SHARPE & DOHME LLC V. MYLAN PHARM. INC                1:19CV101

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

pH units lower than the $pK_a$ value of the basic drug. Id. at .0062-63. According to Stahl, however, while $pK_a$ could be a valuable guideline, "a more predictive method for assessing the feasibility of salt formation would be necessary to minimize trials and errors in the salt-selection program." Id. at .0063. Stahl asserts that the pH-solubility relationship is more critical in determining which salt, if any, can be synthesized for a particular basic drug. Id. at .0063-65. Later Stahl recommends that "for the formulation of a stable salt, there should be a minimum difference of . . . three units between the $pK_a$ value of the ionizable group and a possible counter-ion." Id. at .0091.

Stahl next discloses notable pharmaceutical properties of various acids used to form salts of basic drugs. Id. at 0.0136-38. Hydrochloric acid, the most widely used acid due to its tendency to form salts, carries the risk of corroding stainless-steel equipment and being unstable long-term in very weak bases. Id. at. 0136, .0169. Phosphoric acid tends to form thermally stable salts that can be used to enhance water solubility, but it carries the risk of forming hydrates. Id. at .0137, .0182.

Stahl also updates the list of FDA approved salts of basic drugs reported in Berge and Bighley. Id. at 021.0210. Stahl organizes the acids by $pK_a$ value and discloses that the $pK_a$ value

28

MERCK SHARPE & DOHME LLC V. MYLAN PHARM. INC                    1:19CV101

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

of phosphoric acid's first, second, and third protons are 1.96, 7.12, and 12.32, respectively. Id. at .0215-16.

Finally, Stahl teaches that a compound's pharmaceutical properties may vary from one polymorph to another. Id. at .0007. It also teaches that polymorphs can be characterized using routine techniques. Id.

### g. Davies

Davies, a journal article published in 2001, discusses the impact of changing the salt forms of a compound. Specifically, it teaches that "different salts of the same active drug are distinct products with their own chemical and biological profiles that underlie differences in their clinical efficacy and safety" (PTX 113.0001). But there is "no reliable way of predicting exactly what effect changing the salt form of an active drug will have on its biological activity . . . ," or the way that it is "handled by the body." Id.

### h. Remington

Remington, a textbook titled The Science and Practice of Pharmacy and published in 2006, teaches that pharmacists must understand the degree of permissible error in weighing and measuring ingredients (PTX 650.0015). It also describes the types of balances that may be used in measuring operations and teaches that they "must be used within a degree of error that can be

29

**Appx31**

MERCK SHARPE & DOHME LLC V. MYLAN PHARM. INC                1:19CV101

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

tolerated in prescription compounding and in pharmaceutical manufacturing. The USP allows a maximum error of 5% in a single weighing operation." Id. at .0015-19.

Remington further teaches that, when measured quantities are written, "the numbers should contain only those digits that are significant within the precision of the instrument." Id. at .0022 (emphasis in original). It also defines significant digits as those with practical meaning based on the precision of the weighing instrument. Id.

i. **United States Pharmacopeia and National Formulary**

"The United States Pharmacopeia and the National Formulary are recognized as official compendia and are referenced in various statutes for a basis for determining the strength, quality, purity, packaging, and labeling of drugs and related articles" (PTX 651.0007). The USP-NF teaches how to compare measured values to a stated limit to determine conformance. Id. at .0012. "The observed or calculated values usually will contain more significant figures than there are in the stated limit and an observed or calculated result is to be rounded off to the number of places that is in agreement with the [stated] limit. . . ." Id.

j. **Handbook of Pharmaceutical Excipients**

The Handbook of Pharmaceutical Excipients, a textbook published in 2003, provides monographs of common pharmaceutical

**SEALED**

**MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL**

excipients (PTX 594.0004-05). It teaches that pregelatinized starch ("PGS"), "is a modified starch used in oral capsule and tablet formulations as a binder, diluent, and disintegrant" and may be used in dry-compression or wet granulation manufacturing processes. Id. at .0025. And it also provides that PGS typically "contains 5% of free amylose, 15% of free amylopectin, and 80% unmodified starch." Id.

### k. The Handbook of Pharmaceutical Granulation Technology

The Handbook of Pharmaceutical Granulation Technology, a textbook published in 2005, teaches that PGS "is a modified starch used in tablet formulations as a binder, diluent, and disintegrant. It is obtained by chemically and mechanically processing the starch to rupture all or part of the starch granules" (DTX 2136). It further specifies that Starch 1500, a form of PGS, "contain[s] 20% maximum cold-water soluble fraction, which makes it useful for wet granulation. The water-soluble fraction acts as a binder, while the remaining fraction facilitates the tablet disintegration process." Id. at .0016.

### l. Multifunctional Excipients

Multifunctional Excipients, a journal article published in 2006, "presents a case history of a pharmaceutical manufacturer that replaced a polymer binder, a super disintegrant and a portion

31

**Appx33**

MERCK SHARPE & DOHME LLC V. MYLAN PHARM. INC          1:19CV101

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

of a standard filler with a multifunctional partially pregelatinized starch . . . and achieved remarkable results" (PTX 552.0001). It teaches that Starch 1500 outperformed the individual ingredients and had an estimated cost savings of 60%. Id. "One key reason is that Starch 1500 performs multiple functions within a wet granulation formulation, as a binder, disintegrant, filler and lubricant, eliminating the need for a multitude of costly excipients and additional processing steps." Id.

### m. Pharmaceutical Powder Compaction Technology

Pharmaceutical Powder Compaction Technology, a textbook published in 2011, teaches that native starches consist of two polysaccharides, amylopectin and amylose (PTX 585.0026). "Amylose is a linear polymer and represents approximately 27% by weight, while amylopectin has a branched structure and represents about 73% by weight." Id.

### n. Bernstein

Bernstein, a journal published in 1993, examines polymorph forms and teaches that "[v]irtually all compounds are polymorphic and the number of polymorphs of a material depends on the amount of time and money spent in research on that compound" (PTX 213.0002).

### o. Vippagunta

32

Appx34

MERCK SHARPE & DOHME LLC V. MYLAN PHARM. INC          1:19CV101

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

Vippagunta, journal published in 2001, discusses recent advances in predicting and characterizing polymorphs (DTX 047). It teaches that predicting hydrate formation is "complex and difficult" and, because each solid compound responds different, generalizations about hydration formation cannot be made. Id. at .0016. Nevertheless, once hydrates are formed, a POSA could characterize them with one of several common methods. Id.

### III. DISCUSSION OF FACTS AND LAW

#### A. Person of Ordinary Skill in the Art

Determining who constitutes a person of ordinary skill in the art ("POSA") is a factual question. See ALZA Corp. v. Andrx Pharm., LLC, 603 F.3d 935, 940 (Fed. Cir. 2010). To determine the level of ordinary skill in the art, courts consider the following non-exhaustive factors: "(1) the educational level of the inventor; (2) type of problems encountered in the art; (3) prior art solutions to those problems; (4) rapidity with which innovations are made; (5) sophistication of the technology; and (6) educational level of active workers in the field." Daiichi Sankyo Co., Ltd. v. Apotex, Inc., 501 F.3d 1254, 1256 (Fed. Cir. 2007).

#### 1. The '708 Patent

The parties offer similar definitions of a POSA to whom the '708 patent is directed, and experts for both parties testified

33

**Appx35**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

that adopting the other party's definition of a POSA would not alter their opinions (Trial Trans. 546:17-20 (Myerson); 687:25-688:13 (Cockcroft); 757:6-8 (MacMillan)).

According to Mylan, a POSA would (1) have a doctoral degree in pharmaceutical sciences, a field of chemistry relating to crystals in drug delivery, or some other related field; (2) have two years of experience working with solid state materials for pharmaceuticals, including their characterization in relation to the development of pharmaceutical formulations; and (3) work in a multidisciplinary team and interact with individuals possessing specialized skills, such as a clinician (Trial Trans. 273:1-14 (Buckton)). A POSA could have a lower education level with a commensurate increase in years of relevant work experience. Id.

Merck similarly asserts that a POSA would (1) have a doctoral degree in chemistry, chemical engineering, or a related field; (2) have two years of laboratory experience working with pharmaceutical solids, including polymorph forms; (3) be familiar with "a variety of issues relevant to developing pharmaceutical solids, including, among other things, analytical characterization techniques and pharmaceutical formulations;" and (4) have a medical degree and experience in treating patients with type 2 diabetes. Id. at 545:1-13 (Myerson). A POSA could have a lower

34

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

education level with a commensurate increase in years of relevant work experience. Id.

Merck's requirement that a POSA also have a medical degree is the only meaningful difference between the parties' definitions. But at trial Merck's expert clarified that an individual without a medical degree still would satisfy its definition of a POSA by working as part of a team with a medical doctor having knowledge of type 2 diabetes. Id. at 545:17-546:2 (Myerson).

Based on the parties' definitions and the evidence introduced at trial, the Court finds that a POSA should (1) have a doctoral degree in chemistry, chemical engineering, pharmaceutical sciences, or another related field; (2) have at least two years of experience working with pharmaceutical solids, including polymorph forms and characterization; (3) be familiar with issues that arise in the development of pharmaceutical solids; and (4) work as part of a multidisciplinary team and have access to a clinician or medical doctor with experience treating type 2 diabetes. A POSA may have a lower education level so long as she has have a commensurate increase in years of relevant experience.

### 2.    The '921 Patent

The parties offer similar definitions of a POSA to whom the '921 patent is directed, and their experts' opinions would not change if the Court adopted the other party's definition Id. at

35

MERCK SHARPE & DOHME LLC V. MYLAN PHARM. INC                1:19CV101

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

572:8-14. According to Mylan, a POSA would (1) have a doctoral degree in chemistry, biochemistry, medical chemistry, pharmacy, pharmaceutics, or a related discipline, and two years of relevant experience in drug development; (2) be familiar with oral dosage forms and excipients; (3) understand that the drug product development process is multidisciplinary; and (4) draw upon their own skill set as well as the specialized skills of their colleagues to solve problems. Id. at 572:13-573:2 (Crowley). A POSA could have a lower education level with a commensurate increase in years of relevant work experience. Id.

Merck submits that a POSA would have (1) a doctoral degree in pharmaceutical science, chemical engineering, or a related field; (2) work experience in developing or analyzing solid oral pharmaceutical dosage forms, or a related field; and (3) a medical degree or other clinical experience in treating patients with type 2 diabetes (DTX 2114.0017). A POSA could have a lower education level with a commensurate increase in years of relevant work experience. Id.

Because the slight differences in the parties' definitions do not impact their experts' opinions, the Court determines that a POSA should have (1) a doctoral degree in pharmaceutical science, chemical engineering, chemistry, biochemistry, or a related field; (2) experience in drug development of solid oral pharmaceutical

36

Appx38

MERCK SHARPE & DOHME LLC V. MYLAN PHARM. INC                    1:19CV101

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

dosage forms; (3) access to a multidisciplinary team that includes an individual with a medical degree or other clinical experience in treating patients with type 2 diabetes. A POSA may have a lower education level so long as she has a commensurate increase in years of relevant experience.

## B. Infringement of the Patents-in-Suit

Merck contends that Mylan's Janumet® ANDA Products infringe claim 3 of the '708 patent and claim 1 of the '921 patent.

### 1. Legal Standard

"[W]hoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent." 35 U.S.C. § 271(a). "The patentee bears the burden of proving infringement by a preponderance of the evidence." Creative Compounds, LLC v. Starmark Lab'ys, 651 F.3d 1303, 1314 (Fed. Cir. 2011) (quoting SRI Int'l v. Matsushita Elec. Corp., 775 F.2d 1107, 1123 (Fed. Cir. 1985)). "An infringement analysis entails two steps. The first step is determining the meaning and scope of the patent claims asserted to be infringed. The second step is comparing the properly construed claims to the device accused of infringing." Markman v. Westview Instruments, Inc., 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc) (citation omitted). The first step is a question of law, id.

37

MERCK SHARPE & DOHME LLC V. MYLAN PHARM. INC          1:19CV101

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

at 979, while the second step is a question of fact. <u>Spectrum Pharms., Inc. v. Sandoz Inc.</u>, 802 F.3d 1326, 1337 (Fed. Cir. 2015).

### 2.   Mylan's ANDA Products Infringe Claim 3 of the '708 Patent

#### a.   The Parties' Contentions

The parties dispute whether Mylan has infringed claim 3 of the '708 patent, which covers the DHP salt of sitagliptin in the (S)-configuration (JTX 001.0014). Their dispute turns on which of two Federal Circuit precedential cases govern the Court's infringement analysis.

Merck contends that, under <u>Sunovion Pharmaceuticals, Inc. v. Teva Pharmaceuticals USA, Inc.</u>, 731 F.3d 1271, 1278 (Fed. Cir. 2013), the relevant inquiry is whether Mylan has sought FDA approval to sell a product that may contain any amount of the DHP salt of sitagliptin in the (S)-configuration (Dkt. No. 181 at 2-3). Because Mylan's ANDAs request approval to sell products that

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████

Mylan, on the other hand, asserts that, under <u>Glaxo, Inc. v. Novopharm Ltd.</u>, 110 F.3d 1562 (Fed. Cir. 1997), the relevant inquiry is whether it is likely to sell a product that contains the DHP salt of sitagliptin in the (S)-configuration following FDA approval (Dkt. No. 177 at 32-33). And because there is no evidence

CONFIDENTIAL MATERIAL REDACTED

MERCK SHARPE & DOHME LLC V. MYLAN PHARM. INC          1:19CV101

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

that Mylan's generic products contain ███████████████

███████████████████████████████████████████ Id. at

32-34.

      **b.    Applicable Law**

Under 35 U.S.C. § 271(e)(2), it is an act of infringement to submit an ANDA "'for a drug claimed in a patent or the use of which is claimed in a patent.'" Warner-Lambert Co. v. Apotex Corp., 316 F.3d 1348, 1354 (Fed. Cir. 2003) (quoting § 271(e)(2)). This creates "a highly artificial act of infringement that consists of submitting an ANDA . . . containing" a paragraph IV certification that erroneously claims a generic drug will not infringe a patent covering the pioneer drug. See Eli Lilly & Co. v. Medtronic, Inc., 496 U.S. 661, 678 (1990). Accordingly, § 271(e)(2) vests the court with jurisdiction to determine "if a particular drug were put on the market, it would infringe the relevant patent." Bristol-Myers Squibb Co. v. Royce Lab'ys, Inc., 69 F.3d 1130, 1135 (Fed. Cir. 1995).

In Glaxo, Inc. v. Novopharm Ltd., the Federal Circuit, applying these principles, held that in suits brought under § 271(e)(2) "[t]he relevant inquiry is whether the patentee has proven by a preponderance of the evidence that the alleged infringer will likely market an infringing product. What is likely to be sold, or, preferably, what will be sold, will ultimately

CONFIDENTIAL MATERIAL REDACTED

MERCK SHARPE & DOHME LLC V. MYLAN PHARM. INC          1:19CV101

**SEALED**

<u>MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL</u>

determine whether infringement exists." 110 F.3d at 1570. It then instructed courts to consider "all of the relevant evidence, including the ANDA" to determine what product the generic would likely sell if its ANDA were approved. <u>Id.</u> at 1570.

The compound at issue in <u>Glaxo</u> was capable of existing in multiple forms and the ANDA stated that the generic product would contain one form of the compound. <u>Id.</u> at 1565-66. But the ANDA did not address whether the product would also contain the particular form of the compound covered by the disputed patent. Significantly, there was no evidence in the ANDA that the generic product contained the claimed form of the compound. <u>Id.</u>

After considering all this, the Federal Circuit concluded that the patentee had not proven by a preponderance of the evidence that the generic would likely market a product containing the claimed form of the compound. The generic's filing of the ANDA therefore did not constitute infringement of the disputed patent. <u>Id.</u> at 1570.

Later, in <u>Sunovion Pharmaceuticals, Inc. v. Teva Pharmaceuticals USA, Inc.</u>, the Federal Circuit held that in such suits brought under § 271(e)(2) "[w]hat a generic asks for and receives approval to market, if within the scope of a valid claim, is an infringement," even where internal documents suggest that the generic product will not meet the disputed claim limitation in

40

**Appx42**

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

practice. 731 F.3d at 1279. The disputed patent in Sunovion claimed a compound in its (S)-configuration and specified that the invention was "essentially free" of the (R)-configuration. Id. at 1273-74. The district court construed "essentially free" to mean "less than 0.25%" of the (R)-configuration. Id. at 1274-75. In its ANDA specification, the generic requested FDA approval to market a product containing between 0.0% and 0.6% of the claimed compounds in its (R)-configuration. Id. at 1274-75.

Following the district court's claim construction, the generic submitted a declaration to the district court representing that, if granted FDA approval, it would limit its product to between 0.3% and 0.6% of the (R)-configuration. Id. at 1275. In light of that representation, the district court concluded that the generic product would not infringe the disputed patent. Id.

On appeal, the Federal Circuit affirmed the district court's claim construction but reversed its finding of non-infringement. Id. at 1280. In doing so, it specifically held that the language of the ANDA controlled the infringement analysis. Because the generic had sought FDA approval to sell a product containing an amount of the (R)-configuration that fell within the range claimed in the disputed patent, the ANDA product would infringe the patent regardless of the generic's representations to the court. Id.

41

MERCK SHARPE & DOHME LLC V. MYLAN PHARM. INC          1:19CV101

**SEALED**

### MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

In several later decisions, the Federal Circuit has distinguished its infringement analyses in Glaxo and Sunovion. As this Court understands the distinction, Glaxo governs cases where a generic's ANDA is silent with respect to a claim limitation, while Sunovion governs cases where a generic's ANDA defines a compound in such a way that it meets a limitation of an asserted claim. See Ferring B.V. v. Watson Lab'ys, Inc.-Fla., 764 F.3d 1382 (Fed. Cir. 2014) (applying Glaxo to the generic's first ANDA because, unlike the disputed patent, it did not include a dissolution rate of an essential ingredient, but applying Sunovion to the generic's second ANDA, which did specify a dissolution rate).

In Par Pharmaceuticals, Inc. v. Hospira, Inc., 835 F. App'x 578 (Fed. Cir. 2017), a case discussed in detail by the parties, the disputed patent included a claim limitation of "about 0.01 to 0.4 mg/mL" of a compound. The district court found that the generic infringed this limitation because its ANDA (1) identified the claimed compound as a potential impurity in the generic product, and (2) permitted the claimed compound to be present in an amount within the claimed range. Id. at 582-83.

On appeal, the generic argued that the district court's infringement analysis was flawed because, following Glaxo, it should have focused on the composition of the product likely to be

42

MERCK SHARPE & DOHME LLC V. MYLAN PHARM. INC                    1:19CV101

**\*\*SEALED\*\***

**MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL**

sold and not on the composition of the product theoretically permitted under the language of the ANDA specification. Id. at 585. The Federal Circuit disagreed. It determined that, because the generic's ANDA specification spoke to the amount of the claimed compound the generic product could contain, Sunovion governed the infringement analysis. Id. at 586. Accordingly, it concluded that the generic's ANDA product infringed the disputed patent because the generic had sought FDA approval for a product that could contain an amount of the compound in the claimed range. Id.

      **c.    Mylan Soug███████████████████████████████ts Containing** ███████████████████████████████

To assess infringement, whether pursuant to Glaxo or Sunovion, the Court must first determine whether Mylan's ANDAs speak to or are silent on the DHP salt of sitagliptin in the (S)-configuration. On this point, several relevant facts are undisputed. ███████████████████████████████████████████

███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████

43

**Appx45**

CONFIDENTIAL MATERIAL REDACTED

MERCK SHARPE & DOHME LLC V. MYLAN PHARM. INC                 1:19CV101

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

████████████████ Merck has never tested Mylan's ANDA products to determine whether they contain the (S)-configuration (Trial Trans. 553:7-11, 560:14-17 (Myerson); 697:14-18 (Cockcroft)).

As in <u>Par</u>, Mylan's ANDAs speak directly to claim 3 because



It follows from this that <u>Sunovion</u>'s analytical framework governs the infringement inquiry in this case.

Mylan's contention that Merck cannot meet its burden on infringement because it has not introduced any evidence to establish that Mylan's ANDA products contain the (S)-configuration is irrelevant. <u>Sunovion</u> instructs the Court to examine whether Mylan has sought FDA approval to market an ANDA product containing any amount of the DHP salt of the (S)-configuration. 731 F.3d at 1279.

Mylan urges the Court to apply <u>Glaxo</u> in this case, arguing its ANDAs are "tantamount to almost silen[t]" regarding the (S)-

44

CONFIDENTIAL MATERIAL REDACTED

MERCK SHARPE & DOHME LLC V. MYLAN PHARM. INC                1:19CV101

**SEALED**

<u>MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL</u>

configuration (Trial Trans. 1061:16-21; Dkt. No. 182 at 40-41). In

support, Mylan denies including the (S)-configuration limitation

in its ANDA specifications ████████████████████████████████

█████████████████████████████████████████████████ but rather

because, under guidelines provided by the International Council

for Harmonization of Technical Requirements for Pharmaceuticals

for Human Use ("ICH"), it was required to include such limitation.

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

    The Court is unpersuaded by this argument. Federal Circuit

precedent plainly instructs that where an ANDA speaks to a claim

limitation <u>Sunovion</u> governs. <u>Par</u>, 835 F. App'x at 586. <u>Par</u> makes

clear that <u>Sunovion</u> does not, as Mylan suggests, provide an

exception for constructive silence and as here. In <u>Par</u>, as is the

case here, the generic added reference to the claimed compound to

its ANDA specification "in response to an FDA request for 'adequate

information' showing that its ANDA product would comply with ICH

Q3D." <u>Id.</u> at 586 (the generic's "specifications [were] updated to

demonstrate that its product met the required elemental impurity

guidelines").

    Although ICH guidelines may require pharmaceutical

manufacturers to identify and control impurities in their

products, Mylan remained in control of its specification. The

45

**Appx47**

CONFIDENTIAL MATERIAL REDACTED

MERCK SHARPE & DOHME LLC V. MYLAN PHARM. INC          1:19CV101

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

evidence at trial established that the FDA has adopted the ICH's
guidelines for drug product development submissions, and that
Mylan's ████████████████████████████████████████████
████████████████ (Trial Trans. 567:11-17 (Crowley)); 557:12-23
(Myerson)).

Mylan's internal documents also reference ██ ███████
████████ ████████ ███████████ █████ ███████ ███████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
███████████████████ But nothing in the record suggests that
Mylan could not have satisfied the ICH guideline by setting a lower
limit for the impurity. Presumably, if Mylan ████████████████████
████████████████████████████████████████ it could have set
the limitation at 0.0%, or at its "incredibly low" level of
detection of 0.02% (Dkt. No. 182 at 38). ████████████████████
██████████████████████████████

Applying Sunovion to these facts leads to the conclusion that
Mylan requested FDA approval to market products containing the DHP
salt of the (S)-configuration. And, based on the language in its
ANDAs, if granted FDA approval, Mylan could market a product
containing ██████████████████████████████████ Under Sunovion,

───────────────────

█ ████████████████████████████████████████████████████████████

CONFIDENTIAL MATERIAL REDACTED

MERCK SHARPE & DOHME LLC V. MYLAN PHARM. INC          1:19CV101

**\*\*SEALED\*\***

**MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL**

these representations in the ANDAs about their scope, not Mylan's internal testing, regulatory requirements, or safeguards against the (S)-configuration), are determinative. Merck thus has proven by a preponderance of the evidence that Mylan has infringed claim 3 of the '708 patent.

### 3.  Mylan's Janumet® ANDA Product Infringes Claim 1 of the '921 Patent

Merck next alleges that Mylan's Janumet® ANDA product will infringe claim 1 of the '921 patent. The invention in claim 1 is a pharmaceutical composition comprised of sitagliptin, metformin, a lubricant, a binding agent, a surfactant, and a diluent, each within a specific weight range (JTX 002.0007). █████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████

To establish infringement Merck must prove by a preponderance of the evidence that Mylan's product also satisfies limitations (e) and (f), related to the surfactant and diluent components of the claimed invention. See Enercon GmbH v. Int'l Trade Comm'n, 151 F.3d 1376, 1384 (Fed. Cir. 1998) (direct infringement occurs when "every limitation of the claim is literally met" by the accused

47

CONFIDENTIAL MATERIAL REDACTED

MERCK SHARPE & DOHME LLC V. MYLAN PHARM. INC                    1:19CV101

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

product). As the following discussion establishes, Merck has met its burden.

### a.    Mylan's Janumet® ANDA Product Literally Infringes Limitation (e)

Limitation (e) provides that the pharmaceutical composition of claim 1 contains "about 0.5 to 1% by weight of a surfactant" (JTX 002.0007). It is undisputed that Mylan's Janumet® ANDA product contains ████████████████████████ a "surfactant" as that term has been construed in this case (Trial Trans. 212:16-214:2 (Little); 574:9-10 (Crowley)).[17] The parties disagree about ██

████████████████████████████████████████████

██████████████████████████████████████

i.    ████████████████████████████████
████████████

████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████

---

[17] Under Judge Andrews's construction, the term "surfactant" as used in limitation (e) is a "surfactant that works as a wetting agent to increase the dissolution of sitagliptin." In re Sitagliptin, 2020 WL 6743022, at *8, *11.

CONFIDENTIAL MATERIAL REDACTED

MERCK SHARPE & DOHME LLC V. MYLAN PHARM. INC          1:19CV101

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

In determining infringement, the Court is concerned only with the final product Mylan seeks to commercialize. See Ferring, 764 F.3d at 1409 ("The focus that both Ferring and the district court thus gave to infringement by the uncoated cores of Watson's generic product is misplaced. The infringement evaluation is concerned only with the final, coated commercial . . . tablets for which Watson sought and was granted FDA approval to market.").

The evidence at trial established that Mylan seeks to commercialize its Janumet® ANDA product as a ██████████████████ ████████████████████████████████████████████████████ ████████████████ Infringement thus must be based on ██████████ ██████████████████████████████████████ Merck asserts that, ███████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ According to Mylan, ███████████████████████████████████████ ████████████████████████████████████████████████████████ █████████████████████████████████ The Court need not resolve the parties' dispute regarding ████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████

49

**Appx51**

CONFIDENTIAL MATERIAL REDACTED

MERCK SHARPE & DOHME LLC V. MYLAN PHARM. INC                    1:19CV101

**SEALED**

MEMORANDUM OP██ER FOLLOWING BENCH TRIAL

       ii.        █████et® ANDA Product Contains ███ Encompassed by Limitation (e)

Determining if Mylan's Janumet® ANDA product infringes limitation (e) requires the Court to determine what impact the term "about" has on the claimed numeric range. In other words, how far does the term "about" extend the lower end of the "about 0.5 to 1% by weight of a surfactant" range?

At the outset, it is worth noting that resolution of this issue is not a matter of claim construction. "Although defining the outer reaches of 'about' in a claimed range can be a matter of claim construction, when the claims are applied to an accused device, it is a question of technologic fact whether the accused device meets a reasonable meaning of 'about' in the particular circumstances." Par, 835 F. App'x at 584 (citations omitted). So where, as here, the parties have not proposed a narrowing claim construction based on particular intrinsic evidence, the general considerations set forth in Cohesive Technologies, Inc. v. Waters Corporation, 543 F.3d 1351, 1368 (Fed. Cir. 2008), govern the infringement analysis. Id. And pursuant to those considerations, the Court's analysis must focus on whether, as a matter of fact, the █████ in Mylan's Janumet® ANDA product comes within the "about 0.5 to 1%" range.

50

**Appx52**

CONFIDENTIAL MATERIAL REDACTED

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

Cohesive instructs that, because the term "about" lacks universal meaning in patent claims, its meaning depends on the technological facts of the particular case. 543 F.3d at 1368. "[A]s part of a numeric range, the use of the word 'about,' avoids a strict numerical boundary to the specified parameter. Its range must be interpreted in its technologic and stylistic context." Id. (quotation omitted). Any extension beyond the claimed range must be limited to what a POSA "would reasonably consider 'about' to encompass." Par, 835 F. App'x at 584 (quoting Monsanto Tech. LLC v. E.I. DuPont de Nemours & Co., 878 F.3d 1336, 1342 (Fed. Cir. 2018). Courts must also consider whether any extension effected by "about" is by a "modest amount, considering the criticality of the numerical limitation to the invention." Id. (quotations omitted). And any extension must be tied to the purpose of the limitation. Cohesive, 543 F.3d at 1368.

Although Merck's expert, Dr. Steven Little, opined that the purpose of the surfactant is to increase the dissolution of sitagliptin (Trial Trans. 283:2-3 (Little)), Mylan, in its briefing, contends that the surfactant in the claimed invention serves several additional purposes (Dkt. No. 177-1 at 13-14).[18]

---

[18] Specifically, Mylan points to Merck's representations in the prosecution history of the '921 patent that the surfactant not only increased dissolution of sitagliptin, but also "provided more consistent

**MERCK SHARPE & DOHME LLC V. MYLAN PHARM. INC**                    **1:19CV101**

**\*\*SEALED\*\***

## MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

Judge Andrews resolved this dispute during claim construction, finding that, to overcome the prior art, Merck clearly and unmistakably had disavowed the full scope of the term "surfactant" while prosecuting the '921 patent. In re Sitagliptin, 2020 WL 6743022, at \*9. Merck had "limited the functioning of a surfactant to a wetting agent that increases the dissolution of sitagliptin." Id. So it is with this limited purpose in mind that the Court turns to consider whether an extension of the "about 0.5 to 1%" range that would encompass ███████████ is a modest departure.

Applying the Cohesive framework, Merck's expert, Dr. Little opined that a POSA would understand the "about 0.5 to 1%" range to extend downward to at least 0.4% and to include measured values that round to 0.4% (Trial Trans. 216:11-217:6 (Little)). In his view, this extension is a modest departure from the claimed range, gives meaning to the term "about" within the limitation, and aligns with the purpose of the surfactant in the claimed invention. Id. at 238:2-3 (Little).

Mylan's expert, Dr. Michael Crowley, disagreed and opined that a POSA would understand the term "about" in limitation (e) to "capture the errors associated with measurements." Id. at 591:15-18 (Crowley). From examples in the '921 patent, he determined that

dissolution profiles, and enhanced formulation robustness and stability." Id. (quoting JTX 006.1366, .1378).

52

**Appx54**

CONFIDENTIAL MATERIAL REDACTED

MERCK SHARPE & DOHME LLC V. MYLAN PHARM. INC          1:19CV101

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

the quantity of any ingredient could not vary by more than 3.85%, and so the lower limit of the "about 0.5 to 1%" range extends downward only to 0.475%, or 0.48%. Id.

For several reasons the Court credits the testimony of Dr. Little over that of Dr. Crowley and finds that a POSA would understand the "about 0.5 to 1% by weight of a surfactant" range to encompass values that round to 0.4%. First, Dr. Crowley's "measurement error" approach is not supported by the language of the '921 patent. The inventors chose to express the amount of surfactant through a numeric range rather than an exact value, and to expand that range further through use of the term "about." This language therefore indicates flexibility in the amount of surfactant the inventors believed to be necessary in the claimed invention.

As Dr. Crowley pointed out in his testimony, the prior art does require pharmaceutical weighing instruments to be used within the "maximum error of 5% in a single weighing operation" (PTX 650.0019). But, here, the '921 patent never references weighing or measurement errors in connection with the surfactant or otherwise. There therefore is no evidence that the inventors intended the term "about," in combination with a numeric range, to capture only weighing or measurement errors, as Dr. Crowley contends.

53

**Appx55**

MERCK SHARPE & DOHME LLC V. MYLAN PHARM. INC                1:19CV101

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

Second, Dr. Crowley considers all ingredients in the claimed invention to be equal. Instead of extending the "about 0.5 to 1% by weight of a surfactant" range in light of the limitation's function within the claimed invention, he calculates his permissible variance from theoretical values of all of the ingredients. But, in doing so, he fails to distinguish the surfactant from any other ingredient and does not consider the purpose and criticality of the surfactant within the claimed invention as Cohesive requires.

The Court also is unpersuaded that a POSA would apply the same variance to each of the ingredients in the claimed invention when these chemical compounds are present in vastly different amounts and have substantially different chemical characteristics.[19] Furthermore, by applying the same permissible variance to all of the claim limitations, Dr. Crowley imposes a strict numerical limit, a result the use of "about" specifically avoids. Cohesive, 543 F.3d at 1368.

Third, Dr. Crowley's method confines the claimed invention to its embodiments. See Phillips v. AWH Corp., 415 F.3d 1303, 1321 (Fed. Cir. 2005) ("[A]lthough the specification often describes

---

[19] Applying a 3.85% variance to each ingredient in the claimed invention also contradicts the USP-NF's teaching that the amount of API in a tablet may vary between 15% and 25%, (PTX 651.0025).

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments."). He relies on the examples in the '921 patent to narrow the claimed surfactant range, but in doing so ignores the patent's instruction that its examples are "solely for the purpose of illustration and are not intended to be limitations of the present invention – as many variations thereof are possible without departing from the sprit and scope of the invention" (JTX 002.0005-06).

Indeed, Dr. Crowley's measurement error approach effectively reads the term "about" out of the claim. See Cohesive, 543 F.3d at 1368. Without the term "about," the ordinary rules of rounding would extend the lower end of the "0.5 to 1%" range to 0.45%.[20] See Viskase Corp v. Am. Nat'l Can Co., 261 F.3d 1316, 1320 (Fed. Cir. 2007) (recognizing the "standard scientific convention" of significant figures); see also Trial Trans. 437:1-14 (Little). Thus, Dr. Crowley's extension of the range only to 0.48% makes the range narrower than if it had been written without the term "about."

Dr. Little's approach avoids this result. The Court credits his opinion that, for "about" to have meaning within limitation

---

[20] The Court notes that in some instances the intrinsic record supports a construction narrower than afforded under the ordinary rules of rounding. See AstraZeneca AB v. Mylan Pharms. Inc., 19 F.4th 1325, 1330 (Fed. Cir. 2021).

**\*\*SEALED\*\***

**MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL**

(e), it must extend the lower end of the claimed range at least to the next decimal place, or 0.4%. Trial Trans. 227:21-228:10 (Little); see Allergan Inc. v. Sandoz Inc., 796 F.3d 1293, 1311 (2015) ("If 'about 7.3' is to mean anything other than 7.3, it is not clearly erroneous to it to include a value that differs from it by only one decimal place.").

A variance encompassing 0.4% would be a modest departure from the claimed range and within the reasonable expectations of a POSA. As even Dr. Crowley conceded, 0.4% is "extremely close" to 0.5% (Trial Trans. 597:22-598:6 (Crowley)). Although an extension from 0.5% to 0.4% would result in a 20% variance, the use of smaller quantities of ingredients leads to a higher degree of variation in those ingredients. Id. at 173:18-174:15 (Little). Further, the USP-NF permits APIs to vary between 15% and 25% in a compressed tablet (PTX 651.0025).[21] Other courts have found the term "about" to permit even larger variances. See Monsanto, 878 F.3d at 1341-42 ("about 3%" encompassed 4%, a 33% variance); Ortho-McNeil Pharm., Inc. v. Caraco Pharm. Lab'ys, Ltd., 476 F.3d 1321, 1328 (Fed. Cir. 2007) ("about 1:5" encompassed "up to and including 1:7.1," a 42% variance).

---

[21] While this standard does not discuss acceptable variances in relation to excipients, it informs the Court's understanding of permissible variances of sensitive ingredients in pharmaceutical manufacturing operations.

MERCK SHARPE & DOHME LLC V. MYLAN PHARM. INC                    1:19CV101

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

Such a variance also is supported by the criticality and purpose of the surfactant limitation. Dr. Little explained that the specification is largely silent regarding variability of the surfactant (Trial Trans. 435:4-5 (Little)). It does not indicate that variances in the surfactant could undermine the functionality of the product, or contain any data or testing demonstrating the sensitivity of the surfactant range. Compare Cohesive, 543 F.3d at 1368-1369 (finding surfactant variations highly critical due to teachings in the specification).

Nevertheless, the language of limitation (e) informs a POSA about its criticality. The inventors of the '708 patent opted to articulate the amount of surfactant necessary to their claimed invention as a numeric range, not an exact value. They also chose to qualify that range with the term "about."

Thus, the '921 patent specification indicates that the amount of surfactant in the claimed invention is not highly critical and can serve its intended purpose over a range of quantities (Trial Trans. 232:1-10 (Little)). And, as discussed, the purpose of the surfactant in the claimed invention is to increase the dissolution of sitagliptin. Id. at 238:2-3 (Little). The evidence at trial established that Mylan ███████████████████████████████████ ██████ for this purpose.

CONFIDENTIAL MATERIAL REDACTED

MERCK SHARPE & DOHME LLC V. MYLAN PHARM. INC                    1:19CV101

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

Santanu Chakraborty ("Chakraborty"), the head of product development at Mylan, testified ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████

Mylan asserts that its internal testing is irrelevant to the infringement analysis because it occurred post-publication of the '921 patent. At this stage, however, the Court is tasked with determining whether Mylan's accused product infringes the claim limitation as a matter of technological fact. Par, 835 F. App'x at 584. Undoubtedly, this requires an examination of Mylan's Janumet® ANDA product.

Alternatively, Mylan contends that its testing is not informative because it was not performed on the final product and thus may include ██████████████████████████ These factors notwithstanding, Mylan's ██████████████████████ ██████████████████████████████████ allowed it to finalize the ██████████████ in its product to accomplish that purpose.

58

**Appx60**

CONFIDENTIAL MATERIAL REDACTED

MERCK SHARPE & DOHME LLC V. MYLAN PHARM. INC               1:19CV101

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

Not only does the record support Dr. Little's opinion that a POSA would understand 0.4% to be a modest departure from the "0.5 to 1%" range, but it also establishes that a POSA would round a measured value to the same degree of precision as a stated value prior to comparison (Trial Trans. 226:16-227:7 (Little)). As Remington teaches, measured values are written to the measuring instrument's degree of precision (PTX 650.0022). For this reason, the USP-NF states that a measured value "usually will contain more significant figures than there are in the stated limit" and provides that the measured value must "be rounded off to the number of places that is in agreement with the limit expression. . . ." (PTX 651.0012).

Laman Alani, an inventor of the '921 patent, demonstrated this principle at trial (Trial Trans. 182:10-22 (Alani)). She testified that a measured value of 0.49% and a stated value of 0.5% are "the same number" because 0.49% must be rounded to a single decimal point before comparison. Id. A POSA therefore reasonably would have considered the "0.5 to 1% by weight of a surfactant" range to encompass measured values that round to 0.4%.

Because a POSA would reasonably have considered the "about 0.5 to 1% by weight of a surfactant" range to encompass 0.4% and those measured values that round to 0.4%, the Court finds that Mylan's Janumet® ANDA product, ██████████████████████

CONFIDENTIAL MATERIAL REDACTED

MERCK SHARPE & DOHME LLC V. MYLAN PHARM. INC                1:19CV101

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL
███████████████████████████████████████████████ literally

infringes limitation (e) of claim 1.

### b.   Mylan's Janumet® ANDA Product Literally Infringes Limitation (f)

Claim 1 of the '921 patent also requires that the pharmaceutical composition contain "about 5 to 15% by weight of a diluent" (JTX 002.0007). Merck asserts that Mylan's Janumet® ANDA product infringes limitation (f) literally and under the doctrine of equivalents. In assessing these contentions, the Court first must determine if Mylan's Janumet® ANDA product contains a diluent as that term is defined in the '921 patent. If so, the Court must further consider whether it contains "about 5 to 15%" of a diluent as provided in limitation (f). But if Mylan's Janumet® ANDA product does not literally infringe limitation (f), the Court must then consider whether it infringes that limitation under the doctrine of equivalents.

###### i.   █████n's Janumet® ANDA Product ████████████

It is undisputed that Mylan's Janumet® ANDA product contains

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

60

CONFIDENTIAL MATERIAL REDACTED

MERCK SHARPE & DOHME LLC V. MYLAN PHARM. INC                1:19CV101

**SEALED**

<u>MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL</u>

pharmaceutical tablets. <u>Id.</u> at 441:25-442:2 (Little); 653:12-23

(Crowley).

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████

     But that the '921 patent does not limit ████████ in the

manner Dr. Crowley contends. Its lists of binders and diluents are

exemplary and not exhaustive █████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████ Thus, the specification

merely provides a POSA with examples of binders and diluents for

use in the claimed invention, but it does not clearly disavow the

61

CONFIDENTIAL MATERIAL REDACTED

MERCK SHARPE & DOHME LLC V. MYLAN PHARM. INC                    1:19CV101

**SEALED**

**MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL**

full scope of the term "diluent" ████████████████████████

████████████████████████████████████████

*Teleflex, Inc. v. Ficosa N. Am. Corp.,* 299 F.3d 1313, 1325 (Fed. Cir. 2002) ("The patentee may demonstrate intent to deviate from the ordinary and accustomed meaning of a claim term by including in the specification expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope.").

Based on the language of the specification, the Court agrees with Dr. Little that a POSA would not have read the '921 patent as restricting the



Appx64
CONFIDENTIAL MATERIAL REDACTED

MERCK SHARPE & DOHME LLC V. MYLAN PHARM. INC                1:19CV101

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

███████████████████████████████████████████████████████

███████████████████████████████████

    ii.    ███████████ is a Diluent in Mylan's Janumet®

Mylan's internal records recognize ██████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████ Thus, Mylan's ANDA clearly indicates that

its product contains ███████████ as a diluent.

The ANDA also establishes that Mylan relies on ███████████ to

function as a diluent in its product. "It is not necessary that

[Mylan] intended the ███████████ to function as a [diluent] if,

the district court [can] readily find, the ███████████ actually

does so." Par, 835 F. App'x at 585. Dr. Little testified that

diluents can be used in pharmaceutical compositions to regulate

tablet size and compensate for changes in other ingredients,

functions ███████████ performs in Mylan's product (Trial Trans.

211:5-8, 239:21-240:9 (Little)).

CONFIDENTIAL MATERIAL REDACTED

MERCK SHARPE & DOHME LLC V. MYLAN PHARM. INC                1:19CV101

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

Mylan alters the amount of ███████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███ ███ █████ ████ █ ████ █████ █ ██████

████████████████████████████████████████████████████████████

███████████████████████████████

Mylan cannot refute this evidence. Its expert, Dr. Crowley, conceded that ███████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███ Mylan nevertheless insists that Dr. Little's characterization of ██████████ as a diluent is inconsistent with the '921 patent's exemplary lists (Dkt. No. 177-1 at 26-27). As previously discussed, however, the specification does not prohibit ██████████ from serving as a diluent in the claimed invention or in Mylan's Janumet® ANDA product.

---

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

CONFIDENTIAL MATERIAL REDACTED

MERCK SHARPE & DOHME LLC V. MYLAN PHARM. INC                    1:19CV101

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

Alternatively, Mylan argues that ██████████ cannot serve as both a binder and a diluent in the claimed invention. ██████████

████████████████████████████████████████████

██████████  ████  ██████  █  ██  ████████

████████████████████████████████████████████

██████  ██  ██████  ██  ██████  ██████  ██  ██

██████ Nothing in the '921 patent prevents a single ingredient, such as ██████████ from satisfying multiple claim limitations. Other courts have reached the same conclusion. See Par, 835 F. App'x at 585-87 (affirming the district court's conclusion that citric acid, a multifunctional excipient, could satisfy two claim limitations).

In sum, the Court concludes from the '921 patent specification, the prior art, and Mylan's identification of and reliance on ██████████ that Mylan's Janumet® ANDA product contains a diluent ██████████████

   **iii.**  ██████████ **Mylan's Janumet® ANDA Product** ██████ **tation (f)**

The Court next must determine whether the amount of ██████ ██████████████████ Mylan's Janumet® ANDA product satisfies the "about 5 to 15%" range in limitation (f).

65

**Appx67**

CONFIDENTIAL MATERIAL REDACTED

MERCK SHARPE & DOHME LLC V. MYLAN PHARM. INC                 1:19CV101

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

According to Merck's expert, Dr. Little, Mylan's coated[23] 50/500mg strength Janumet® ANDA product contains ██████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████ (Trial Trans. 466:15-467:25, 468:24-469:6 (Little)). Based on this, it was his opinion at trial that Mylan's product literally infringes both the "about 5 to 15% by weight of a diluent" range in limitation (f) and the "about 0 to 35% by weight of a binding agent" range in limitation (d). Id.

In explaining how he arrived at this opinion, Dr. Little testified about his understanding of how Mylan incorporates ████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████████████

_____

[23] Dr. Little performed his calculations twice, using the weight of a coated tablet and an uncoated tablet (Trial Trans. 466:15-467:25, 468:24-469:6 (Little)). Because infringement is based on the weight of the binder and diluent in Mylan's final product, see Ferring, 764 F.3d at 1409, the Court considers only his calculations based on the weight of Mylan's coated tablet (Trial Trans. 575:8-12 (Crowley); 495:19-21, 496:24-497:5 (Little)).

CONFIDENTIAL MATERIAL REDACTED

MERCK SHARPE & DOHME LLC V. MYLAN PHARM. INC                    1:19CV101

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

Second, Dr. Little

CONFIDENTIAL MATERIAL REDACTED

MERCK SHARPE & DOHME LLC V. MYLAN PHARM. INC                1:19CV101

**SEALED**

### MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

██████████████████████████████████████████████████████

██████████

    Finally, █████████████████████████████████████████████

██████████, Dr. Little determined that Mylan's Janumet® ANDA

product contains █████████████████████ of a diluent,

depending on its strength (Trial Trans. 466:15-467:25, 468:24-

469:6 (Little)); see also PTX 762.[26] Both strengths of Mylan's

Janumet® ANDA product therefore contain ██ ████████ of a diluent

and literally infringe the "about 5 to 15% by weight of a diluent"

range in limitation (f). Id. at 467:18-22, 467:24-468:1 (Little).

    Dr. Crowley "vehemently disagree[d]" that a POSA would ████████

████████████████████████████████████████ in order to determine the

amount serving as a diluent in Mylan's Janumet® ANDA product, Id.

at 628:3-10 (Crowley), but he proposed no alternative method.

Instead, he applied Dr. Little's calculation and determined that

Mylan's 50/500mg and 50/1000mg Janumet® ANDA products ████████

██████████████████████████ of a diluent, respectively. Id. at

628:11-25 (Crowley). And, as such, he concluded they do not

literally infringe limitation (f). Id.

---

[26] Dr. Little prepared PTX 762 to demonstrate his mathematical
calculation. See Trial Trans. 459:5-469:6 (Little).
[27] As Dr. Little previously explained, to determine if a measured value
meets a numeric range in a claim limitation, a POSA rounds the measured
value to the same degree of precision. Id. at 467:7-10 (Little).

CONFIDENTIAL MATERIAL REDACTED

MERCK SHARPE & DOHME LLC V. MYLAN PHARM. INC                    1:19CV101

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

Although Drs. Little and Crowley apply the same calculation, they reach different conclusions because they entered different values for two variables. Dr. Little's methodology accounts for

████████████████████████████████████████████████████████

████████████    To account for these variables, he relied on the

██████████████████████████████████    while Dr. Crowley relied on

a particular batch of ██████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████

At this point, the parties repeat their Glaxo versus Sunovion arguments. But as both experts derive their input values directly from Mylan's ANDA, the ANDA not silent on this issue and Sunovion again governs the Court's infringement analysis. See supra §

69

CONFIDENTIAL MATERIAL REDACTED

MERCK SHARPE & DOHME LLC V. MYLAN PHARM. INC          1:19CV101

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

III.B.2.b.; <u>Ferring</u>, 764 F.3d at 1382. For this reason, the Court
agrees with Dr. Little that, in order to demonstrate the full scope
of what Mylan has requested FDA approval to market, a POSA would
input values from ███████████████████████████

Finally, because, per Dr. Little's calculations, Mylan's
Janumet® ANDA product literally infringes limitation (f), the
Court need not consider whether the product also meets that claim
limitation under the doctrine of equivalents.

C.   **Invalidity of the '708 Patent**

According to Mylan, claims 1, 2, 3, and 19 of the '708 patent
are invalid under the judicially created doctrine of obviousness-
type double patenting, and under 35 U.S.C. § 112 for lack of
written description or enablement.

   1.   **Legal Standard**

Each of the asserted claims is presumed to be valid. <u>See</u> 35
U.S.C. § 282; <u>Microsoft Corp. v. I4i Ltd. P'ship</u>, 564 U.S. 91, 94
(2011); <u>Novo Nordisk A/S v. Caraco Pharm. Lab'ys, Ltd.</u>, 719 F.3d
1346, 1352 (Fed. Cir. 2013). Mylan thus bears the burden of proving
invalidity by clear and convincing evidence. <u>See</u> 35 U.S.C. § 282
("The burden of establishing invalidity of a patent or any claim
thereof shall rest on the party asserting such invalidity.");
<u>Microsoft</u>, 564 U.S. at 102 ("[A] defendant raising an invalidity
defense [bears] a heavy burden of persuasion, requiring proof of

**Appx72**

CONFIDENTIAL MATERIAL REDACTED

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

the defense by clear and convincing evidence." (citation and quotation marks omitted)). "Clear and convincing evidence places in the fact finder 'an abiding conviction that the truth of [the] factual contentions are highly probable.'" Procter & Gamble Co. v. Teva Pharm. USA, Inc., 566 F.3d 989, 994 (Fed. Cir. 2009) (quoting Colorado v. New Mexico, 467 U.S. 310, 316 (1984)).

### 2.    Obviousness-Type Double Patenting

An inventor may obtain only one patent for any single invention. See Otsuka Pharm. Co. v. Sandoz, Inc., 678 F.3d 1280, 1297 (Fed. Cir. 2012) (citing 35 U.S.C. § 101). The judicially created obviousness-type double patenting doctrine thus precludes an inventor "from obtaining more than one valid patent for either (a) the 'same invention,' or (b) an 'obvious' modification of the same invention." Id. (quoting In re Longi, 759 F.2d 887, 892 (Fed. Cir. 1985). The purpose of this doctrine is to prevent an inventor from unduly extending its monopoly by claiming a slight variation of an earlier patented invention. See Sun Pharm. Indus. Ltd. v. Eli Lilly and Co., 611 F.3d 1381, 1384 (Fed. Cir. 2010); Abbvie v. Mathilda & Terence Kennedy Inst. of Rheumatology Tr., 764 F.3d 1366, 1378-79 (Fed. Cir. 2014).

The obviousness-type double patenting analysis involves two steps: "First, the court construes the claims in the earlier patent and the claims in the later patent and determines the differences.

71

**Appx73**

MERCK SHARPE & DOHME LLC V. MYLAN PHARM. INC                1:19CV101

**SEALED**

### MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

Second, the court determines whether those differences render the claims patentably distinct." Pfizer, Inc. v. Teva Pharms. USA, Inc., 518 F.3d 1353, 1363 (Fed. Cir. 2008) (quotation and alterations omitted). "A later patent claim is not patentably distinct from an earlier patent claim if the later claim is obvious over, or anticipated by, the earlier claim." Eli Lilly and Co. v. Barr Lab'ys, Inc., 251 F.3d 955, 968 (Fed. Cir. 2001).

    a.   **The Differences Between the Reference Claims and the Asserted Claims**

The Court first considers the differences between the asserted claims and the reference claims. According to Mylan, asserted claims 1, 2, and 3 of the '708 patent are patentably indistinct from reference claim 17 of Merck's earlier-issued '871 patent ("the reference patent"), and asserted claim 19 of the '708 patent is patentably indistinct from reference claim 20 of the '871 patent.

Reference claim 17 covers the sitagliptin free base compound in its (R)-configuration, "or a pharmaceutically acceptable salt thereof" (DTX 2054.0022). Asserted claim 1 covers the 1-to-1 DHP salt of sitagliptin, and asserted claims 2 and 3 cover this salt in its (R)-configuration and (S)-configuration, respectively (JTX 001.0014). The difference between these claims is that asserted claims 1, 2, and 3 cover a particular species of sitagliptin salt

72

MERCK SHARPE & DOHME LLC V. MYLAN PHARM. INC          1:19CV101

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

encompassed by the broad genus of sitagliptin salts described in reference claim 17. There is no dispute that the 1-to-1 DHP salt of sitagliptin is a pharmaceutically acceptable salt (Trial Trans 309:19-21 (Buckton); 949:10-12 (Myerson)).

Next, reference claim 20 claims "[a] pharmaceutical composition which comprises an inert carrier and a compound of claim 17" (DTX 2054.0022). Asserted claim 19 recites a "method for the treatment of type 2 diabetes comprising administering to a patient in need of such treatment a therapeutically effective amount of the salt according to claim 2 or a hydrate thereof" (JTX 001.0015). These claims are different because the reference claim covers pharmaceutical compositions containing sitagliptin or any pharmaceutically acceptable sitagliptin salt, whereas the asserted claim covers a method of using the particular 1-to-1 DHP salt of sitagliptin in its (R)-configuration to effectively treat patients with type 2 diabetes.

Notably, reference claims 17 and 20 and asserted claims 1, 2, 3, and 19 are similar in that all "are useful in the treatment or prevention of diseases in which the [DPP-IV] enzyme is involved," particularly type 2 diabetes (DTX 2054.0001, .0019-21; JTX 002.0007).

MERCK SHARPE & DOHME LLC V. MYLAN PHARM. INC                    1:19CV101

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

b. **These Differences Render the Asserted Claims Patentably Distinct**

In light of these differences, the Court must determine whether the asserted claims are more than "slight variations" of the reference claims. Eli Lilly v. Teva, 689 F.3d at 1340. At this second step, "the law of obviousness-type double patenting looks like the law of obviousness generally" and "is analogous to an obviousness analysis under 35 U.S.C. § 103." Abbvie, 764 F.3d at 1379 (quotations omitted).

"It is well-settled that a narrow species can be non-obvious and patent eligible despite a patent on its genus." Id. (citing Eli Lilly & Co. v. Bd. of Regents of Univ. of Wash., 334 F.3d 1264, 1270 (Fed. Cir. 2003); see also Brigham & Women's Hosp. Inc. v. Teva Pharm. USA. Inc., 761 F. Supp. 2d 210, 224 (D. Del. 2011) ("[A]n earlier patent claiming a large genus of pharmaceutical compounds does not preclude a later patent claiming a species within that genus, so long as the species is novel, useful, and nonobvious.").

In the obviousness-type double patenting context, where claimed chemical compounds are involved, the analysis turns on "whether the later compound would have been an obvious . . . modification of the earlier compound." UCB, Inc. v. Accord Healthcare, Inc., 890 F.3d 1313, 1323 (Fed. Cir. 2018). This type

74

MERCK SHARPE & DOHME LLC V. MYLAN PHARM. INC                    1:19CV101

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

of challenge "requires identifying some reason that would have led a chemist to modify the earlier compound to make the later compound with a reasonable expectation of success." Eli Lilly v. Teva, 689 F.3d at 1378.[28]

### c.    Asserted Claims 1 and 2

As it relates to asserted claims 1 and 2, the double patenting inquiry is whether, upon reading reference claim 17, a POSA would have been motivated to create the 1-to-1 DHP salt of sitagliptin in its (R)-configuration with a reasonable expectation of success. UCB, 890 F.3d at 1324.

### i.    Asserted Claims 1 and 2 Are Not Obvious Considering the '871 Patent Alone

Mylan contends that, even without considering any prior art, reference claim 17, in combination with the definition of "pharmaceutically acceptable salts" in the '871 patent specification, renders the 1-to-1 DHP salt of sitagliptin in its (R)-configuration obvious. Merck disagrees. The parties' dispute centers on the extent to which the Court should consider the '871

---

[28] Mylan relies on Geneva Pharms., Inc. v. GlaxoSmithKline PLC, 349 F.3d 1373, 1378 n.1 (Fed. Cir. 2003), to assert that the obviousness-type double patenting analysis does not require an inquiry into the motivation to modify the prior art (Dkt. No. 175 at 7 n.2). But the Federal Circuit rejected this argument in Otsuka, 678 F.3d at 1298, holding that, as with a § 103 analysis, obviousness-type double patenting requires a determination that a POSA would have had a "motivation to modify the earlier claimed compound to make the compound of the asserted claim with a reasonable expectation of success." Id.

75

**SEALED**

**MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL**

patent specification in its obviousness-type double patenting analysis.

The '871 patent specification defines "pharmaceutically acceptable salts" as used in reference claim 17 as those salts "prepared from pharmaceutically acceptable non-toxic bases or acids including inorganic or organic bases and inorganic or organic acid" (DTX 2054.0004). It then teaches that when a compound of the invention is basic, as is the sitagliptin free base, "salts may be prepared from pharmaceutically acceptable non-toxic acids, including inorganic and organic acids," and it provides a list of twenty-six (26) exemplary acids. Id. at .0004-05. The specification further instructs that, of the exemplary acids, eight are particularly preferred, including phosphoric acid. Id. at .0005.

According to Mylan, the list of particularly preferred acids in the '871 patent is part of the definition of "pharmaceutically acceptable salts" (Dkt. No. 175 at 7-8). Given that, it contends this definition significantly narrows the genus of pharmaceutically acceptable sitagliptin salts described in reference claim 17. Id. at 8. And based on this narrowing Mylan's expert, Dr. Graham Buckton, opined that a POSA would have been motivated to combine phosphoric acid with the sitagliptin free

76

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

base, and would have reasonably expected the 1-to-1 DHP salt of sitagliptin to form (Trial Trans. 309:15-312:12 (Buckton)).

Merck contends Mylan's reliance on the list of preferred acids in the '871 patent specification is misplaced (Dkt. No. 176 at 23-24). It disputes that the list of exemplary acids in the '871 patent is part of the definition of "pharmaceutically acceptable acids," and contends that the Court ought not consider this list since its obviousness-type double patenting analysis turns on what the reference patent claims, not what it discloses. Id.

Because "[i]t is the claims, not the specification, that define an invention," Ortho, 959 F.2d at 943, the Court agrees with Merck. As the Federal Circuit has explained:

> As a general rule, obviousness-type double patenting determinations turn on a comparison between a patentee's earlier and later claims, with the earlier patent's written description considered only to the extent necessary to construe its claims. This is so because the nonclaim portion of the earlier patent ordinarily does not qualify as prior art against the patentee and because obviousness-type double patenting is concerned with the improper extension of exclusive rights—rights conferred and defined by the claims. The focus of the obviousness-type double patenting doctrine thus rests on preventing a patentee from claiming an obvious variant of what it has previously claimed, not what it has previously disclosed.

Eli Lilly v. Teva, 689 F.3d at 1378-79 (emphasis in original) (citations omitted). In limited instances, the Court may consider the reference patent's specification to the extent necessary to

77

MERCK SHARPE & DOHME LLC V. MYLAN PHARM. INC          1:19CV101

**SEALED**

**MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL**

construe its claims and understand their utility, id. at 1379-80, but this case presents no such circumstance.

In the first place, the reference patent's list of particularly preferred acids is not needed to construe the term "pharmaceutically acceptable salts." Both Dr. Buckton, and Merck's expert, Dr. Allan Myerson, opined at trial that a POSA would have understood this commonly used term without needing to consult the specification (Trial Trans. 310:25-311:10, 366:8-16 (Buckton); 842:25-843:8 (Myerson)). Even so, the reference patent's definition of this term comports with a POSA's common understanding, id. at 368:1-14 (Buckton), and does not include the list of particularly preferred acids. Id. at 368:15-369:20 (Buckton); 843:25-844:10 (Myerson).

Secondly, the '871 patent specification's list of particularly preferred acids is not needed to determine the utility of reference claim 17. Sun Pharm., 611 F.3d at 1387 ("[W]here a patent features a claim directed to a compound, a court must consider the specification because the disclosed uses of the compound affect the scope of the claim for obviousness-type double patenting purposes."). The reference patent teaches that reference claim 17 is "useful in the treatment or prevention of diseases in which the [DPP-IV] enzyme is involved, such as diabetes and particularly type 2 diabetes" (DTX 2054.0001). But its list of

78

**Appx80**

MERCK SHARPE & DOHME LLC V. MYLAN PHARM. INC          1:19CV101

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

particularly preferred acids adds nothing to a POSA's understanding of this disclosed utility.

Finally, Mylan's argument that the Court may consider the reference patent's list of particularly preferred acids to interpret the scope of the genus in reference claim 17 is unpersuasive. In support of its argument, Mylan relies on Sun Pharm., where the Federal Circuit stated that "a court considering a claim to a compound must examine the patent's specification to ascertain the coverage of the claim, because a claim to a compound '[s]tanding alone . . . does not adequately disclose the patentable bounds of the invention.'" 611 F.3d at 1387 (citing Geneva, 349 F.3d at 1385).

On first review, Sun Pharm. appears to support Mylan's argument. On closer examination, however, it is clear that what Sun Pharm. permits is examination of the reference patent specification to ascertain the relevant disclosed utility of the compound. As the Federal Circuit later explained, the teachings of Sun Pharm. and its related line of cases apply to the "situation in which an earlier patent claims a compound, disclosing the utility of that compound in the specification, and a later patent claims a method of using that compound for a particular use described in the specification of the earlier patent." Eli Lilly v. Teva, 689 F.3d at 1378-79 (collecting cases). As the issue

79

**Appx81**

MERCK SHARPE & DOHME LLC V. MYLAN PHARM. INC          1:19CV101

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

addressed in Sun Pharm. is not before the Court, its teachings are not relevant to the analysis here.

As it pertains to its obviousness-type double patenting analysis, the Court concludes that the reference patent's list of particularly preferred acids does not narrow the genus of sitagliptin salts covered by reference claim 17. Mylan consequently must demonstrate by clear and convincing evidence that a POSA would have found her way from the generic pharmaceutically acceptable salt of sitagliptin, as claimed in reference claim 17, to the particular 1-to-1 DHP salt of sitagliptin in its (R)-configuration as claimed in asserted claims 1 and 2.

Based on reference claim 17 and the definition of "pharmaceutically acceptable salts," Mylan has not met this burden. The mere fact that reference claim 17 covers pharmaceutically acceptable salts of sitagliptin would not, in and of itself, have motivated a POSA to abandon the free base form of sitagliptin to go in search of an acid-addition salt of this compound. And even if a POSA did pursue a salt form nothing in reference claim 17 would have motivated her to select the specific 1-to-1 DHP salt of sitagliptin from all of the pharmaceutically acceptable salts of sitagliptin. Nor would reference claim 17 have given her a reasonable expectation of success in doing so.

MERCK SHARPE & DOHME LLC V. MYLAN PHARM. INC          1:19CV101

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

ii.    WO '498 Does Not Qualify as a Prior Art
Reference

Mylan next contends that asserted claims 1 and 2 would be obvious over WO '498 and other prior art. Merck objects that WO '498 does not qualify as prior art to the '708 patent. The specification of WO '498 is substantively identical to that of the '871 patent (Trial Trans. 327:25-328:2 (Buckton)). Thus, if prior art, the Court may consider all of WO '498's disclosures, including its list of particularly preferred acids and its example of a hydrochloric salt of sitagliptin. See DTX 036.0010-11, .0047.

Despite Mylan's assertions, WO '498 does not qualify as prior art. WO '498 and the '708 patent were commonly owned by Merck at the time of the inventions claimed in the '708 patent (Dkt. No. 123 at 17). Based on this common ownership, prior to trial, the parties stipulated that WO '498 was not available as prior art to prove obviousness under 35 U.S.C. § 103. Id. And because WO '498 is disqualified as an obviousness reference, it is also disqualified as an obviousness-type double patenting prior art reference. See Ex Parte Hrkack, 2011 WL 514313, at *5 (B.P.A.I. Feb, 9, 2011). Mylan therefore cannot rely on WO '498 to support its obviousness-type double patenting challenge.

81

Appx83

MERCK SHARPE & DOHME LLC V. MYLAN PHARM. INC                1:19CV101

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

### iii.    Asserted Claims 1 and 2 Are Not Obvious Considering the Prior Art

Even without WO '498, Mylan contends that asserted claims 1 and 2 would be obvious over reference claim 17 in light of the remaining prior art. Its expert, Dr. Buckton, testified that a POSA would have been motivated to conduct a salt screen of the sitagliptin free base and to include phosphoric acid in her experiment based on the acid's known pharmaceutical properties and frequency of use in pharmaceutical salts (Dkt. No. 175 at 11-12). He further asserted that a POSA reasonably would have expected the 1-to-1 DHP salt of sitagliptin to form in a reaction between the sitagliptin free base and phosphoric acid based on the difference in their pK$_a$ values. Id. at 12.

Merck's expert, Dr. Myerson, rejected this contention, explaining that the prior art would not have motivated a POSA to modify the broad genus of sitagliptin free base and all pharmaceutically acceptable sitagliptin salts to achieve the 1-to-1 DHP salt of sitagliptin (Dkt. No. 176 at 11-12). In his opinion, a POSA would not have been motivated to (1) abandon the sitagliptin free base; (2) abandon the HCL salt of sitagliptin; or (3) conduct a salt screen, including phosphoric acid, in such experiment. Id. at 12-18. Nor would a POSA have had any expectation of success in synthesizing the 1-to-1 DHP salt of sitagliptin

**\*\*SEALED\*\***

**MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL**

because the prior art did not teach a method for predicting whether any pharmaceutical salt of sitagliptin would form. Id. at 19-22. And if a pharmaceutical salt had formed, the prior art did not teach a method for predicting its stoichiometry. Id.

After fair consideration of this testimony, the Court concludes that Mylan has not established by clear and convincing evidence that a POSA would have been motivated to modify the reference genus in claim 17 of the '871 patent to achieve the 1-to-1 DHP salt of sitagliptin covered by asserted claims 1 and 2. Nor, in doing so, would she have had a reasonable expectation of success.

### (a)  No Motivation

There are several reasons why the prior art on which Mylan relies would not have motivated a POSA to modify the reference genus. First, even accepting Dr. Buckton's assertion that a salt screen is a relatively simple experiment, the prior art did not necessarily direct a POSA to conduct such an experiment for the sitagliptin free base. Undoubtedly, the benefits of developing pharmaceutical salts were well known when the '708 patent was published. See DTX 006.0004-05 (teaching salt selection as a means for creating and developing the compound with the best aggregate pharmaceutical properties); DTX 005.0001 (same); DTX 007.0037 (teaching that salt forms might display better pharmaceutical

MERCK SHARPE & DOHME LLC V. MYLAN PHARM. INC          1:19CV101

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

properties than the neutral form of the same compound). The prior art also taught that salt formation was common with weakly basic compounds, because "it is a relatively simple chemical manipulation which may alter the physiochemical, formulation, biopharmaceutical, and therapeutic properties of a drug without modifying the basic chemical structure" (DTX 007.0002).

But although a POSA would have understood the benefits of pursuing a salt form of sitagliptin, a weakly basic compound (Trial Trans. 956:13-14 (Myerson)), the prior art did not disclose information that would have been essential to her experiment, such as sitagliptin's solubility or $pK_a$ value (DTX 235.0008; DTX 005.0001-02). Thus, even Dr. Buckton's opinion would require a POSA to conduct other preliminary testing of the sitagliptin compound before conducting a salt screen.

Further, the prior art taught that it is not always necessary for a POSA to seek a salt form of a new chemical compound. See PTX 274 (providing examples of pharmaceutical compounds marketed in non-salt forms); DTX 021.0001 (teaching that 50% drug entities were administered as salts). In fact, although Bighley outlines a methodology for salt selection, its first step directs a POSA to determine whether a salt form is even necessary, or whether the pharmaceutical compound is viable per se (DTX 007.0030-31).

84

MERCK SHARPE & DOHME LLC V. MYLAN PHARM. INC          1:19CV101

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

Although Dr. Buckton conceded that the prior art did not disclose the pharmaceutical properties of the sitagliptin free base, it was his opinion that a POSA would have immediately pursued salt forms of this compound (Trial Trans. 282:12-283:14, 293:8-13 (Buckton)). But the evidence at trial indicated that sitagliptin might have been one of the compounds for which a salt form would not be needed. Indeed, the prior art taught that "the vast majority of salts are developed to enhance the aqueous solubility of drug substances" (DTX 005.0002), and there generally is no need for a salt form for "a high-melting water-soluble solid" (DTX 007.0032, .0034). As the sitagliptin free base had good solubility and a high-melting point in its solid form (Trial Trans. 849:2-850:23 (Myerson)), a POSA easily could have determined the sitagliptin free base to be viable and not have pursued a salt form.

Second, had a POSA pursued a salt form of sitagliptin, the prior art would have directed her to the HCL salt. The evidence at trial established that, at the time of the invention, hydrochloric acid was the obvious choice for acid-addition salts of basic compounds. Throughout the relevant time frame, hydrochloric was the most commonly used acid in basic drugs. See DTX 006.0004; DTX 012.0005; DTX 007.0003-05. Gould specifically noted that "there is clear precedent, and an overwhelming argument on many grounds to immediately process to the HCL salt and evaluate other forms only

85

Appx87

MERCK SHARPE & DOHME LLC V. MYLAN PHARM. INC          1:19CV101

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

if problems with the hydrochloride emerge" (DTX 012.0005). Bighley's decision tree also taught a POSA to evaluate an HCL salt before making mineral salts, such as a phosphate salt (DTX 007.0034-35).[29] Moreover, the prior art disclosed no problem with the HCL salt of sitagliptin (Trial Trans. 380:8-381:17 (Buckton); 825:17- 826:5 (Myerson)). Therefore, based on the prior art's preference for hydrochloride salts, a POSA likely would have pursued an HCL salt of sitagliptin before attempting a phosphate salt.

Third, had a POSA conducted a salt screen, it is not clear she would have included phosphoric acid. Typically, she would have begun her screen with approximately ten acids. Id. at 293:14-19 (Buckton); 877:19-878:8 (Myerson). But at the time of the invention there were more than 100 pharmaceutically acceptable acids available from which a POSA could have populated her experiment Id. at 876:24-877:12 (Myerson); see also DTX 007.0004-05. And because neither the properties of the sitagliptin free base nor

---

[29] Although he conceded that Bighley's decision tree is written sequentially, Dr. Buckton testified that it taught a POSA to create a hydrochloride salt and other mineral salts simultaneously. The Court is unconvinced. The weight of the evidence established that Bighley taught a process for efficiency in salt formation and emphasized that pharmaceutical manufacturers must proceed quickly and should narrow salt forms as soon as possible (DTX 007.0034-37). It therefore instructed a POSA to create a hydrochloride salt and study its viability before turning to the time-consuming process of creating and studying other salt forms. Id.

MERCK SHARPE & DOHME LLC V. MYLAN PHARM. INC          1:19CV101

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

any problem with this compound were known, the prior art would not have directed a POSA's research or narrowed this world of potential pharmaceutically acceptable acids.

Nevertheless, Dr. Buckton testified that a POSA would have included phosphoric acid in her salt screen simply due to its popularity (Trial Trans. 297:14-22 (Buckton)). In 1996, phosphoric acid was the eighth most commonly used acid in pharmaceutical salts (DTX 007.0004-05), but its popularity had decreased during the relevant time frame. Between 1995 and 2006, the FDA approved 101 salts of basic drugs but phosphoric acid appeared in only 2 of them, one of which was Merck's NDA product (PTX 111.0011).[30]

Moreover, when selecting acids other than hydrochloric acid, the prior art did not teach a POSA to consider an acid's frequency of use but instead instructed her to consider any issues with the basic drug compound and the acids known to target such problems (DTX 005.0002-04). For example, a POSA would have relied on phosphoric acid to increase the solubility of basic drugs (DTX 021.0137, .0182). But, here, where sitagliptin did not have poor solubility, a POSA reasonably could have excluded phosphoric acid from any salt screen. A POSA also may have been dissuaded from

---

[30] During this same time, hydrochloric acid remained the most frequently chosen acid, appearing in 54 salts of drug entities approved by the FDA (PTX 111.0011).

87

Appx89

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

pursuing a phosphoric salt of sitagliptin because she would have been aware that such salts tend to form hydrates (DTX 021.0137, .0182), and in other instances had proved to be unstable (PTX 35; PTX 155; PTX 219).

Dr. Buckton also opined that a POSA would have included phosphoric acid in her salt screen of sitagliptin based on the difference in their $pK_a$ values[31] (Trial Trans. 314:8-315:2 (Buckton)). But the $pK_a$ of sitagliptin had never been disclosed in the prior art, or in the '871 patent. Id. at 382:15-20 (Buckton); 829:9-17 (Myerson). Dr. Buckton nevertheless contends that a POSA could have synthesized sitagliptin and measured its $pK_a$. Id.

But even if true and a POSA knew sitagliptin's $pK_a$, phosphoric acid was just one of many acids within Dr. Buckton's desired $pK_a$ range. Specifically, phosphoric acid was one of sixty-nine (69) pharmaceutically acceptable acids with a $pK_a$ value 2 units greater than that of sitagliptin, and one of fifty-five (55) pharmaceutically acceptable acids with a $pK_a$ 3 units greater than that of sitagliptin (DTX 021.0210, .0215-16). Accordingly, a POSA's knowledge of sitagliptin's $pK_a$ would not have significantly narrowed the world of acids that she could have included in her

---

[31] As discussed in detail below, it was Dr. Buckton's opinion that a POSA would have expected a salt to form if there was an adequate difference between the $pK_a$ values of the basic drug and acid.

MERCK SHARPE & DOHME LLC V. MYLAN PHARM. INC                    1:19CV101

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

salt screen, and she would have had to select phosphoric acid from the many acids with the same or similar $pK_a$.

For these reasons, the Court concludes that Mylan has failed to establish that the prior art would have motivated a POSA to modify the reference genus to arrive at the specific species covered by the asserted claims.

### (b)  No Reasonable Expectation of Success

Mylan also has not sufficiently demonstrated that a POSA would have had a reasonable expectation of success in modifying the reference genus to achieve the claimed 1-to-1 DHP salt of sitagliptin. The prior art recognized the unpredictable nature of salt formation. See DTX 006.0001-02; DTX 007.0002. To overcome this unpredictability, Bighley proposed a method to guide a POSA methodically through salt selection. DTX 007.0002, .0029-30 (proposing a methodology "whereby a suitable salt form can be chosen in an efficient and timely manner with few false states and the minimum expenditure of resources").

Other prior art sources recognized that knowledge of a compound's $pK_a$ could be an important factor in a POSA's salt formation process. Aulton taught that solubility and $pK_a$ control a POSA's work, and that $pK_a$ can aid her selection of salts, if necessary (DTX 235.0008). Bighley instructed that the $pK_a$ value of a compound can determine the range of acids available for salt

89

**Appx91**

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

formation and that "[t]here should be at least one unit of separation between the $pK_a$ of the basic drug and that of the [acid]" (DTX 007.0034). Likewise, Bastin taught that the $pK_a$ value is one of the first pieces of information that a POSA would need to select acids for a salt screen (DTX 005.0001-02). It also instructed that "there should be a minimum difference of about 3 units between the $pK_a$ value of the [compound] and that of its counter[-]ion." Id. Stahl suggested that a POSA should select acids with a minimum difference of 2 or 3 units (DTX 021.0062-63, .0091).

Dr. Buckton relied heavily on this so-called delta $pK_a$ rule to support his opinion that a POSA would have reasonably expected the 1-to-1 DHP salt of sitagliptin to form. As he explained, the $pK_a$ of sitagliptin is 7.7 and the $pK_a$ of phosphoric acid's first, second, and third protons are 1.96, 7.12, and 12.32, respectively. Accordingly, because the difference between the $pK_a$ value of sitagliptin and the $pK_a$ value of phosphoric acid's first proton is greater than 3 units, a POSA could have predicted that a phosphate salt of sitagliptin would form.

But the prior art did not teach the delta $pK_a$ rule to be as predictive as Dr. Buckton contends. Bastin taught that "knowledge of the $pK_a$ value enables potential salt forming agents (counter[-]ions) to be selected. . . ." (DTX 005.0001-02). And Stahl, after recognizing that a $pK_a$ delta of greater than 3 units can be a

90

**\*\*SEALED\*\***

**MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL**

valuable guideline for a POSA in selecting acids for a screen, taught that "[n]o predictive procedure to determine whether a particular acidic or basic drug would form a salt with a particular counter-ion has been reported in the literature" (DTX 021.0062-63, .0091). Thus, even with knowledge of a compound's $pK_a$ "a more predictive method for assessing the feasibility of salt formation would be necessary to minimize trials and errors in the salt-selection program." Id. at .0063. Indeed, the prior art also taught that stable salts can form from reactions with a $pK_a$ differential below 3 units, and, significantly, that art contained examples of experiments in which the $pK_a$ differential exceeded 3 units but no salt formed (0005.0001-02, .0004-06).

Thus, while the delta $pK_a$ rule may inform a POSA's selection of acids for a salt screen, and thereby increase the chance of salt formation, it can neither predict nor guarantee that any salt will form. As Dr. Myerson explained, an increased difference in $pK_a$ values ensures that there is sufficient ionization in the chemical reaction to enable proton transfer and salt formation (Trial Trans. 838:21-839:5 (Myerson)). Nevertheless, a POSA cannot predict whether salt formation will occur unless and until the reaction produces such salt.

His perspective was confirmed by the evidence at trial. Dr. Wenslow, one of the named inventors of the '708 patent, testified

91

MERCK SHARPE & DOHME LLC V. MYLAN PHARM. INC          1:19CV101

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

that, while the delta $pK_a$ rule might help a POSA select acids for a salt screen, she must still choose from more than 20 or 30 potential acids. Id. at 737:1-21 (Wenslow). Importantly, because salt formation is "serendipitous," he testified that even those "fluent in salt selection" applying the delta $pK_a$ rule could not reasonably predict whether a salt would form in any given reaction. Id. at 736:10-737:9, 738:20-740:2 (Wenslow). Another named inventor, Dr. Hansen, also testified that, despite his efforts, he had been unable to synthesize a hydrochloric salt of sitagliptin although the difference in $pK_a$ values exceeded 3 units. Id. at 114:15-115:4 (Hansen).

The Court is not persuaded by Dr. Buckton's opinion that, although sitagliptin is polyprotic and capable of forming salts in several different stoichiometries, a POSA reasonably would have expected the specific 1-to-1 stoichiometry of the DHP salt of sitagliptin to form. He testified that, because only the $pK_a$ value of phosphoric acid's first proton would satisfy the delta $pK_a$ rule, a POSA reasonably would have expected any phosphate salt of sitagliptin to be in the 1-to-1 ratio. But, as has been discussed, the prior art taught that a salt may form from a reaction that does not satisfy the delta $pK_a$ rule. Notably, since the filing of the '708 patent, non-1-to-1 DHP salts of sitagliptin have been

92

MERCK SHARPE & DOHME LLC V. MYLAN PHARM. INC                1:19CV101

**\*\*SEALED\*\***

<u>MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL</u>

synthesized (Dkt. No. 123 at 17-18; Trial Trans. 821:21-822:3,

(Myerson)).[32]

To conclude, Mylan has failed to prove by clear and convincing

evidence that the prior art would have motivated a POSA to modify

the reference genus to achieve the specific 1-to-1 DHP salt of

sitagliptin with a reasonable expectation of success. Its

obviousness-type double patenting challenge to the validity of

asserted claims 1 and 2 therefore fails.

### iv.    <u>Pfizer v. Apotex</u> Is Not Controlling

Mylan's contention that <u>Pfizer, Inc. v. Apotex, Inc.</u>, 480

F.3d 1348, 1359 (Fed. Cir. 2007), compels a different result (Dkt.

No. 175 at 8-10) is unavailing. Two patents were at issue that

case. In the first, Pfizer claimed the generic amlodipine compound

and disclosed twelve of its pharmaceutically acceptable acid-

addition salts. 480 F.3d at 1352-53. Although that patent expressed

a preference for the maleate salt of amlodipine, Pfizer later

discovered that it was not suitable for commercial development due

to its stickiness and degradation. <u>Id.</u> at 1353-54. To find a more

suitable salt form, Pfizer isolated the problem within the chemical

---

[32] Nor does the fact that a POSA would have conducted her salt screen
using equimolar proportions of the relevant acid and base (DTX 005.0002),
alter the Court's conclusion. The prior art demonstrated that, even when
using equimolar proportions of the acid and base, non-1-to-1 salts may
form (PTX 154).

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

structure of the maleate salt and, using prior art teachings, compiled a list of seven other pharmaceutically acceptable acids that could eliminate these manufacturing barriers. After determining the besylate salt of amlodipine to be the best alternative to the amlodipine salt, Pfizer claimed it in a second patent. Id. at 1352-54, 1362. After the district court rejected Apotex's obviousness challenge, the Federal Circuit reversed, emphasizing that its holding was premised on the "particularized facts" of the case. Id. at 1358-59, 1369.

It is on those "particularized facts" that the Court distinguishes Pfizer v. Apotex and concludes it does not control the analysis in this case. In the first place, Pfizer's chemists were motivated to modify its earlier-claimed compound to address a particular need and relied on prior art teachings to select a limited number of acids that would allow them to design around the manufacturing issues they had identified. Here, in contrast, the prior art never disclosed any issue with the sitagliptin free base or any pharmaceutically acceptable salt of sitagliptin that would have driven a POSA's salt selection or narrowed the genus of pharmaceutically acceptable acids that could be used in salt formation.

In Pfizer v. Apotex, moreover, the prior art taught that the besylate salt of amlodipine likely would have solved the issues

94

**\*\*SEALED\*\***

### MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

that prevented Pfizer from manufacturing the maleate salt of amlodipine. Here, Mylan has offered no prior art reference teaching that the phosphate salt of sitagliptin would be beneficial, or even suggesting that a POSA could have synthesized a phosphate salt of sitagliptin in the first place.

> **d.    Asserted Claim 3 Is Not Obvious Over the '871 Patent or the Prior Art**

As to asserted claim 3, the obviousness-type double patenting inquiry is whether reference claim 17 covering the sitagliptin free base in its (R)-configuration, in combination with the prior art, would have motivated a POSA to create the 1-to-1 DHP salt of sitagliptin in its (S)-configuration with a reasonable expectation of success. UCB, 890 F.3d at 1324. Because asserted claim 3 differs from asserted claim 2 only in so far as it relates to the (S)-configuration of the 1-to-1 DHP salt of sitagliptin, the Court's obviousness-type double patenting analysis of asserted claims 1 and 2 also applies to asserted claim 3.

Several undisputed facts are relevant to this inquiry. First, with its one chiral center, sitagliptin has two isomers, its (R) and (S)-configurations (Trial Trans. 316:21-317:13 (Buckton); 957:25-958:2 (Myerson)). Second, a POSA knowing the (R)-configuration of a compound could create the (S)-configuration. Id. at 317:8-13 (Buckton); 958:12-959:8 (Myerson). Third, the (R)-

95

MERCK SHARPE & DOHME LLC V. MYLAN PHARM. INC                1:19CV101

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

configuration and the (S)-configuration of the same compound can have different biological properties. Id. at 317:14-16 (Buckton); 959:1-3 (Myerson).

These known facts might have motivated a POSA to modify the 1-to-1 DHP salt of sitagliptin in the (R)-configuration to create the (S)-configuration with a reasonable expectation of success. But they do not overcome the larger problem Mylan has, which is that it has failed to establish that reference claim 17 and the prior art would have motivated a POSA to create any DHP salt of sitagliptin with a reasonable expectation of success.[33] It is for this reason that Mylan's obviousness-type double patenting challenge to asserted claims 1, 2, and 3 fails.

### e. Asserted Claim 19 Is Not Obvious Over the '871 Patent or the Prior Art

Finally, the Court must consider whether a POSA, upon reading reference claim 20, would have been motivated to treat type 2 diabetes patients with a therapeutically effective amount of the 1-to-1 DHP salt of sitagliptin in its (R)-configuration. Because asserted claim 20 depends from asserted claims 1 and 2, the Court

---

[33] Mylan also has asserted that a POSA would have been motivated to create the 1-to-1 DHP salt of sitagliptin in its (S)-configuration because the FDA requires pharmaceutical manufacturers to study all isomers of a compound (Dkt. No. 175 at 13-14). Even if the FDA's directives supplied the requisite motivation, a POSA still would have lacked a reasonable expectation of success in forming any DHP salt of sitagliptin.

96

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

incorporates its obviousness-type double patenting analysis of these claims.

### i.   **Pfizer v. Teva** Is Not Controlling

According to Mylan, because asserted claim 19 uses a pharmaceutically acceptable salt of sitagliptin to treat diabetes, a utility disclosed in the '871 patent, it is not patentably distinct from reference claim 20. In support of this argument, it relies on Pfizer Inc. v. Teva Pharms. USA, Inc., 518 F.3d 1353 (2008), which involved a compound patent and a method patent. In its compound patent, Pfizer claimed "a pharmaceutical composition containing a therapeutically effective amount of a compound selected from a group of listed compounds, including celecoxib" and disclosed that such pharmaceutical composition would be useful in the treatment of inflammation. Pfizer Inc. v. Teva Pharms. USA, Inc., 482 F. Supp. 2d 390, 476 (D.N.J. 2007). In its later-filed method patent, Pfizer claimed a method of treating inflammation in subjects by administering a therapeutically effective amount of celecoxib. Id. The parties stipulated that the term "therapeutically effective amount" carried the same meaning in both patents. Id. at 477.

After Teva challenged several claims of Pfizer's method patent on obviousness-type double patenting grounds, the district court concluded that the asserted method claims were patentably

97

MERCK SHARPE & DOHME LLC V. MYLAN PHARM. INC            1:19CV101

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

indistinct from the reference compound claims because the asserted claims merely covered a method of using the identical composition claimed in the reference patent for the identical use disclosed in the reference patent. The Federal Circuit affirmed this conclusion. Pfizer v. Teva, 518 F.3d at 1363.

Pfizer v. Teva does not compel a conclusion here that asserted claim 19 is patently indistinct from reference claim 20. Although these claims share a common utility, treating diseases involving the DPP-IV enzyme such as type 2 diabetes, they do not claim identical compounds. Reference claim 20 covers a pharmaceutical composition comprised of an inert carrier and a pharmaceutically acceptable salt of sitagliptin. Asserted claim 19, in contrast, covers the use of 1-to-1 DHP salt of sitagliptin in its (R)-configuration. Thus, this is not a case in which Merck has attempted to claim an identical composition for a previously disclosed identical use.

### ii. No Motivation or Reasonable Expectation of Success

Mylan's obviousness-type double patenting challenge to asserted claim 19 fails for the same reason its challenge to asserted claims 1 and 2 fails. A POSA would not have been motivated to select the 1-to-1 DHP salt of sitagliptin in its (R)-configuration from the reference genus. It also fails because

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

reference claim 20 would not have motivated a POSA to treat patients with a therapeutically effective amount of this salt.

Reference claim 20 covers "pharmaceutical compositions" comprised of sitagliptin or a salt of sitagliptin and an inert carrier (DTX 2054.0022). The '871 patent specification defines the term "composition" as one created by "admixing a compound of the present invention and a pharmaceutically acceptable carrier." Id. at .0005. For such carrier to be "pharmaceutically acceptable" it must be "compatible with the other ingredients of the formulation and not deleterious to the recipient thereof." Id.

According to Mylan, a POSA would have known that the purpose of the pharmaceutical composition described in reference claim 20 is to deliver a therapeutically effective amount to a patient in need (Dkt. No. 175 at 15-16; Trial Trans. 320:5-14 (Buckton)). And because treating patients is the ultimate goal of pharmaceutical compositions, a POSA would have been motivated to administer a pharmaceutically acceptable salt to patients with type 2 diabetes. Id.

At trial, there was overwhelming evidence regarding the unpredictability of pharmaceutical salt properties and, specifically, evidence that a POSA cannot predict the properties of a pharmaceutical salt unless and until she synthesizes and studies it. See DTX 006.0004-05 ("[T]here is no reliable way of

99

**SEALED**

**MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL**

predicting the influence of a particular salt species on the behavior of the parent compound."); PTX 113.0001 ("There is, as yet, no reliable way of predicting exactly what effect changing the salt form of an active drug will have on its biological activity . . . ."); Trial Trans. 110:13-15 (Hansen); 740:3-6 (Wenslow); 841:8-13 (Myerson); 995:5-8 (Buckton).

If a POSA could not predict a salt's pharmaceutical properties, she also could not predict the human body's reaction to the compound (PTX 113.0001). Accordingly, the language of reference claim 20 alone would not have motivated a POSA to administer the 1-to-1 DHP salt of sitagliptin in its (R)-configuration to a patient with a reasonable expectation of success.

This is especially true where the prior art did not disclose any information regarding the properties of this salt, and where it was known that changing the salt form of a compound could drastically impact its clinical efficacy and safety. Id. Without additional information related to the 1-to-1 DHP salt of sitagliptin, a POSA could not have known if it was safe, nor would she have been motivated to advance it into clinical development, a prerequisite for administration (Trial Trans. 762:3-765:1, 769:14-770:4 (MacMillan); 837:5-14, 902:10-17 (Myerson)). As Merck's expert, Dr. David MacMillan, opined, administration of the

100

**Appx102**

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

1-to-1 DHP salt of sitagliptin based on the prior art and the '891 patent would have been "reckless if not dangerous." Id. at 776:13-22 (MacMillan).

Nor could a POSA have determined a therapeutically effective amount of the 1-to-1 DHP salt of sitagliptin in its (R)-configuration with a reasonable expectation of success. According to Dr. MacMillan, only 1 of 1000 compounds that are studied preclinically advance to human clinical trials. Id. at 762:3-19, 765:6-766:12 (MacMillan) (citing PTX 246). And many of the compounds that do advance to clinical study ultimately fail. Id. at 765:6-766:12 (MacMillan).

In opining that a POSA would have had a reasonable expectation of success in administering a therapeutically effective dose of the 1-to-1 DHP salt of sitagliptin in its (R)-configuration to type 2 diabetes patients, Mylan's expert, Dr. Buckton, cited the in vitro data in the reference patent demonstrating that sitagliptin would be effective. But the '871 patent defines a "therapeutically effective amount" much more broadly than does the '708 patent. Compare JTX 001 with DTX 2054.0005; see also Trial Trans. 767:1-16, 779:20-780:17 (MacMillan). And even considering the reference patent's data on sitagliptin's efficacy, Dr. MacMillan testified that it is "extremely common" for drugs with

101

MERCK SHARPE & DOHME LLC V. MYLAN PHARM. INC                1:19CV101

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

in vitro potency to fail to show efficacy in treating patients.
Id. at 761:7-9 (MacMillan).

Thus, given the lack of necessary information related to the
claimed salt in the prior art and the high failure rate of
compounds in clinical studies, based on the prior art and the
reference patent a POSA would have had a very low expectation of
success in treating patients with a therapeutically effective
amount of the 1-to-1 DHP salt of sitagliptin in its (R)-
configuration. For these reasons, Mylan's obviousness-type double
patenting challenge to asserted claim 19 fails.

### f.    Secondary Considerations

Merck contends that the unexpected properties of the 1-to-1
DHP salt of sitagliptin confirm the non-obviousness of the asserted
claims. "The burden of proof never shifts to the patentee to prove
validity." Pfizer v. Apotex, 480 F.3d at 1359. But the patentee
bears the burden of producing evidence to establish the existence
of secondary considerations supporting non-obviousness. See Novo
Nordisk, 719 F.3d at 1353. In determining whether Mylan has met
its burden of proof on its obviousness-type double patenting
challenge, the Court must consider objective indicia of non-
obviousness, if such evidence is presented. Eli Lilly v. Teva, 689
F.3d at 1381.

MERCK SHARPE & DOHME LLC V. MYLAN PHARM. INC          1:19CV101

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

For a patentee to rely on unexpected results as secondary evidence of non-obviousness, "the results must be shown to be unexpected compared with the closest prior art." Abbott Lab'ys v. Andrx Pharms., Inc., 452 F.3d 1331, 1345 (Fed. Cir. 2006) (citing In re Baxter Travenol Lab'ys, 952 F.2d 388, 392 (Fed. Cir. 1991)). "Unexpected results that are probative of non-obviousness are those that are different in kind and not merely in degree from the results of the prior art." Galderma Lab'ys, L.P. v. Tolmar, Inc., 737 F.3d 731, 739 (Fed. Cir. 2013) (citations omitted).

According to Merck, the 1-to-1 DHP salt of sitagliptin exhibits a suite of unpredictable and unexpectedly superior pharmaceutical properties compared to the next closest prior art, the sitagliptin free base and the HCL salt of sitagliptin (Dkt. No. 176 at 31-32; Trial Trans. 903:3-10 (Myerson)). Mylan, however, asserts that these improved qualities are not probative of non-obviousness because pharmaceutical manufacturers routinely pursue salt formation with the expectation of improving a compound's properties (Dkt. No. 175 at 19-20).

Even so, the prior art taught that a POSA could not predict whether any resulting salt form might exhibit more favorable properties (DTX 005.004). And she could not have expected any single salt form to emerge with all of the desired properties. See DTX 006.0004-05; DTX 005.0001. Rather, she would have expected to

103

MERCK SHARPE & DOHME LLC V. MYLAN PHARM. INC          1:19CV101

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

compromise and select the compound exhibiting the best aggregate pharmaceutical properties for development. Id.

In this case, Merck's DPP-IV team had hoped that a salt form of sitagliptin might exhibit more favorable properties, but it could not have anticipated which salt, if any, might do so (PTX 082.0001; Trial Trans. 126:19-22, 129:2-5 (Hansen)). It thus surprised to learn that the 1-to-1 DHP salt of sitagliptin exhibited each of the desired properties. Id.; see also In re Mayne, 104 F.3d 1339, 1343 (Fed. Cir. 1997) ("[T]hat which would have been surprising to a person of ordinary skill in a particular art would not have been obvious."). These favorable properties were vastly superior to those exhibited by sitagliptin free base and the HCL salt of sitagliptin and thus were differences in kind, not degree.

Both the sitagliptin free base and the HCL salt of sitagliptin were unstable with a needle-like morphology that had led Merck to conclude they could not be developed (PTX 71; Trial Trans. 102:2-14, 103:10-104:4, 104:15-105:11, 106:20-107:7, 116:25-117:3, 128:12-24 (Hansen). The 1-to-1 DHP salt of sitagliptin, on the other hand, was better in every respect. It had a desired particle morphology, low hygroscopicity, good chemical stability in solution, and high thermal stability and was quickly recommended for development (Trial Trans. 120:11-122:8, 124:13-126:5

104

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

(Hansen)). Later, Merck's DPP-IV team discovered that the crystalline monohydrate exhibited even more exceptional pharmaceutical properties. Id. at 133:12-134:22 (Hansen). These surprising differences from the closest prior art compounds support the conclusion that the asserted claims are non-obvious.

### 3. Written description

To satisfy the written description requirement outlined in 35 U.S.C. § 112, a patent's specification must "clearly allow persons of ordinary skill in the art to recognize that [the inventor] invented what is claimed." Ariad Pharm., Inc. v. Eli Lilly & Co., 598 F.3d 1336, 1351 (Fed. Cir. 2010) (quotation omitted). "[T]he test for sufficiency is whether the disclosure of the application relied upon reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date." Id.

Possession as shown in the disclosure is the hallmark of written description. Id. at 1351. The written-description inquiry therefore entails an "objective inquiry into the four corners of the specification from the perspective of a [skilled artisan]." Biogen Int'l GMBH v. Mylan Pharms. Inc., 18 F.4th 1333, 1342 (Fed. Cir. 2021) (citing Ariad, 598 F.3d at 1351). An inventor sufficiently describes a genus claim if it discloses either "a representative number of species falling within the scope of the

MERCK SHARPE & DOHME LLC V. MYLAN PHARM. INC          1:19CV101

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

genus or structural features common to the members of the genus so that one of skill in the art can 'visualize or recognize' the members of the genus." Ariad, 598 F.3d at 1349 (quoting Regents of the Univ. of Ca. v. Eli Lilly & Co., 119 F.3d 1559, 1568-69 (Fed. Cir. 1997)).

Whether the asserted claims of the '708 patent are invalid for lack of written description is a factual question for Mylan to establish by clear and convincing evidence. Rivera v. Int'l Trade Comm'n, 857 F.3d 1315, 1319 (Fed. Cir. 2017). Most of the facts on this point are undisputed. First, asserted claim 1 covers the 1-to-1 DHP salt of sitagliptin "or a hydrate thereof" (JTX 002.0007-08, .0014). Second, at the time of the invention, Merck had created several forms of the DHP salt of sitagliptin (Trial Trans. 126:7-10; 129:10-130:1 (Hansen); 278:23-25 (Buckton)). Third, Merck possessed the crystalline monohydrate form, but no other hydrated forms of the DHP salt of sitagliptin existed. Id. at 937:14-18 (Myerson); 334:9-12 (Buckton). Fourth, to date, the crystalline monohydrate remains the only known hydrate of the DHP salt of sitagliptin. Id. at 134:23-135:1 (Hansen). Fifth, it is possible that other hydrates could be discovered in the future and, if so, those would be covered by the asserted claims (Trial Trans. 937:5-13 (Myerson)).

106

**Appx108**

MERCK SHARPE & DOHME LLC V. MYLAN PHARM. INC          1:19CV101

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

Mylan contends that the asserted claims of the '708 patent
fail for lack of written description because, in claiming all
hydrates of the DHP salt of sitagliptin while possessing only the
crystalline monohydrate, Merck has attempted to claim more than it
invented (Dkt. No. 175 at 38-39). Mylan characterizes Merck's
disclosure as no more than a research plan for the discovery of
additional hydrates.

Merck argues that it has satisfied the written description
requirement by identifying structural features common to the
members of the genus and by disclosing a representative number of
species (Dkt. No. 176 at 40-41). Conceding that the crystalline
monohydrate is the only hydrate described in the '708 patent, it
contends nothing additional is required. Id. Having described
every known hydrate of the DHP salt of sitagliptin, it is not
required to describe every unknown or undiscovered hydrate of the
DHP salt of sitagliptin in order to satisfy the written description
requirement. Id.

"[A]n adequate written description requires a precise
definition, such as by structure, formula, chemical name, physical
properties, or other properties, of species falling within the
genus sufficient to distinguish the genus from other materials."
Ariad, 598 F.3d at 1350. Here, the asserted claims cover a genus
of all forms of the 1-to-1 DHP salt of sitagliptin, including

107

**Appx109**

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

hydrates.  The key structural feature of this genus is its unique chemical formula, or structure. At trial, Dr. Buckton and Dr. Myerson agreed that every form of the DHP salt of sitagliptin, whether hydrous or anhydrous, shares the common chemical formula disclosed in the '708 patent (Trial Trans. 349:3-351:6 (Buckton); 913:2-21 (Myerson)). Based on this chemical structure, a POSA using routine techniques would be able to recognize any form of the 1-to-1 DHP salt of sitagliptin and distinguish it from other compounds. Id. at 352:13-25 (Buckton); 913:14-914:7 (Myerson). And this would be true even if the form is a hydrate. Id. at 352:20-353:8 (Buckton); 912:2-9, 914:4-21 (Myerson).

It is well settled that Merck is not required to describe "every conceivable and possible future embodiment of [its] invention." Rexnord Corp. v. Laitram Corp., 274 F.3d 1336, 1344 (Fed. Cir. 2001). And it may adequately describe a broadly claimed invention "without describing all species that [the] claim encompasses." Cordis Corp. v. Medtronic AVE, Inc., 339 F.3d 1352, 1365 (Fed. Cir. 2003). Thus, Merck need not have actually possessed every species within the genus at the time of filing in order to satisfy the written description requirement.

Further, because the genus in the asserted claims does not contain any functional or performance requirement, this is not a case in which Merck has overstated its invention in an attempt to

108

preempt the future before it arrives by "merely recit[ing] a description of the problem to be solved while claiming all solutions to it." Ariad, 598 F.3d at 1353 (citing Fiers v. Revel, 984 F.2d 1664, 1171 (Fed. Cir. 1993)).

The Federal Circuit's holding in GlaxoSmithKline LLC v. Banner Pharmacaps, Inc., 744 F.3d 725 (Fed. Cir. 2014), on which both parties rely, supports this conclusion. There, the patent claimed dutasteride and its pharmaceutically acceptable solvates. 744 F.3d at 727-28. The defendant argued that the term "solvates" lacked an adequate description because the patent's specification did not describe a wide enough range of the solvates. Id. The district court rejected this challenge. Id. On appeal the Federal Circuit affirmed, holding that "[d]escribing a complex of dutasteride and solvent molecules is an identification of structural features commonly possessed by members of the genus that distinguish them from others, allowing one of skill in the art to visualize or recognize the identity of the members of the genus." Id. at 729 (quotations omitted). The Federal Circuit also noted that the term "solvate" was structural rather than functional, that solvation was well established in the prior art, and that a POSA would have known dutasteride to be prone to solvate formation. Id. at 731.

MERCK SHARPE & DOHME LLC V. MYLAN PHARM. INC          1:19CV101

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

In a similar vein, the asserted claims here describe a genus
consisting of a compound and its hydrates, and members of this
genus are described using common structural features. Dr. Buckton
and Dr. Myerson agreed that a POSA would be familiar with hydrates
and hydrate formation, as well as with the prior art teaching that
phosphate salts commonly produced hydrates (Trial Trans. 355:12-
356:5 (Buckton); DTX 021.0137, .0182).

Because Mylan has not demonstrated by clear and convincing
evidence that a POSA would not be able to use the common structural
features disclosed in the '708 patent to identify members of its
claimed genus, its argument that the asserted claims are not
adequately described fails.[34] Given this conclusion, the Court need
not address whether Merck also disclosed a representative number
of species to satisfy the written description requirement.

**4.  Enablement**

"To prove that a claim is invalid for lack of enablement,
[Mylan] must show by clear and convincing evidence that a person
of ordinary skill in the art would not be able to practice the

---

[34] On June 22, 2022, Mylan notified the Court of the Federal Circuit's
precedential opinion in Novartis Pharms. Corp. v. Accord Healthcare,
Inc., 38 F.4th 1013, 1016 (Fed. Cir. 2022) (Dkt. No. 191). Aside from
reiterating established points of law and the importance of the written
description requirement, Novartis primarily addresses negative claim
limitations, which are not at issue in this case.

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

claimed invention without undue experimentation." Amgen Inc. v. Sanofi, Aventisub LLC, 987 F.3d 1080, 1084 (Fed. Cir. 2021) (quotations omitted). The key word is "undue," not "experimentation." ALZA Corp. v. Andrx Pharms., LLC, 603 F.3d 935, 939 (Fed. Cir. 2010). Id. Enablement does not require the specification to describe "how to make and use every possible variant of the claimed invention," McRO, Inc. v. Bandai Namco Games Am. Inc., 959 F.3d 1091, 1100 (Fed. Cir. 2020), but it must reasonably enable a POSA to practice the full scope of the claimed invention. Trustees of Boston Uni. V. Everlight Electronics Co., LTD, 896 F.3d 1357, 1364 (2018).

To determine whether the asserted claims have been sufficiently enabled to avoid undue experimentation, the parties rely on the so-called "Wands factors," as follows:

> (1) the quantity of experimentation necessary, (2) the amount of direction or guidance presented, (3) the presence or absence of working examples, (4) the nature of the invention, (5) the state of the prior art, (6) the relative skill of those in the art, (7) the predictability or unpredictability of the art, and (8) the breadth of the claims.

In re Wands, 858 F.2d 731, 737 (Fed. Cir. 1988).

The Court agrees that it must analyze these factors in order to determine if the full scope of the claims at issue have been enabled. Under Mylan's analysis of the Wands factors, because the

**\*\*SEALED\*\***

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

'708 patent does not enable the full scope of the invention, the asserted claims are invalid (Dkt. No. 175 at 22-23). Specifically, Mylan argues that Merck has claimed all physical forms of the 1-to-1 DHP salt of sitagliptin without enabling each and every one. Id. Merck, in its analysis of the Wands factors, responds that the specification of the '708 patent teaches a POSA to make every known physical form of the claimed salt without undue experimentation (Dkt. No. 176 at 33-36), and the asserted claims therefore are valid.

At bottom, the parties dispute whether the law of enablement requires the '708 patent specification to enable all possible forms of the 1-to-1 DHP salt of sitagliptin, or only known forms of this salt. As the following discussion of the relevant Wands factors establishes, the '708 patent specification enables the full scope of the asserted claims by enabling every known form of the 1-to-1 DHP salt of sitagliptin.

###### a.   Nature of the Invention and Breadth of the Claims

In order to develop a treatment for type 2 diabetes, Merck selected sitagliptin from a class of DPP-IV inhibitors (Trial Trans. 94:17-23, 95:8-25 (Hansen)). Its '708 patent claims a single salt form of this compound, the 1-to-1 DHP salt of sitagliptin. See JTX 001. The asserted claims cover a genus of all physical forms of this salt (Trial Trans. 336:13-20 (Buckton); 934:2-5,

112

**Appx114**

MERCK SHARPE & DOHME LLC V. MYLAN PHARM. INC          1:19CV101

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

935:6-8, 937:19-22, 939:18-25, 941:4-7, 961:14-21 (Myerson)).

Mylan contends that Merck has advocated for a broad construction of the asserted claims, specifically for the phrase "or a hydrate thereof" (Dkt. No. 175 at 24-26). Merck denies this and argues that Mylan's contention is not supported by the evidence of record. The Court agrees with Merck.

During claim construction before the Delaware district court, the issue arose whether asserted claim 2 of the '708 patent included hydrates of the salt of claim 1. In re Sitagliptin., 2020 WL 6743022, at *3. While claim 1 specifically covered hydrates of the 1-to-1 DHP salt of sitagliptin, claim 2 was silent. Id. at *3-4. Based on this silence, the defendants argued for a construction of claim 2 that excluded hydrates. Id.

After careful review, Judge Andrews declined to adopt this construction and concluded that asserted claim 2 did not exclude hydrates. Had he adopted the construction urged by the defendant generics, claim 4, related to the crystalline monohydrate, would have been invalid for a technical defect inasmuch as it depends from claim 2. Id. This history persuades the Court that, when viewed in the proper context, Merck did not advocate for an overly broad construction of the asserted claims but rather urged that dependent claim 2 covered the same physical forms as independent claim 1, which covers hydrates.

113

Appx115

MERCK SHARPE & DOHME LLC V. MYLAN PHARM. INC          1:19CV101

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

Despite covering all hydrates, anhydrous forms, and amorphous forms of the 1-to-1 DHP salt of sitagliptin, the asserted claims are relatively narrow. They are limited to a single salt form of a single compound, with every physical form sharing a common, identifiable chemical structure.

### b.    State of the Prior Art

The state of the prior art is a pivotal factor in resolving the parties' enablement dispute. Enablement is determined as of the patent's effective filing date. Hybritech Inc. v. Monoclonal Antibodies, Inc., 802 F.2d 1367, 1384 (Fed. Cir. 1986). Therefore, the state of the art at the time of the invention is relevant to the enablement inquiry and not any future state of the art. In re Hogan, 559 F.2d 595, 605-06 (CCPA 1977).

According to Mylan, the '708 patent specification must enable all hydrates of the 1-to-1 DHP salt of sitagliptin. But adopting Mylan's position would require Merck to enable technology that was not available as of the date of filing, or even today.

At trial, the parties' experts agreed that the crystalline monohydrate described in the '708 patent is the only known hydrate of the claimed salt (Trial Trans. 338:11-20 (Buckton); 919:6-16, 937:2-4 (Myerson)). They also agreed that it is possible that additional hydrates might be discovered in the future, although

114

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

Dr. Myerson opined that the likelihood of finding another hydrate to be "quite low." Id.; PTX 213.0002.

But such possibility does not invalidate the asserted claim for lack of enablement. "[A] patent document cannot enable technology that arises after the date of application. The law does not expect an applicant to disclose knowledge invented or developed after the filing date. Such disclosure would be impossible." Chiron Corp. v. Genentech, Inc., 363 F.3d 1247, 1254 (Fed. Cir. 2004) (citing Hogan, 599 F.2d at 605-06).

### c. Amount of Direction or Guidance Presented and Quantity of Experimentation Necessary

Throughout its enablement challenge, Mylan frames the genus claimed in the '708 patent as hydrates of the 1-to-1 DHP salt of sitagliptin. And, following on that, Mylan's argues that to enable the full scope of this genus, the patent specification must teach the POSA how to create more than one hydrate of the claimed salt (Dkt. No. 175 at 25).

Despite Mylan's argument, the claimed genus is actually all physical forms of the 1-to-1 DHP salt of sitagliptin. Enablement of this genus requires that the '708 patent disclose invented species commensurate in scope. Amgen Inc. v. Sanofi, Aventisub LLC, 850 F. App'x 794, 797 (Fed. Cir. 2021) (denying rehearing en banc) ("Entitlement to a broad genus claim thus requires disclosure

115

MERCK SHARPE & DOHME LLC V. MYLAN PHARM. INC                    1:19CV101

**SEALED**

## MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

and enablement of species supportive of the genus that a patentee claims to have invented."). This is not a case in which the '708 patent claims a broad genus but only provides examples of a small number of invented species. Here, Merck had reduced to practice and enabled every known species of the 1-to-1 DHP salt of sitagliptin.

When Merck filed the '708 patent, six physical forms of the claimed salt were known to exist. These included anhydrous forms I, II, III, and IV; a crystalline monohydrate; and a dehydrated monohydrate (Trial Trans. 147:4-9 (Hansen); 920:24-921:7 (Myerson)). The evidence of record establishes that a POSA could have made each of these physical forms from the guidance contained in the '708 patent.

In particular, the '708 patent specification includes procedures for creating the "starting compound" of 1-to-1 DHP salt of sitagliptin. JTX 001.0010-13. It sets forth several detailed methods for synthesizing the crystalline monohydrate. Id. at .0009-10; see also Trial Trans. 138:13-25 (Hansen). And it teaches the POSA how to convert the crystalline monohydrate into the dehydrated monohydrate (JTX 001.0014).

The '708 patent does not expressly disclose the anhydrous forms of the claimed salt but, at trial, Merck's witnesses testified that upon reading the specification a POSA would have

116

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

known how to make each of these forms (Trial Trans. 139:23-140:25, 145:2-25 (Hansen); 924:15-22 (Myerson)). Specifically, these witnesses testified that a POSA would understand that altering the water concentration in the crystalline monohydrate examples would produce the anhydrous forms. Id. Mylan's expert did not credibly dispute this.

It is clear from the evidence, and the Court so finds, that the '708 patent teaches a POSA how to reproduce every known form of the 1-to-1 DHP salt of sitagliptin. It describes a number of species commensurate with the scope of the claimed genus, thereby rendering the asserted claims sufficiently enabled.[35] Mylan's complaint, that the specification lacks guidance for synthesizing any hydrates other than the crystalline monohydrate, does not alter this conclusion. No other hydrates are known, and Merck is not required to enable hydrates that might be discovered in the future. Chiron, 363 F.3d at 1254; Hogan, 599 F.2d at 605-06.

### d.    Predictability of the Art

Finally, it is undisputed that formation of new solid forms and hydrates is unpredictable (Trial Trans. 927:16-22 (Myerson);

---

[35] Mylan also points to the fact that no phosphate salt of sitagliptin was disclosed in the prior art (Dkt. No. 176 at 22; see also Trial. Trans. 921:13-16, 935:19-23 (Myerson)). But this ignores the fact that enablement is based on the teachings of the specification at issue. In this case, those teachings are significant.

MERCK SHARPE & DOHME LLC V. MYLAN PHARM. INC          1:19CV101

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

see also PTX 213.0002). Thus, a POSA looking to find hydrates of the 1-to-1 DHP salt of sitagliptin could not have predicted if or when she would be successful (PTX 213.0002; DTX 047). But the prior art taught her how to crystallize and characterize solid forms, including hydrates, if any formed (Trial Trans. 926:12-25 (Myerson); DTX 047; DTX 021.0007).

The unpredictability of finding additional hydrates of the claimed salt is offset by the predictability provided by the patent specification. Following the guidance in the '708 patent a POSA could have reproduced each of the known physical forms of the 1-to-1 DHP salt of sitagliptin without any undue experimentation.

### e.  Summary

For the reasons discussed, the Wands factors support a finding of enablement. The asserted claims cover all physical forms of the 1-to-1 DHP salt of sitagliptin, and the '708 patent enables every known form of this compound. Thus, no undue experimentation would be required to practice the full scope of the asserted claims. Mylan's challenge on this basis fails.

118

Appx120

MERCK SHARPE & DOHME LLC V. MYLAN PHARM. INC                    1:19CV101

**SEALED**

MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL

IV.    CONCLUSION

For the reasons discussed:

1.    Merck has demonstrated by a preponderance of the evidence that Mylan's ANDA products will infringe claim 3 of the '708 patent;

2.    Merck has demonstrated by a preponderance of the evidence that Mylan's ANDA products will infringe claim 1 of the '921 patent;

3.    Mylan has not demonstrated by clear and convincing evidence that the asserted claims of the '708 patent are invalid under the obviousness-type double patenting doctrine;

4.    Mylan has not demonstrated by clear and convincing evidence that the asserted claims of the '708 patent are invalid for lack of written description; and

5.    Mylan has not demonstrated by clear and convincing evidence that the asserted claims of the '708 patent are invalid for lack of enablement.

It is so **ORDERED.**

**MERCK SHARPE & DOHME LLC V. MYLAN PHARM. INC**               **1:19CV101**

**\*\*SEALED\*\***

**MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL**

The Clerk is directed to enter a separate judgment order in

favor of Merck Sharpe & Dohme LLC, and to transmit copies of both

orders to counsel of record.

DATED: September 21, 2022

> /s/ Irene M. Keeley
> IRENE M. KEELEY
> UNITED STATES DISTRICT JUDGE

120

**Appx122**



US007326708B2

(12) **United States Patent**
    Cypes et al.

(10) **Patent No.:**     **US 7,326,708 B2**
(45) **Date of Patent:**         **Feb. 5, 2008**

(54) **PHOSPHORIC ACID SALT OF A DIPEPTIDYL PEPTIDASE-IV INHIBITOR**

(75) Inventors: **Stephen Howard Cypes**, Santa Clara, CA (US); **Alex Minhua Chen**, Metuchen, NJ (US); **Russell R. Ferlita**, Westfield, NJ (US); **Karl Hansen**, Atlantic Highlands, NJ (US); **Ivan Lee**, Piscataway, NJ (US); **Vicky K. Vydra**, Fair Lawn, NJ (US); **Robert M. Wenslow, Jr.**, East Windsor, NJ (US)

(73) Assignee: **Merck & Co., Inc.**, Rahway, NJ (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 657 days.

(21) Appl. No.: **10/874,992**

(22) Filed: **Jun. 23, 2004**

(65)          **Prior Publication Data**
    US 2005/0032804 A1    Feb. 10, 2005

    **Related U.S. Application Data**

(60) Provisional application No. 60/482,161, filed on Jun. 24, 2003.

(51) **Int. Cl.**
    *A61K 31/495*      (2006.01)
    *C07D 471/04*      (2006.01)
(52) **U.S. Cl.** ...................................... **514/249**; 544/350
(58) **Field of Classification Search** ............... 514/249; 544/350
    See application file for complete search history.

(56)          **References Cited**

    U.S. PATENT DOCUMENTS

    6,479,692 B1 *   11/2002   Ekwuribe et al. ........... 558/413
    6,699,871 B2     3/2004   Edmondson et al.
    2003/0100563 A1     5/2003   Edmondson et al.
    2006/0287528 A1 *  12/2006   Wenslow et al. .......... 544/350
    2007/0021430 A1 *   1/2007   Chen et al. ................. 514/249

    FOREIGN PATENT DOCUMENTS

    WO     WO 2005/072530 A1   8/2005
    WO     W● 2006/033848 A1   3/2006

    OTHER PUBLICATIONS

Edmondson, S.D., Drug Data Report, vol. 25, No. 3, pp. 245-246 (2003).
Database Prous DDR Online—Database Accession No. 2003: 3561.

* cited by examiner

*Primary Examiner*—James O. Wilson
*Assistant Examiner*—Ebenezer Sackey
(74) *Attorney, Agent, or Firm*—Philippe L. Durette; Catherine D. Fitch

(57)          **ABSTRACT**

The dihydrogenphosphate salt of 4-oxo-4-[3-(trifluoromethyl)-5,6-dihydro [1,2,4]triazolo[4,3-a]pyrazin-7(8H)-yl]-1-(2,4,5-trifluorophenyl)butan-2-amine is a potent inhibitor of dipeptidyl peptidase-IV and is useful for the prevention and/or treatment of non-insulin dependent diabetes mellitus, also referred to as type 2 diabetes. The invention also relates to a crystalline monohydrate of the dihydrogenphosphate salt as well as a process for its preparation, pharmaceutical compositions containing this novel form and methods of use for the treatment of diabetes, obesity, and high blood pressure.

          **24 Claims, 5 Drawing Sheets**

N.D. West Virginia
No. 1:19-cv-101-IMK
**JTX-001**

MRK-STG-02560499
**JTX-001.0001**



FIG.1

MRK-STG-02560500

JTX-001.0002



FIG.2

MRK-STG-02560501

JTX-001.0003



FIG.3

MRK-STG-02560502

JTX-001.0004



FIG.4

MRK-STG-02560503

JTX-001.0005



FIG.5

MRK-STG-02560504

JTX-001.0006

US 7,326,708 B2

1

# PHOSPHORIC ACID SALT OF A DIPEPTIDYL PEPTIDASE-IV INHIBITOR

## CROSS-REFERENCE TO RELATED APPLICATIONS

The present invention is related to U.S. provisional application Ser. No. 60/482,161, filed Jun. 24, 2003, the contents of which are hereby incorporated by reference.

## FIELD OF THE INVENTION

The present invention relates to a particular salt of a dipeptidyl peptidase-IV inhibitor. More particularly, the invention relates to a dihydrogenphosphate salt of 4-oxo-4-[3-(trifluoromethyl)-5,6-dihydro[1,2,4]triazolo[4,3-a]pyrazin-7(8H)-yl]-1-(2,4,5-trifluorophenyl)butan-2-amine, which is a potent inhibitor of dipeptidyl peptidase-IV. This novel salt and crystalline hydrates thereof are useful for the treatment and prevention of diseases and conditions for which an inhibitor of dipeptidyl peptidase-IV is indicated, in particular Type 2 diabetes, obesity, and high blood pressure. The invention further concerns pharmaceutical compositions comprising the dihydrogenphosphate salt and crystalline hydrates thereof useful to treat Type 2 diabetes, obesity, and high blood pressure as well as processes for preparing the dihydrogenphosphate salt and crystalline hydrates thereof and their pharmaceutical compositions.

## BACKGROUND OF THE INVENTION

Inhibition of dipeptidyl peptidase-IV (DP-IV), an enzyme that inactivates both glucose-dependent insulinotropic peptide (GIP) and glucagon-like peptide 1 (GLP-1), represents a novel approach to the treatment and prevention of Type 2 diabetes, also known as non-insulin dependent diabetes mellitus (NIDDM). The therapeutic potential of DP-IV inhibitors for the treatment of Type 2 diabetes has been reviewed: C. F. Deacon and J. J. Holst, "Dipeptidyl peptidase IV inhibition as an approach to the treatment and prevention of Type 2 diabetes: a historical perspective," *Biochem. Biophys. Res. Commun.*, 294: 1-4 (2000); K. Augustyns, et al., "Dipeptidyl peptidase IV inhibitors as new therapeutic agents for the treatment of Type 2 diabetes," *Expert. Opin. Ther. Patents*. 13: 499-510 (2003); and D. J. Drucker, "Therapeutic potential of dipeptidyl peptidase IV inhibitors for the treatment of Type 2 diabetes," *Expert Opin. Investig. Drugs*, 12: 87-100 (2003).

WO 03/004498 (published 16 Jan. 2003), assigned to Merck & Co., describes a class of beta-amino tetrahydrotriazolo[4,3-a]pyrazines, which are potent inhibitors of DP-IV and therefore useful for the treatment of Type 2 diabetes. Specifically disclosed in WO 03/004498 is 4-oxo-4-[3-(trifluoromethyl)-5,6-dihydro[1,2,4]triazolo[4,3-a]pyrazin-7(8H)-yl]-1-(2,4,5-trifluorophenyl)butan-2-amine. Pharmaceutically acceptable salts of this compound are generically encompassed within the scope of WO 03/004498.

However, there is no specific disclosure in the above reference of the newly discovered monobasic dihydrogenphosphate salt of 4-oxo-4-[3-(trifluoromethyl)-5,6-dihydro[1,2,4]triazolo[4,3-a]pyrazin-7(8H)-yl]-1-(2,4,5-trifluorophenyl)butan-2-amine of structural formula I below.

## SUMMARY OF THE INVENTION

The present invention is concerned with a novel dihydrogenphosphate salt of the dipeptidyl peptidase-IV (DP-IV)

2

inhibitor 4-oxo-4-[3-(trifluoromethyl)-5,6-dihydro[1,2,4]triazolo[4,3-a]pyrazin-7(8H)-yl]-1-(2,4,5-trifluorophenyl)butan-2-amine and crystalline hydrates thereof, in particular a crystalline monohydrate. The dihydrogenphosphate salt and crystalline hydrates of the present invention have advantages in the preparation of pharmaceutical compositions of 4-oxo-4-[3-(trifluoromethyl)-5,6-dihydro[1,2,4]triazolo[4,3-a]pyrazin-7(8H)-yl]-1-(2,4,5-trifluorophenyl)butan-2-amine, such as ease of processing, handling, and dosing. In particular, they exhibit improved physical and chemical stability, such as stability to stress, high temperatures and humidity, as well as improved physicochemical properties, such as solubility and rate of solution, rendering them particularly suitable for the manufacture of various pharmaceutical dosage forms. The invention also concerns pharmaceutical compositions containing the novel salt and hydrates as well as methods for using them as DP-IV inhibitors, in particular for the prevention or treatment of Type 2 diabetes, obesity, and high blood pressure.

## BRIEF DESCRIPTION OF THE FIGURES

FIG. **1** is a characteristic X-ray diffraction pattern of the crystalline monohydrate of the dihydrogenphosphate salt of structural formula II.

FIG. **2** is a carbon-13 cross-polarization magic-angle spinning (CPMAS) nuclear magnetic resonance (NMR) spectrum of the crystalline monohydrate of the dihydrogenphosphate salt of structural formula II.

FIG. **3** is a fluorine-19 magic-angle spinning (MAS) nuclear magnetic resonance (NMR) spectrum of the crystalline monohydrate of the dihydrogenphosphate salt of structural formula II.

FIG. **4** is a typical thermogravimetric analysis (TGA) curve of the crystalline monohydrate dihydrogenphosphate salt of structural formula II.

FIG. **5** is a typical differential scanning calorimetry (DSC) curve of the crystalline monohydrate of the dihydrogenphosphate salt of structural formula II.

## DETAILED DESCRIPTION OF THE INVENTION

This invention provides a new monobasic dihydrogenphosphate salt of 4-oxo-4-[3-(trifluoromethyl)-5,6-dihydro[1,2,4]triazolo[4,3-a]pyrazin-7(8H)-yl]-1-(2,4,5-trifluorophenyl)butan-2-amine of the following structural formula I:



(I)

or a crystalline hydrate thereof. In particular, the instant invention provides a crystalline monohydrate of the dihydrogenphosphate salt of formula I.

The dihydrogenphosphate salt of the present invention has a center of asymmetry at the stereogenic carbon atom

MRK-STG-02560505

US 7,326,708 B2

3

indicated with an * and can thus occur as a racemate, racemic mixture, and single enantiomers, with all isomeric forms being included in the present invention. The separate enantiomers, substantially free of the other, are included within the scope of the invention, as well as mixtures of the two enantiomers.

One embodiment of the present invention provides the dihydrogenphosphate salt of (2R)-4-oxo-4-[3-(trifluorom-ethyl)-5,6-dihydro[1,2,4]triazolo[4,3-a]pyrazin-7(8H)-yl]-1-(2,4,5-trifluorophenyl) butan-2-amine of structural formula II:

(II)



or a crystalline hydrate thereof.

A second embodiment of the present invention provides the dihydrogenphosphate salt of (2S)-4-oxo-4-[3-(trifluo-romethyl)-5,6-dihydro[1,2,4]triazolo[4,3-a]pyrazin-7(8H)-yl]-1-(2,4,5-trifluorophenyl) butan-2-amine of structural for-mula III:

(III)



or a crystalline hydrate thereof.

More specifically, the dihydrogenphosphate salt of the present invention is comprised of one molar equivalent of mono-protonated 4-oxo-4-[3-(trifluoromethyl)-5,6-dihydro [1,2,4]triazolo[4,3-a]pyrazin-7(8H)-yl]-1-(2,4,5-trifluo-rophenyl)butan-2-amine cation and one molar equivalent of dihydrogenphosphate (biphosphate) anion.

In a further embodiment of the present invention, the dihydrogenphosphate salt of structural formulae I-III is a crystalline hydrate. In one class of this embodiment, the crystalline hydrate is a crystalline monohydrate.

A further embodiment of the present invention provides the dihydrogenphosphate salt drug substance of structural formulae I-III that comprises the crystalline monohydrate present in a detectable amount. By "drug substance" is meant the active pharmaceutical ingredient ("API"). The amount of crystalline monohydrate in the drug substance can be quantified by the use of physical methods such as X-ray powder diffraction, solid-state fluorine-19 magic-angle spin-ning (MAS) nuclear magnetic resonance spectroscopy, solid-state carbon-13 cross-polarization magic-angle spin-ning (CPMAS) nuclear magnetic resonance spectroscopy,

4

solid state Fourier-transform infrared spectroscopy, and Raman spectroscopy. In a class of this embodiment, about 5% to about 100% by weight of the crystalline monohydrate is present in the drug substance. In a second class of this embodiment, about 10% to about 100% by weight of the crystalline monohydrate is present in the drug substance. In a third class of this embodiment, about 25% to about 100% by weight of the crystalline monohydrate is present in the drug substance. In a fourth class of this embodiment, about 50% to about 100% by weight of the crystalline monohy-drate is present in the drug substance. In a fifth class of this embodiment, about 75% to about 100% by weight of the crystalline monohydrate is present in the drug substance. In a sixth class of this embodiment, substantially all of the dihydrogenphosphate salt drug substance is the crystalline monohydrate of the present invention, i.e., the dihydrogen-phosphate salt drug substance is substantially phase pure monohydrate.

The crystalline dihydrogenphosphate salt of the present invention exhibits pharmaceutic advantages over the free base and the previously disclosed hydrochloride salt (WO 03/004498) in the preparation of a pharmaceutical drug product containing the pharmacologically active ingredient. In particular, the enhanced chemical and physical stability of the crystalline dihydrogenphosphate salt monohydrate con-stitute advantageous properties in the preparation of solid pharmaceutical dosage forms containing the pharmacologi-cally active ingredient.

The dihydrogenphosphate salt of the present invention, which exhibits potent DP-IV inhibitory properties, is par-ticularly useful for the prevention or treatment of Type 2 diabetes, obesity, and high blood pressure.

Another aspect of the present invention provides a method for the prevention or treatment of clinical conditions for which an inhibitor of DP-IV is indicated, which method comprises administering to a patient in need of such pre-vention or treatment a prophylactically or therapeutically effective amount of the dihydrogenphosphate salt of struc-tural formula I or a hydrate thereof, in particular the crys-talline monohydrate thereof. Such clinical conditions include diabetes, in particular Type 2 diabetes, hyperglyce-mia, insulin resistance, and obesity.

The present invention also provides the use of the dihy-drogenphosphate salt of structural formula I or a hydrate thereof, in particular the crystalline monohydrate, for the manufacture of a medicament for the prevention or treat-ment of clinical conditions for which an inhibitor of DP-IV is indicated.

The present invention also provides pharmaceutical com-positions comprising the dihydrogenphosphate salt of struc-tural formula I or a hydrate thereof, in particular the crys-talline monohydrate, in association with one or more pharmaceutically acceptable carriers or excipients. In one embodiment the pharmaceutical composition comprise a therapeutically effective amount of the active pharmaceuti-cal ingredient in admixture with pharmaceutically accept-able excipients wherein the active pharmaceutical ingredient comprises a detectable amount of the crystalline monohy-drate of the present invention. In a second embodiment the pharmaceutical composition comprise a therapeutically effective amount of the active pharmaceutical ingredient in admixture with pharmaceutically acceptable excipients wherein the active pharmaceutical ingredient comprises about 5% to about 100% by weight of the crystalline monohydrate of the present invention. In a class of this second embodiment, the active pharmaceutical ingredient in such compositions comprises about 10% to about 100% by

MRK-STG-02560506

JTX-001.0008

US 7,326,708 B2

5

weight of the crystalline monohydrate. In a second class of this embodiment, the active pharmaceutical ingredient in such compositions comprises about 25% to about 100% by weight of the crystalline monohydrate. In a third class of this embodiment, the active pharmaceutical ingredient in such compositions comprises about 50% to about 100% by weight of the crystalline monohydrate. In a fourth class of this embodiment, the active pharmaceutical ingredient in such compositions comprises about 75% to about 100% by weight of the crystalline monohydrate. In a fifth class of this embodiment, substantially all of the active pharmaceutical ingredient is the crystalline dihydrogenphosphate salt monohydrate of the present invention, i.e., the active pharmaceutical ingredient is substantially phase pure dihydrogenphosphate salt monohydrate.

The compositions in accordance with the invention are suitably in unit dosage forms such as tablets, pills, capsules, powders, granules, sterile solutions or suspensions, metered aerosol or liquid sprays, drops, ampoules, auto-injector devices or suppositories. The compositions are intended for oral, parenteral, intranasal, sublingual, or rectal administration, or for administration by inhalation or insufflation. Formulation of the compositions according to the invention can conveniently be effected by methods known from the art, for example, as described in *Remington's Pharmaceutical Sciences,* 17th ed., 1995.

The dosage regimen is selected in accordance with a variety of factors including type, species, age, weight, sex and medical condition of the patient; the severity of the condition to be treated; the route of administration; and the renal and hepatic function of the patient. An ordinarily skilled physician, veterinarian, or clinician can readily determine and prescribe the effective amount of the drug required to prevent, counter or arrest the progress of the condition.

Oral dosages of the present invention, when used for the indicated effects, will range between about 0.01 mg per kg of body weight per day (mg/kg/day) to about 100 mg/kg/day, preferably 0.01 to 10 mg/kg/day, and most preferably 0.1 to 5.0 mg/kg/day. For oral administration, the compositions are preferably provided in the form of tablets containing 0.01, 0.05, 0.1, 0.5, 1.0, 2.5, 5.0, 10.0, 15.0, 25.0, 50.0, 100, 200, and 500 milligrams of the active ingredient for the symptomatic adjustment of the dosage to the patient to be treated. A medicament typically contains from about 0.01 mg to about 500 mg of the active ingredient, preferably, from about 1 mg to about 200 mg of active ingredient. Intravenously, the most preferred doses will range from about 0.1 to about 10 mg/kg/minute during a constant rate infusion. Advantageously, the crystalline forms of the present invention may be administered in a single daily dose, or the total daily dosage may be administered in divided doses of two, three or four times daily. Furthermore, the crystalline forms of the present invention can be administered in intranasal form via topical use of suitable intranasal vehicles, or via transdermal routes, using those forms of transdermal skin patches well known to those of ordinary skill in the art. To be administered in the form of a transdermal delivery system, the dosage administration will, of course, be continuous rather than intermittent throughout the dosage regimen.

In the methods of the present invention, the dihydrogenphosphate salt and crystalline hydrates herein described in detail can form the active pharmaceutical ingredient, and are typically administered in admixture with suitable pharmaceutical diluents, excipients or carriers (collectively referred to herein as 'carrier' materials) suitably selected with respect to the intended form of administration, that is, oral tablets, capsules, elixirs, syrups and the like, and consistent with conventional pharmaceutical practices.

6

For instance, for oral administration in the form of a tablet or capsule, the active pharmaceutical ingredient can be combined with an oral, non-toxic, pharmaceutically acceptable, inert carrier such as lactose, starch, sucrose, glucose, methyl cellulose, magnesium stearate, dicalcium phosphate, calcium sulfate, mannitol, sorbitol and the like; for oral administration in liquid form, the active pharmaceutical ingredient can be combined with any oral, non-toxic, pharmaceutically acceptable inert carrier such as ethanol, glycerol, water and the like. Moreover, when desired or necessary, suitable binders, lubricants, disintegrating agents and coloring agents can also be incorporated into the mixture. Suitable binders include starch, gelatin, natural sugars such as glucose or beta-lactose, corn sweeteners, natural and synthetic gums such as acacia, tragacanth or sodium alginate, carboxymethylcellulose, polyethylene glycol, waxes and the like. Lubricants used in these dosage forms include sodium oleate, sodium stearate, magnesium stearate, sodium benzoate, sodium acetate, sodium chloride and the like. Disintegrators include, without limitation, starch, methyl cellulose, agar, bentonite, xanthan gum and the like.

The dihydrogenphosphate salt of structural formula I and the crystalline monohydrate have been found to possess a high solubility in water, rendering it especially amenable to the preparation of formulations, in particular intranasal and intravenous formulations, which require relatively concentrated aqueous solutions of active ingredient. The solubility of the crystalline dihydrogenphosphate salt monohydrate of formula I in water has been found to be about 72 mg/mL.

According to a further aspect, the present invention provides a process for the preparation of the dihydrogenphosphate salt of formula I, which process comprises reacting 4-oxo-[4-[3-(trifluoromethyl)-5,6-dihydro[1,2,4]triazolo[4, 3-a]pyrazin-7(8H)-yl]-1-(2,4,5-trifluoromethyl)butan-2-amine of structural formula IV below:



(IV)

with approximately one equivalent of phosphoric acid in a suitable $C_1$-$C_5$ alkanol, such as methanol, ethanol, isopropyl alcohol (IPA), and isoamyl alcohol (IAA) or aqueous $C_1$-$C_5$ alkanol. The reaction is carried out at a temperature range of about 25 °C. to about 80 °C. The phosphoric acid solution can be added to a solution of the amine, or the addition can be performed in the reverse direction. The crystalline dihydrogenphosphate salt monohydrate is obtained by crystallization from an aqueous $C_1$-$C_5$ alkanol solution of the dihydrogenphosphate salt as described below.

General Methods for Crystallizing the Monohydrate of the Dihydrogenphosphate Salt of Structural Formula I

(a) In Ethanol/Water System at 25° C.:

(1) crystallization from a mixture of compound I in ethanol and water, such that the water concentration is above 31 weight percent,

(2) recovering the resultant solid phase, and

(3) removing the solvent therefrom.

MRK-STG-02560507

JTX-001.0009

US 7,326,708 B2

**7**

(b) In Isoamyl Alcohol (IAA)/Water System at 25° C.:

(1) crystallization from a mixture of compound I in IAA and water, such that the water concentration is above 2.9 weight percent;

(2) recovering the resultant solid phase; and

(3) removing the solvent therefrom.

(c) In IAA/Water System at 40° C.:

(1) crystallization from a mixture of compound I in IAA and water, such that the water concentration is above 3.6 weight percent;

(2) recovering the resultant solid phase; and

(3) removing the solvent therefrom

(d) In IAA/Water System at 60° C.:

(1) crystallization from a mixture of compound I in IAA and water, such that the water concentration is above 4.5 weight percent;

(2) recovering the resultant solid phase; and

(3) removing the solvent therefrom.

(e) In Isopropyl Alcohol (IPA)/Water System at 25° C.:

(1) crystallization from a mixture of compound I in IPA and water, such that the water concentration is above 7.0 weight percent;

(2) recovering the resultant solid phase; and

(3) removing the solvent therefrom

(f) In IPA/Water System at 40° C.:

(1) crystallization from a mixture of compound I in IPA and water, such that the water concentration is above 8.1 weight percent;

(2) recovering the resultant solid phase; and

(3) removing the solvent therefrom.

(g) In IPA/Water System at 75° C.:

(1) crystallization from a mixture of compound I in IPA and water, such that the water concentration is above about 20 weight percent;

(2) recovering the resultant solid phase; and

(3) removing the solvent therefrom.

The starting compound of structural formula IV can be prepared by the procedures detailed in Schemes 1-3 and Example 1 below.

In a still further aspect, the present invention provides a method for the treatment and/or prevention of clinical conditions for which a DP-IV inhibitor is indicated, which method comprises administering to a patient in need of such prevention or treatment a prophylactically or therapeutically effective amount of the salt of Formula I as defined above or a crystalline hydrate thereof.

The following non-limiting Examples are intended to illustrate the present invention and should not be construed as being limitations on the scope or spirit of the instant invention.

Compounds described herein may exist as tautomers such as keto-enol tautomers. The individual tautomers as well as mixtures thereof are encompassed with compounds of structural formula I.

The term "% enantiomeric excess" (abbreviated "ee") shall mean the % major enantiomer less the % minor enantiomer. Thus, a 70% enantiomeric excess corresponds to formation of 85% of one enantiomer and 15% of the other. The term "enantiomeric excess" is synonymous with the term "optical purity."

**8**

EXAMPLE



(2R)-4-oxo-4-[3-(trifluoromethyl)-5,6-dihydro[1,2,4]triazolo[4,3-a]pyrazin-7(8H)-yl]-1-(2,4,5-trifluorophenyl)butan-2-amine dihydrogenphosphate monohydrate

Preparation of 3-(trifluoromethyl)-5,6,7,8-tetrahydro[1,2,4]triazolo[4,3-a]pyrazine hydrochloride (1-4)



Scheme 1

Step A: Preparation of bishydrazide (1-1)

Hydrazine (20.1 g, 35 wt% in water, 0.22 mol) was mixed with 310 mL of acetonitrile. 31.5 g of ethyl trifluoroacetate (0.22 mol) was added over 60 min. The internal temperature was increased to 25° C. from 14° C. The resulting solution was aged at 22-25° C. for 60 min. The was cooled to 7° C. 17.9 g of 50 wt % aqueous NaOH (0.22 mol) and 25.3 g of chloroacetyl chloride (0.22 mol) were added simultaneously over 130 min at a temperature below 16° C. When the reaction was complete, the mixture was vacuum distilled to

MRK-STG-02560508

JTX-001.0010

**9**

remove water and ethanol at 27–30° C. and under 26 ~27 in Hg vacuum. During the distillation, 720 mL of acetonitrile was added slowly to maintain constant volume (approximately 500 mL). The slurry was filtered to remove sodium chloride. The cake was rinsed with about 100 mL of acetonitrile. Removal of the solvent afforded bis-hydrazide 1-1 (43.2 g, 96.5% yield, 94.4 area % pure by HPLC assay).

$^1$H-NMR (400 MHz, DMSO-d$_6$): δ 4.2 (s, 2H), 10.7 (s, 1H), and 11.6 (s, 1H) ppm. $^{13}$C-NMR (100 MHz, DMSO-d$_6$): δ 41.0, 116.1 (q, J=362 Hz), 155.8 (q, J=50 Hz), and 165.4 ppm.

Step B: Preparation of 5-(trifluoromethyl)-2-(chloromethyl)-1,3,4-oxadiazole (1-2)

Bishydrazide 1-1 from Step A (43.2 g, 0.21 mol) in ACN (82 mL) was cooled to 5° C. Phosphorus oxychloride (32.2 g, 0.21 mol) was added, maintaining the temperature below 10° C. The mixture was heated to 80° C. and aged at this temperature for 24 h until HPLC showed less than 2 area % of 1-1. In a separate vessel, 260 mL of IPAc and 250 mL of water were mixed and cooled to 0° C. The reaction slurry was charged to the quench keeping the internal temperature below 10° C. After the addition, the mixture was agitated vigorously for 30 min, the temperature was increased to room temperature and the aqueous layer was cut. The organic layer was then washed with 215 mL of water, 215 mL of 5 wt % aqueous sodium bicarbonate and finally 215 mL of 20 wt % aqueous brine solution. HPLC assay yield after work up was 86-92%. Volatiles were removed by distillation at 75-80 mm Hg, 55° C. to afford an oil which could be used directly in Step C without further purification. Otherwise the product can be purified by distillation to afford 1-2 in 70-80% yield.

$^1$H-NMR (400 MHz, CDCl$_3$): δ 4.8 (s, 2H) ppm. $^{13}$C-NMR (100 MHz, CDCl$_3$): δ 32.1, 115.8 (q, J=337 Hz), 156.2 (q, J=50 Hz), and 164.4 ppm.

Step C: Preparation of N-[(2Z)-piperazin-2-ylidene]trifluoroacetohydrazide (1-3)

To a solution of ethylenediamine (33.1 g, 0.55 mol) in methanol (150 mL) cooled at −20° C. was added distilled oxadiazole 1-2 from Step B (29.8 g, 0.16 mol) while keeping the internal temperature at −20° C. After the addition was complete, the resulting slurry was aged at −20° C. for 1 h. Ethanol (225 mL) was then charged and the slurry slowly warmed to −5° After 60 min at −5° C., the slurry was filtered and washed with ethanol (60 mL) at −5° C. Amidine 1-3 was obtained as a white solid in 72% yield (24.4 g, 99.5 area wt % pure by HPLC).

$^1$H-NMR (400 MHz, DMSO-d$_6$): δ 2.9 (t, 2H), 3.2 (t, 2H), 3.6 (s, 2H), and 8.3 (b, 1H) ppm. $^{13}$C-NMR (100 MHz, DMSO-d$_6$): δ 40.8, 42.0.43.3, 119.3 (q, J=350 Hz), 154.2, and 156.2 (q, J=38 Hz) ppm.

Step D: Preparation of 3-(trifluoromethyl)-5,6,7,8-tetrahydro[1,2,4]triazolo[4,3-a]pyrazine hydrochloride (1-4)

A suspension of amidine 1-3 (27.3 g, 0.13 mol) in 110 mL of methanol was warmed to 55° C. 37% Hydrochloric acid (11.2 mL, 0.14 mol) was added over 15 min at this temperature. During the addition, all solids dissolved resulting in a clear solution. The reaction was aged for 30 min. The solution was cooled down to 20° C. and aged at this temperature until a seed bed formed (10 min to 1 h). 300 mL of MTBE was charged at 20° C. over 1 h. The resulting slurry was cooled to 2° C., aged for 30 min and filtered. Solids were washed with 50 mL of ethanol:MTBE (1:3) and dried under vacuum at 45° C. Yield of triazole 1-4 was 26.7 g (99.5 area wt % pure by HPLC).

**10**

$^1$H-NMR (400 MHz, DMSO-d$_6$): δ 3.6 (t, 2H), 4.4 (t, 2H), 4.6 (s, 2H), and 10.6 (b, 2H) ppm; $^{13}$C-NMR (100 MHz, DMSO-d$_6$): δ: 39.4, 39.6, 41.0, 118.6 (q, J=325 Hz), 142.9 (q, J=50 Hz), and 148.8 ppm.

Scheme 2



Step A: Preparation of 4-oxo-4-[3-(trifluoromethyl)-5,6-dihydro[1,2,4]triazolo[4,3-a]pyrazin-7(8H)-yl]-1-(2,4,5-trifluorophenyl)butan-2-one (2-3)

2,4,5-Trifluorophenylacetic acid (2-1 (150 g, 0.789 mol), Meldrum's acid (125 g, 0.868 mol), and 4-(dimethylamino) pyridine (DMAP) (7.7 g, 0063 mol) were charged into a 5 L three-neck flask. N,N-Dimethylacetamide (DMAc) (525 mL) was added in one portion at room temperature to

MRK-STG-02560509

JTX-001.0011

US 7,326,708 B2

**11**

dissolve the solids. N,N-diisopropylethylamine (282 mL, 1.62 mol) was added in one portion at room temperature while maintaining the temperature below 40° C. Pivaloyl chloride (107 mL, 0.868 mol) was added dropwise over 1 to 2 h while maintaining the temperature between 0 and 5° C. The reaction mixture was aged at 5° C. for 1 h. Triazole hydrochloride 14 (180 g, 0.789 mol) was added in one portion at 40-50° C. The reaction solution was aged at 70° C. for several h. 5% Aqueous sodium hydrogencarbonate solution (625 mL) was then added dropwise at 20-45° C. The batch was seeded and aged at 20-30° C. for 1-2 h. Then an additional 525 mL of 5% aqueous sodium hydrogencarbonate solution was added dropwise over 2-3 h. After aging several h at room temperature, the slurry was cooled to 0-5° C. and aged 1 h before filtering the solid. The wet cake was displacement-washed with 20% aqueous DMAc (300 mL), followed by an additional two batches of 20% aqueous DMAc (400 mL), and finally water (400 mL). The cake was suction-dried at room temperature. The isolated yield of final product 2-3 was 89%.

Step B: Preparation of (2Z)-4-oxo-4-[3-(trifluoromethyl)-5,6-dihydro[1,2,4]triazolo[4,3-a]pyrazin-7(8H)-yl]-1-(2,4,5-trifluorophenyl)but-2-en-2-amine (2-4)

A 5 L round-bottom flask was charged with methanol (100 mL), the ketoamide 2-3 (200 g), and ammonium acetate (110.4 g). Methanol (180 mL) and 28% aqueous ammonium hydroxide (58.6 mL) were then added keeping the temperature below 30° C. during the addition. Additional methanol (100 mL) was added to the reaction mixture. The mixture was heated at reflux temperature and aged for 2 h. The reaction was cooled to room temperature and then to about 5° C. in an ice-bath. After 30 min, the solid was filtered and dried to afford 2-4 as a solid (180 g); m.p. 271.2° C.

Step C: Preparation of (2R)-4-oxo-4-[3-(trifluoromethyl)-5,6-dihydro[1 2,4]triazolo[4,3-a]pyrazin-7(8H)-yl]-1-(2,4,5-trifluorophenyl)butan-2-amine (2-5)

Into a 500 ml flask were charged chloro(1,5-cyclooctadiene)rhodium(I) dimer {[Rh(cod)Cl]$_2$}(292 mg, 1.18 mmol) and (R,S) t-butyl Josiphos (708 mg, 1.3 mmol) under a nitrogen atmosphere. Degassed MeOH was then added (200 mL) and the mixture was stirred at room temperature for 1 h. Into a 4 L hydrogenator was charged the enamine amide 2-4 (118 g, 0.29 mol) along with MeOH (1 L). The slurry was degassed. The catalyst solution was then transferred to the hydrogenator under nitrogen. After degassing three times, the enamine amide was hydrogenated under 200 psi hydrogen gas at 50° C. for 13 h. Assay yield was determined by HPLC to be 93% and optical purity to be 94% ee.

The optical purity was further enhanced in the following manner. The methanol solution from the hydrogenation reaction (18 g in 180 mL MeOH) was concentrated and switched to methyl t-butyl ether (MTBE) (45 mL). To this solution was added aqueous H$_3$PO$_4$ solution (0.5 M, 95 mL). After separation of the layers, 3N NaOH (35 mL) was added to the water layer, which was then extracted with MTBE (180 mL+100 mL). The MTBE solution was concentrated and solvent switched to hot toluene (180 mL, about 75° C.). The hot toluene solution was then allowed to cool to 0° C. slowly (5-10 h). The crystals were isolated by filtration (13 g, yield 72%, 98-99% ee); m.p. 114.1-115.7° C.

$^1$H NMR (300 MHz, CD$_3$CN): δ 7.26 (m), 7.08 (m), 4.90 (s), 4.89 (s), 4.14 (m), 3.95 (m), 3.40 (m), 2.68 (m), 2.49 (m), 1.40 (bs).

**12**

Compound 2-5 exists as amide bond rotamers. Unless indicated, the major and minor rotamers are grouped together since the carbon-13 signals are not well resolved:

$^{13}$C NMR (CD$_3$CN): δ 171.8, 157.4 (ddd, $J_{CF}$=242.4, 9.2, 2.5 Hz), 152.2 (major), 151.8 (minor), 149.3 (ddd; $J_{CF}$=246.7, 14.2, 12.9 Hz), 147.4 (ddd, $J_{CF}$=241.2, 12.3, 3.7 Hz), 144.2 (q, $J_{CF}$=38.8 Hz), 124.6 (ddd, $J_{CF}$=18.5, 5.9, 4.0 Hz), 120.4 (dd, $J_{CF}$=19.1, 6.2 Hz), 119.8 (q, $J_{CF}$=268.9 Hz), 106.2(dd, $J_{CF}$=29.5, 20.9 Hz), 50.1, 44.8, 44.3 (minor), 43.2 (minor), 42.4, 41.6 (minor), 41.4, 39.6, 38.5 (minor), 36.9.

The crystalline free base can also be isolated as follows:

(a) The reaction mixture upon completion of the hydrogenation step is charged with 25 wt % of Ecosorb C-941. The mixture is stirred under nitrogen for one h and then filtered. The cake is washed with 2 L/kg of methanol. Recovery of free base is about 95% and optical purity about 95% ee.

(b) The freebase solution in methanol is concentrated to 3.5-4.0 L/kg volume (based on free base charge) and then solvent-switched into isopropanol (IPA) to final volume of 3.0 L/kg IPA.

(c) The slurry is heated to 40° C. and aged 1 h at 40° C. and then cooled to 25° C. over 2 h.

(d) Heptane (7 L/kg) is charged over 7 h and the slurry stirred for 12 h at 22-25° C. The supernatant concentration before filtering is 10-12 mg/g.

(e) The slurry is filtered and the solid washed with 30% IPA/heptane (2 L/kg).

(f) The solid is dried in a vacuum oven at 40° C.

(g) The optical purity of the free base is about 99% ee.

The following high-performance liquid chromatographic (HPLC) conditions were used to determine percent conversion to product:

Column: Waters Symmetry C18, 250 mm×4.6 mm
Eluent: Solvent A: 0.1 vol % HClO$_4$/H$_2$O
Solvent B: acetonitrile
Gradient: 0 min 75% A: 25% B
10 min 25% A: 75% B
12.5 min 25% A: 75% B
15 min 75% A: 25% B
Flow rate: 1 mL/min
Injection Vol.: 10 μL
UV detection: 210 nm
Column temp.: 40° C.
Retention times: compound 2-4: 9.1 min
compound 2-5: 5.4 min
tBu Josiphos: 8.7 min

The following high-performance liquid chromatographic (HPLC) conditions were used to determine optical purity:

Column: Chirapak, AD-H, 250 mm×4.6 mm
Eluent: Solvent A: 0.2 vol. % diethylamine in heptane
Solvent B: 0.1 vol % diethylamine in ethanol
Isochratic Run Time: 18 min
Flow rate: 0.7 mL/min
Injection Vol.: 7 μL
UV detection: 268 nm
Column temp.: 35° C.
Retention times: (R)-amine 2-5: 13.8 min
(S)-amine 2-5: 11.2 min

(2R)-4-oxo-4-[3-(trifluoromethyl)-5,6-dihydro[1,24]triazolo[4,3-a]pyrazin-7(8H)-yl]-1-(2,4,5-trifluorophenyl)butan-2-amine dihydrogenphosphate monohydrate

A 250 mL round bottom flask equipped with an overhead stirrer, heating mantle and thermocouple, was charged with 31.5 mL of isopropanol (IPA), 13.5 mL water, 15.0 g (36.9 mmol) of (2R)-4-oxo-4-[3-(trifluoromethyl)-5,6-dihydro[1,

MRK-STG-02560510

JTX-001.0012

US 7,326,708 B2

13

2,4]triazolo[4,3-a]pyrazin-7(8H)-yl]-1-(2,4,5-trifluorophe-nyl) butan-2-amine freebase and 4.25 g (36.9 mmol) of 85% aqueous phosphoric acid. The mixture was heated to 75° C. A thick white precipitate formed at lower temperatures but dissolved upon reaching 75° C. The solution was cooled to 68° C. and then held at that temperature for 2 h. A slurry bed of solids formed during this age time [the solution can be seeded with 0.5 to 5 wt % of small particle size (alpine milled) monohydrate]. The slurry was then cooled at a rate of 4° C./h to 21° C. and then held overnight. 105 mL of EPA was then added to the slurry. After 1 h the slurry was filtered and washed with 45 mL IPA (solids can also be washed with a water/IPA solution to avoid turnover to other crystal forms). The solids were dried on the frit with open to air. 18.6 g of solids were recovered. The solids were found to be greater than 99.8% pure by HPLC area percentage (HPLC conditions same as those given above). The particle size distribution analysis of the isolated solids showed a mean PSD of 80 microns with 95% less than 180 microns. The crystal form of the solids was shown to be monohydrate by X-ray powder diffraction and thermogravimetric analysis.

X-ray powder diffraction studies are widely used to characterize molecular structures, crystallinity, and polymorphism. The X-ray powder diffraction pattern of the crystalline dihydrogenphosphate monohydrate was generated on a Philips Analytical X'Pert PRO X-ray Diffraction System with PW3040/60 console. A PW3373/00 ceramic Cu LEF X-ray tube K-Alpha radiation was used as the source.

FIG. 1 shows the X-ray diffraction pattern for the crystalline monohydrate form of the dihydrogenphosphate salt of structural formula II. The monohydrate exhibited characteristic diffraction peaks corresponding to d-spacings of 7.42, 5.48, and 3.96 angstroms. The monohydrate was further characterized by the d-spacings of 6.30, 4.75, and 4.48 angstroms. The monohydrate was even further characterized by the d-spacings of 5.85, 5.21, and 3.52 angstroms.

In addition to the X-ray powder diffraction patterns described above, the crystalline monohydrate form of the dihydrogenphosphate salt of structural formula II was further characterized by its solid-state carbon-13 and fluorine-19 nuclear magnetic resonance (NMR) spectra. The solid-state carbon-13 NMR spectrum was obtained on a Bruker DSX 400WB NMR system using a Bruker 4 mm double resonance CPMAS probe. The carbon-13 NMR spectrum utilized proton/carbon-13 cross-polarization magic-angle spinning with variable-amplitude cross polarization. The sample was spun at 15.0 kHz, and a total of 2048 scans were collected with a recycle delay of 20 seconds. A line broadening of 40 Hz was applied to the spectrum before FT was performed. Chemical shifts are reported on the TMS scale using the carbonyl carbon of glycine (176.03 p.p.m.) as a secondary reference.

The solid-state fluorine-19 NMR spectrum was obtained on a Bruker DSX 400WB NMR system using a Bruker 4 mm CRAMPS probe. The NMR spectrum utilized a simple pulse-acquire pulse program. The samples were spun at 15.0 kHz, and a total of 16 scans were collected with a recycle delay of 30 seconds. A vespel endcap was utilized to minimize fluorine background. A line broadening of 100 Hz was applied to the spectrum before FT was performed. Chemical shifts are reported using poly(tetrafluoroethylene) (teflon) as an external secondary reference which was assigned a chemical shift of −122 ppm.

FIG. 2 shows the solid-state carbon-13 CPMAS NMR spectrum for the crystalline monohydrate form of the dihydrogenphosphate salt of structural formula II. The monohydrate form exhibited characteristic signals with chemical

14

shift values of 169.1, 120.8, and 46.5 p.p.m. Further characteristic of the monohydrate form were the signals with chemical shift values of 159.0, and 150.9, and 40.7 ppm.

FIG. 3 shows the solid-state fluorine-19 MAS NM spectrum for the crystalline monohydrate form of the dihydrogenphosphate salt of structural formula II. The monohydrate form exhibited characteristic signals with chemical shift values of −64.5, −114.7, −136.3, and −146.2 p.p.m. Further characteristic of the monohydrate form were the signals with chemical shift values of −96.5, −104.4, −106.3, and −154.5 ppm.

FIG. 4 shows the characteristic thermogravimetric analysis (TGA) curve for the crystalline monohydrate form of the dihydrogenphosphate salt of structural formula II. A Perkin Elmer model TGA 7 or equivalent instrument was used. Experiments were performed under a flow of nitrogen and using a heating rate of 10° C./min to a maximum temperature of approximately 250° C. After automatically taring the balance, 5 to 20 mg of sample was added to the platinum pan, the furnace was raised, and the heating program started. Weight/temperature data were collected automatically by the instrument. Analysis of the results was carried out by selecting the Delta Y function within the instrument software and choosing the temperatures between which the weight loss was to be calculated. Weight losses are reported up to the onset of decomposition/evaporation. TGA indicated a weight loss of about 3.3647 % from ambient temperature to about 250° C.

FIG. 5 shows the characteristic DSC curve for the crystalline monohydrate form of the dihydrogenphosphate salt of structural formula II. A TA Instruments DSC 2910 or equivalent instrumentation was used. Between 2 and 6 mg sample was weighed into an open pan. This pan was then crimped and placed at the sample position in the calorimeter cell. An empty pan was placed at the reference position. The calorimeter cell was closed and a flow of nitrogen was passed through the cell. The heating program was set to heat the sample at a heating rate of 10° C./min to a temperature of approximately 250° C. The heating program was started. When the run was completed, the data were analyzed using the DSC analysis program contained in the system software. The melting endotherm was integrated between baseline temperature points that are above and below the temperature range over which the endotherm was observed. The data reported are the onset temperature, peak temperature, and enthalpy.

The crystalline dihydrogenphosphate salt monohydrate of the present invention has a phase purity of at least about 5% of the form with the above X-ray powder diffraction, fluorine-19 MAS NMR, carbon-13 CPMAS NMR, and DSC physical characteristics. In one embodiment the phase purity is at least about 10% of the form with the above solid-state physical characteristics. In a second embodiment the phase purity is at least about 25% of the form with the above solid-state physical characteristics. In a third embodiment the phase purity is at least about 50% of the form with the above solid-state physical characteristics. In a fourth embodiment the phase purity is at least about 75% of the form with the above solid-state physical characteristics. In a fifth embodiment the phase purity is at least about 90% of the form with the above solid-state physical characteristics. In a sixth embodiment the crystalline dihydrogenphosphate salt monohydrate is the substantially phase pure form with the above solid-state physical characteristics. By the term "phase purity" is meant the solid state purity of the dihydrogenphosphate salt monohydrate with regard to a particu-

MRK-STG-02560511

JTX-001.0013

US 7,326,708 B2

15

lar crystalline or amorphous form of the salt as determined by the solid-state physical methods described in the present application.

The crystalline dihydrogenphosphate salt monohydrate was found to be stable under ambient condition. It was found to convert to dehydrated monohydrate if heated to above 40° C. under very dry nitrogen flow. Dehydrated monohydrate converted back to monohydrate under ambient condition.

### EXAMPLES OF PHARMACEUTICAL COMPOSITIONS

1) Direct Compression Process:

The dihydrogenphosphate salt monohydrate was formulated into a tablet by a direct compression process. A 100 mg potency tablet was composed of 128.4 mg of the active ingredient, 127.8 mg microcrystalline cellulose, 127.8 mg of mannitol (or 127.8 mg of dicalcium phosphate), 8 mg of croscarmellose sodium, 8 mg of magnesium stearate and 16 mg of Opadry white (proprietary coating material made by Colorcon, West Point, Pa.). The active ingredient, microcrystalline cellulose, mannitol (or dicalcium phosphate), and croscarmellose were first blended, and the mixture was then lubricated with magnesium stearate and pressed into tablets. The tablets were then film coated with Opadry White.

2) Roller Compaction Process:

The dihydrogenphosphate salt monohydrate was formulated into a tablet by a roller compaction process. A 100 mg potency tablet was composed of 128.4 mg of the active ingredient, 45 mg microcrystalline cellulose, 111.6 mg of dicalcium phosphate, 6 mg of croscarmellose sodium, 6 mg of magnesium stearate and 12 mg of Opadry white (proprietary coating material made by Colorcon, West Point, Pa.). The active ingredient, microcrystalline cellulose, dicalcium phosphate, and croscarmellose were first blended, and the mixture was then lubricated with one third the total amount of magnesium stearate and roller compacted into ribbons. These ribbons were then milled and then resulting granules were lubricated with the remaining amount of the magnesium stearate and pressed into tablets. The tablets were then film coated with Opadry White. 3) An intravenous (i.v.) aqueous formulation is defined as the monohydrate of dihydrogenphosphate salt of formula I in 10 mM sodium acetate/ 0.8% saline solution at pH 4.5±0.2. For a formulation with a concentration of 4.0 mg/mL, 800 mg of NaCl is dissolved in 80 mL of water, then 57.5 μL of glacial acetic acid is added, followed by 512 mg of the dihydrogenphosphate salt monohydrate. The pH is adjusted to 4.5±0.2 with 0.1 N NaOH solution. The final volume is adjusted to 100 mL with water. A 2.0 mg/mL solution can be made by dilution of 50.0 mL of the 4.0 mg/mL solution to 100.0 mL with placebo. A 1.0 mg/mL solution can be made by dilution of 25.0 mL of the 4.0 mg/mL solution to 100.0 mL with placebo.

What is claimed is:

1. A dihydrogenphosphate salt of 4-oxo-4-[3-(trifluoromethyl)-5,6-dihydro[1,2,4]triazolo[4,3-a]pyrazin-7(8H)-yl]-1-(2,4,5-trifluorophenyl)butan-2-amine of structural formula I:

16



(I)

or a hydrate thereof.

2. The salt of claim 1 of structural formula II having the (R)-configuration at the chiral center marked with an *



(II)

3. The salt of claim 1 of structural formula III having the (S)-configuration at the chiral center marked with an *



(III)

4. The salt of claim 2 characterized in being a crystalline monohydrate.

5. The salt of claim 4 characterized by characteristic absorption bands obtained from the X-ray powder diffraction pattern at spectral d-spacings of 7.42, 5.48, and 3.96 angstroms.

6. The salt of claim 5 further characterized by characteristic absorption bands obtained from the X-ray powder diffraction pattern at spectral d-spacings of 6.30, 4.75, and 4.48 angstroms.

7. The salt of claim 6 further characterized by characteristic absorption bands obtained from the X-ray powder diffraction pattern at spectral d-spacings of 5.85, 5.21, and 3.52 angstroms.

8. The salt of claim 7 further characterized by the X-ray powder diffraction pattern of FIG. 1.

9. The salt of claim 4 characterized by a solid-state carbon-13 CPMAS nuclear magnetic resonance spectrum showing signals at 169.1, 120.8, and 46.5 ppm.

US 7,326,708 B2

17

**10**. The salt of claim **9** further characterized by a solid-state carbon-13 CPMAS nuclear magnetic resonance spectrum showing signals at 159.0, 150.9, and 40.7 ppm.

**11**. The salt of claim **10** further characterized by the solid-state carbon-13 CPMAS nuclear magnetic resonance spectrum of FIG. **2**.

**12**. The salt of claim **4** characterized by a solid-state fluorine-19 MAS nuclear magnetic resonance spectrum showing signals at −64.5, −114.7, −136.3, and −146.2 ppm.

**13**. The salt of claim **12** further characterized by a solid-state fluorine-19 MAS nuclear magnetic resonance spectrum showing signals at −96.5, −104.4, −106.3, and −154.5 ppm.

**14**. The salt of claim **13** further characterized by the solid-state fluorine-19 MAS nuclear magnetic resonance spectrum of FIG. **3**.

**15**. The salt of claim **4** characterized by the thermogravimetric analysis curve of FIG. **4**.

**16**. The salt of claim **4** characterized by the differential scanning calorimetric curve of FIG. **5**.

**17**. A pharmaceutical composition comprising a therapeutically effective amount of the salt according to claim **2** in association with one or more pharmaceutically acceptable carriers.

**18**. A pharmaceutical composition comprising a therapeutically effective amount of the salt according to claim **4** in association with one or more pharmaceutically acceptable carriers.

**19**. A method for the treatment of type 2 diabetes comprising administering to a patient in need of such treatment a therapeutically effective amount of the salt according to claim **2** or a hydrate thereof.

**20**. A method for the treatment of type 2 diabetes comprising administering to a patient in need of such treatment a therapeutically effective amount of the salt according to claim **4**.

**21**. A process for preparing the salt of claim **2** comprising the step of contacting one equivalent of (2R)-4-oxo-4-[3-

18

(trifluoromethyl)-5,6-dihydro[1,2,4]triazolo[4,3-a]pyrazin-7(8H)-yl]-1-(2,4,5-trifluorophenyl)butan-2-amine in an organic solvent or aqueous organic solvent with about a one equivalent of phosphoric acid at a temperature in the range of about 25–100° C.

**22**. The process of claim **21** wherein said organic solvent is a $C_1$-$C_5$ linear or branched alkanol.

**23**. The phosphoric acid salt of (2R)-4-oxo-4-[3-(trifluoromethyl)-5,6-dihydro[1,2,4]triazolo[4,3-a]pyrazin-7(8H)-yl]-1-(2,4,5-trifluorophenyl)butan-2-amine prepared according to the process of claim **21**.

**24**. A process for preparing the crystalline monohydrate of claim **4** comprising the steps of:

(a) crystallizing the dihydrogenphosphate salt of structural formula (II):



at 25° C. from a mixture of isopropanol and water, such that the water concentration is above 6.8 weight percent;

(b) recovering the resultant solid phase; and

(c) removing the solvent therefrom.

\* \* \* \* \*

MRK-STG-02560513

JTX-001.0015

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

| | | |
|---|---|---|
| PATENT NO. | : 7,326,708 B2 | Page 1 of 1 |
| APPLICATION NO. | : 10/874992 | |
| DATED | : February 5, 2008 | |
| INVENTOR(S) | : Cypes et al. | |

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

On the Title Page:

The first or sole Notice should read --

Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 884 days.

Signed and Sealed this
Ninth Day of February, 2016

*Michelle K. Lee*

Michelle K. Lee
*Director of the United States Patent and Trademark Office*

MRK-STG-02560514

JTX-001.0016

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.            : 7,326,708 B2                                    Page 1 of 1
APPLICATION NO.   : 10/874992
DATED                    : February 5, 2008
INVENTOR(S)         : Stephen Howard Cypes et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

In the Claims

In Column 16, Claim 5, Lines 2-3, replace "absorption bands obtained from the X-ray powder diffraction pattern at spectral" with --diffraction peaks obtained from the X-ray powder diffraction pattern corresponding to--.

In Column 16, Claim 6, Lines 2-3, replace "absorption bands obtained from the X-ray powder diffraction pattern at spectral" with --diffraction peaks obtained from the X-ray powder diffraction pattern corresponding to--.

In Column 16, Claim 7, Lines 2-3, replace "absorption bands obtained from the X-ray powder diffraction pattern at spectral" with --diffraction peaks obtained from the X-ray powder diffraction pattern corresponding to--.

Signed and Sealed this
Ninth Day of February, 2021

Drew Hirshfeld
*Performing the Functions and Duties of the*
*Under Secretary of Commerce for Intellectual Property and*
*Director of the United States Patent and Trademark Office*

MRK-STG-02560515

JTX-001.0017



US008414921B2

(12) **United States Patent**    (10) **Patent No.:**    **US 8,414,921 B2**
Kamali et al.    (45) **Date of Patent:**    **Apr. 9, 2013**

(54) **PHARMACEUTICAL COMPOSITIONS OF COMBINATIONS OF DIPEPTIDYL PEPTIDASE-4 INHIBITORS WITH METFORMIN**

(75) Inventors: **Ashkan Kamali**, West Conshohocken, PA (US); **Laman Alani**, Lansdale, PA (US); **Kyle A. Fliszar**, Quakertown, PA (US); **Soumojeet Ghosh**, Lansdale, PA (US); **Monica Tijerina**, Doylestown, PA (US)

(73) Assignee: **Merck Sharp & Dohme Corp.**, Rahway, NJ (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **12/085,722**

(22) PCT Filed: **Dec. 12, 2006**

(86) PCT No.: **PCT/US2006/047380**
§ 371 (c)(1),
(2), (4) Date: **May 29, 2008**

(87) PCT Pub. No.: **WO2007/078726**
PCT Pub. Date: **Jul. 12, 2007**

(65) **Prior Publication Data**
US 2009/0105265 A1    Apr. 23, 2009

**Related U.S. Application Data**

(60) Provisional application No. 60/750,954, filed on Dec. 16, 2005.

(51) Int. Cl.
*A61K 9/20* (2006.01)

(52) U.S. Cl. .................................................... **424/465**

(58) **Field of Classification Search** ........................ None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,548,481 B1 | 4/2003 | Demuth et al. | |
| 2003/0139434 A1 | 7/2003 | Balkan et al. | |
| 2003/0166578 A1 | 9/2003 | Arch et al. | |
| 2004/0229848 A1 | 11/2004 | Demuth et al. | |
| 2004/0254167 A1 | 12/2004 | Biftu et al. | |
| 2005/0051922 A1 * | 3/2005 | Nangia et al. | 424/464 |
| 2006/0210627 A1 | 9/2006 | Pfeffer et al. | |
| 2006/0270701 A1 * | 11/2006 | Kroth et al. | 514/300 |
| 2006/0270722 A1 * | 11/2006 | Thornberry et al. | 514/374 |
| 2007/0072810 A1 * | 3/2007 | Asakawa | 514/19 |
| 2007/0172525 A1 | 7/2007 | Sesha | |
| 2008/0064701 A1 | 3/2008 | Sesha | |
| 2009/0253752 A1 * | 10/2009 | Burkey et al. | 514/342 |
| 2009/0304790 A1 * | 12/2009 | Nilsson et al. | 424/464 |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CA | 2 623 011 A1 | 4/2007 |
| EP | 1 557 165 A1 | 7/2005 |
| JP | 2003-520226 A | 7/2003 |
| JP | 2003-535898 A | 12/2003 |
| JP | 2005/041885 A | 2/2005 |
| JP | 2005-514377 A | 5/2005 |
| WO | 99/38501 A2 | 8/1999 |
| WO | 99/38501 A3 | 8/1999 |
| WO | 01/52825 A2 | 7/2001 |
| WO | 01/52825 A3 | 7/2001 |
| WO | 01/97808 A1 | 12/2001 |
| WO | WO 03/004498 A1 | 1/2003 |
| WO | 03/045977 A2 | 6/2003 |
| WO | 03/045977 A3 | 6/2003 |
| WO | 2004/028521 A1 | 4/2004 |
| WO | WO 2004/050022 A2 | 6/2004 |
| WO | WO 2004/050022 A3 | 6/2004 |
| WO | WO 2004/058266 A1 | 7/2004 |
| WO | WO 2005/013957 A2 | 2/2005 |
| WO | WO 2005/013957 A3 | 2/2005 |
| WO | 2005/041923 A1 | 5/2005 |
| WO | WO 2005/047297 A1 | 5/2005 |
| WO | 2005/082348 A2 | 9/2005 |
| WO | 2005/082849 A1 | 9/2005 |
| WO | WO 2006/047248 A1 | 5/2006 |
| WO | WO 2006/135723 A2 | 12/2006 |
| WO | WO 2006/135723 A3 | 12/2006 |
| WO | WO 2007/019255 A2 | 2/2007 |
| WO | WO 2007/019255 A3 | 2/2007 |
| WO | WO 2007/041053 A2 | 4/2007 |
| WO | WO 2007/041053 A3 | 4/2007 |

OTHER PUBLICATIONS

"Sitagliptin (MK-0431) for Type 2 Diabetes shows promise in Phase II clinical trials" from Medical News Today, Jun. 11, 2005, p. 1-3 (http://www.medicalnewstoday.com/releases/25962.php).*

Ahren, B., et al., "Improved Meal-Releated B-Cell Function and Insulin Sensitivity by the Dipeptidyl Peptidase-IV Inhibitor Vildagliptin in Metformin-Treated Patients With Type 2 Diabetes Over 1 Year", Diabetes Care, 2005, p. 1936-, vol. 28, No. 8.

Brazg, R. et al., "Effect of Adding MK-0431 to On-Going Motformin Therapy in Type 2 Diabetic Paitents Who Have Inadequate Glycemic Control on Metformin", Diabetes, 2005, p. A3, vol. 54, Suppl 1.

Goldstein, B. J. et al., "Effect of Initial Combination Therapy With Sitagliptin, a Dipeptidyl Peptidase-4 inhibitor, and Metformin on Glycemic Control in Patients With Type 2 Diabetes", Diabetes Care, 2007, p. 1979-, vol. 30, No. 8.

Herman, G. et al., "Co-Administration of MK-0431 and Metformin in Patients with Type 2 Diabetes Does Not Alter the Pharmacokinetics of MK-0431 or Metformin", p. A505.

* cited by examiner

*Primary Examiner* — Bethany Barham

(74) *Attorney, Agent, or Firm* — Baerbel R. Brown; John C. Todaro

(57) **ABSTRACT**

Disclosed are pharmaceutical compositions comprising fixed-dose combinations of a dipeptidyl peptidase-4 inhibitor and metformin, methods of preparing such pharmaceutical compositions, and methods of treating Type 2 diabetes with such pharmaceutical compositions.

**28 Claims, No Drawings**

N.D. West Virginia
No. 1:19-cv-101-IMK

**JTX-002**

**JTX-002.0001**

US 8,414,921 B2

1

**PHARMACEUTICAL COMPOSITIONS OF COMBINATIONS OF DIPEPTIDYL PEPTIDASE-4 INHIBITORS WITH METFORMIN**

CROSS REFERENCE TO RELATED APPLICATIONS

This application is the National Stage of International Application No. PCT/US2006/047380, filed 12 Dec. 2006, which claims the benefit under 35 U.S.C. 119(e) of U.S. Provisional Application No. 60/750,954, filed Dec. 16, 2005.

BACKGROUND OF THE INVENTION

Type 2 diabetes is a chronic and progressive disease arising from a complex pathophysiology involving the dual endo-crine defects of insulin resistance and impaired insulin secre-tion. The treatment of Type 2 diabetes typically begins with diet and exercise, followed by oral antidiabetic monotherapy. For many patients, these regimens do not sufficiently control glycaemia during long-term treatment, leading to a require-ment for combination therapy within several years following diagnosis. However, co-prescription of two or more oral antidiabetic drugs may result in treatment regimens that are complex and difficult for many patients to follow. Combining two or more oral antidiabetic agents into a single tablet pro-vides a potential means of delivering combination therapy without adding to the complexity of patients' daily regimens. Such formulations have been well accepted in other disease indications, such as hypertension (HYZAAR™ which is a combination of losartan potassium and hydrochlorothiazide) and cholesterol lowering (VYTORIN™ which is a combina-tion of simvastatin and ezetimibe). The selection of effective and well-tolerated treatments is a key step in the design of a combination tablet. Moreover, it is essential that the compo-nents have complementary mechanisms of action and com-patible pharmacokinetic profiles. Examples of marketed combination tablets containing two oral antidiabetic agents include Glucovance™ (metformin and glyburide), Avan-dame™ (metformin and rosiglitazone), and Metaglip™ (met-formin and glipizide).

Metformin represents the only oral antidiabetic agent proven to reduce the total burden of microvascular and mac-rovascular diabetic complications and to prolong the lives of Type 2 diabetic patients. Furthermore, metformin treatment is often associated with reductions in body weight in over-weight patients and with improvements in lipid profiles in dyslipidemic patients.

Dipeptidyl peptidase-4 (DPP-4) inhibitors represent a novel class of agents that are being developed for the treat-ment or improvement in glycemic control in patients with Type 2 diabetes. Specific DPP-4 inhibitors currently in clini-cal trials for the treatment of Type 2 diabetes include sitaglip-tin phosphate (MK-0431), vildagliptin (LAF-237), saxaglip-tin (BMS47718), P93/01 (Prosidion), SYR322 (Takeda), GSK 823093, Roche 0730699, TS021 (Taisho), E3024 (Ei-sai), and PHX-1149 (Phenomix). For example, oral adminis-tration of vildagliptin or sitagliptin to human Type 2 diabetics has been found to reduce fasting glucose and postprandial glucose excursion in association with significantly reduced $HbA_{1c}$ levels. For reviews on the application of DPP-4 inhibi-tors for the treatment of Type 2 diabetes, reference is made to the following publications: (1) H.-U. Demuth, et al., "Type 2 diabetes—Therapy with dipeptidyl peptidase IV inhibitors, *Biochim. Biophys. Acta,* 1751: 33-44 (2005) and (2) K. Augustyns, et al., "Inhibitors of proline-specific dipeptidyl

2

peptidases: DPP IV inhibitors as a novel approach for the treatment of Type 2 diabetes," *Expert Opin. Ther. Patents,* 15: 1387-1407 (2005).

Sitagliptin phosphate having structural formula I below is the dihydrogenphosphate salt of (2R)-4-oxo-4-[3-(trifluo-romethyl)-5,6-dihydro[1,2,4]triazolo[4,3-a]pyrazin-7(8H)-yl]-1-(2,4,5-trifluorophenyl)butan-2-amine.



(I)

In one embodiment sitagliptin phosphate is in the form of a crystalline anhydrate or monohydrate. In a class of this embodiment, sitagliptin phosphate is in the form of a crystal-line monohydrate. Sitagliptin free base and pharmaceutically acceptable salts thereof are disclosed in U.S. Pat. No. 6,699, 871, the contents of which are hereby incorporated by refer-ence in their entirety. Crystalline sitagliptin phosphate mono-hydrate is disclosed in international patent publication WO 2005/0031335 published on Jan. 13, 2005. For a review on sitagliptin phosphate (MK-0431) including its synthesis and pharmacological properties, reference is made to the follow-ing publications: (1) C. F. Deacon, "MK-431," *Curr. Opin. Invest. Drugs,* 6: 419-426 (2005) and (2) "MK-0431", *Drugs of the Future,"* 30: 337-343 (2005).

Vildagliptin (LAF-237) is the generic name for (S)-1-[(3-hydroxy-1-adamantyl)amino]acetyl-2-cyano-pyrrolidine having structural formula II. Vildagliptin is specifically dis-closed in U.S. Pat. No. 6,166,063, the contents of which are hereby incorporated by reference in their entirety.



(II)

Saxagliptin (BMS-47718) is a methanoprolinenitrile of structural formula III below. Saxagliptin is specifically dis-closed in U.S. Pat. No. 6,395,767, the contents of which are hereby incorporated by reference in their entirety.



(III)

The present invention provides for pharmaceutical compo-sitions of a fixed-dose combination of a DPP-4 inhibitor and

JTX-002.0002

US 8,414,921 B2

3

metformin which are prepared by dry or wet processing methods. The pharmaceutical compositions of the present invention provide for immediate release of the two active pharmaceutical ingredients. In one embodiment the pharmaceutical compositions of the present invention are in the dosage form of a tablet, and, in particular, a film-coated tablet.

The present invention also provides a process to prepare pharmaceutical compositions of a fixed-dose combination of a DPP-4 inhibitor and metformin by dry or wet processing methods. The dry processing methods include dry compression and dry granulation, and the wet processing methods include wet granulation.

Another aspect of the present invention provides methods for the treatment of Type 2 diabetes by administering to a host in need of such treatment a therapeutically effective amount of a pharmaceutical composition of the present invention.

These and other aspects will become readily apparent from the detailed description which follows.

SUMMARY OF THE INVENTION

The present invention is directed to novel pharmaceutical compositions comprising fixed dose combinations of a DPP-4 inhibitor and metformin, or pharmaceutically acceptable salts of each thereof, methods of preparing such pharmaceutical compositions, and methods of treating Type 2 diabetes with such pharmaceutical compositions. In particular, the invention is directed to pharmaceutical compositions comprising fixed-dose combinations of sitagliptin phosphate and metformin hydrochloride.

DETAILED DESCRIPTION OF THE INVENTION

One aspect of the present invention is directed to dosage forms for the medicinal administration of a fixed-dose combination of a DPP-4 inhibitor and metformin. Such dosage forms may be in the powder or solid format and include tablets, capsules, sachets, etc. A particular solid dosage form relates to tablets comprising a fixed-dose combination of a DPP-4 inhibitor and metformin hydrochloride (1,1-dimethylbiguanide hydrochloride).

In a particular aspect of the present invention, the pharmaceutical compositions comprise (1) a DPP-4 inhibitor, or a pharmaceutically acceptable salt thereof, as one of the two active pharmaceutical ingredients; (2) metformin hydrochloride as the second active pharmaceutical ingredient; and (3) a lubricant or glidant. In an embodiment of this aspect of the present invention, the pharmaceutical compositions may also contain one or more excipients which excipients are selected from the group consisting of one or more binding agents (binders); one or more diluents; one or more surfactants or wetting agents; one or more disintegrants; and one or more antioxidants.

In another embodiment of this aspect of the invention, the DPP-4 inhibitor is selected from the group consisting of sitagliptin, vildagliptin, saxagliptin, P93/01, SYR322, GSK 823093, Roche 0730699, TS021, E3024, and PHX-1149. In a class of this embodiment the DPP-4 inhibitor is sitagliptin, vildagliptin, or saxagliptin. In a subclass of this class, the DPP-4 inhibitor is sitagliptin.

A preferred pharmaceutically acceptable salt of sitagliptin is the dihydrogenphosphate salt of structural formula I above (sitagliptin phosphate). A preferred form of the dihydrogenphosphate salt is the crystalline monohydrate disclosed in WO 2005/0031335.

The preparation of sitagliptin and pharmaceutically acceptable salts thereof is disclosed in U.S. Pat. No. 6,699,

4

871, the contents of which are herein incorporated by reference in their entirety. The preparation of sitagliptin phosphate monohydrate is disclosed in international patent publication WO 2005/0031335 published on Jan. 13, 2005, the contents of which are herein incorporated by reference in their entirety.

The dosage strength of the DPP-4 inhibitor for incorporation into the pharmaceutical compositions of the present invention is an amount from about 1 milligram to about 250 milligrams of the active moiety. A preferred dosage strength of the DPP-4 inhibitor is an amount from about 25 milligrams to about 200 milligrams of the active moiety. Discrete dosage strengths are the equivalent of 25, 50, 75, 100, 150, and 200 milligrams of the DPP-4 inhibitor active moiety. By "active moiety" is meant the free base form of the DPP-4 inhibitor as an anhydrate.

The unit dosage strength of sitagliptin free base anhydrate (active moiety) for inclusion into the fixed-dose combination pharmaceutical compositions of the present invention is 25, 50, 75, 100, 150, or 200 milligrams. A preferred dosage strength of sitagliptin is 50 or 100 milligrams. An equivalent amount of sitagliptin phosphate monohydrate to the sitagliptin free base anhydrate is used in the pharmaceutical compositions, namely, 32.13, 64.25, 96.38, 128.5, 192.75, and 257 milligrams, respectively.

The unit dosage strength of the metformin hydrochloride for incorporation into the fixed-dose combination of the present invention is 250, 500, 625, 750, 850, and 1000 milligrams. These unit dosage strengths of metformin hydrochloride represent the dosage strengths approved in the U.S. for marketing to treat Type 2 diabetes.

Specific embodiments of dosage strengths for sitagliptin and metformin hydrochloride in the fixed-dose combinations of the present invention are the following:

(1) 50 milligrams of sitagliptin (equivalent to 64.25 milligrams of sitagliptin phosphate monohydrate) and 500 milligrams metformin hydrochloride;

(2) 50 milligrams of sitagliptin (equivalent to 64.25 milligrams of sitagliptin phosphate monohydrate) and 850 milligrams metformin hydrochloride;

(3) 50 milligrams of sitagliptin (equivalent to 64.25 milligrams of sitagliptin phosphate monohydrate) and 1000 milligrams metformin hydrochloride;

(4) 100 milligrams of sitagliptin (equivalent to 128.5 milligrams of sitagliptin phosphate monohydrate) and 500 milligrams metformin hydrochloride;

(5) 100 milligrams of sitagliptin (equivalent to 128.5 milligrams of sitagliptin phosphate monohydrate) and 850 milligrams metformin hydrochloride; and

(6) 100 milligrams of sitagliptin (equivalent to 128.5 milligrams of sitagliptin phosphate monohydrate) and 1000 milligrams metformin hydrochloride.

The pharmaceutical compositions of the present invention are prepared by wet or dry processing methods. In one embodiment the pharmaceutical compositions are prepared by wet processing methods. In a class of this embodiment the pharmaceutical compositions are prepared by wet granulation. With wet granulation either high-shear granulation or fluid-bed granulation may be used. In one embodiment fluid-bed granulation is employed which has the advantage of affording tablets with higher diametric strength.

In a second embodiment the pharmaceutical compositions are prepared by dry processing methods. In a class of this embodiment the pharmaceutical compositions are prepared by direct compression or dry granulation methods. An embodiment of dry granulation is roller compaction.

JTX-002.0003

Appx142

US 8,414,921 B2

5        6

The pharmaceutical compositions obtained by the dry or wet processing methods may be compressed into tablets, encapsulated, or metered into sachets.

The pharmaceutical compositions contain one or more lubricants or glidants. Examples of lubricants include magnesium stearate, calcium stearate, stearic acid, sodium stearyl fumarate, hydrogenated castor oil, and mixtures thereof. A preferred lubricant is magnesium stearate or sodium stearyl fumarate or a mixture thereof. Examples of glidants include colloidal silicon dioxide, calcium phosphate tribasic, magnesium silicate, and talc.

The pharmaceutical compositions of the present invention optionally contain one or more binding agents. Embodiments of binding agents include hydroxypropylcellulose (HPC), hydroxypropylmethyl cellulose (HMPC), hydroxyethyl cellulose, starch 1500, polyvinylpyrrolidone (povidone), and co-povidone. A preferred binding agent is polyvinylpyrrolidone.

The pharmaceutical compositions of the present invention may also optionally contain one or more diluents. Examples of diluents include mannitol, sorbitol, dibasic calcium phosphate dihydrate, microcrystalline cellulose, and powdered cellulose. A preferred diluent is microcrystalline cellulose. Microcrystalline cellulose is available from several suppliers and includes Avicel PH 101, Avicel PH 102, Avicel, PH 103, Avicel PH 105, and Avicel PH 200, manufactured by the FMC Corporation.

The pharmaceutical compositions of the present invention may also optionally contain a disintegrant. The disintegrant may be one of several modified starches, modified cellulose polymers, or polycarboxylic acids, such as croscarmellose sodium, sodium starch glycollate, polacrilin potassium, and carboxymethylcellulose calcium (CMC Calcium). In one embodiment, the disintegrant is croscarmellose sodium. Croscarmellose sodium NF Type A is commercially available under the trade name "Ac-di-sol."

The pharmaceutical compositions of the present invention may also optionally contain one or more surfactants or wetting agents. The surfactant may be anionic, cationic, or neutral. Anionic surfactants include sodium lauryl sulfate, sodium dodecanesulfonate, sodium oleyl sulfate, and sodium laurate mixed with stearates and talc. Cationic surfactants include benzalkonium chlorides and alkyltrimethylammonium bromides. Neutral surfactants include glyceryl monooleate, polyoxyethylene sorbitan fatty acid esters, polyvinyl alcohol, and sorbitan esters. Embodiments of wetting agents include poloxamer, polyoxyethylene alkyl ethers, polyoxyethylene castor oil derivatives, and polyoxyethylene stearates.

An anti-oxidant may optionally be added to the formulation to impart chemical stability. The anti-oxidant is selected from the group consisting of α-tocopherol, γ-tocopherol, δ-tocopherol, extracts of natural origin rich in tocopherol, L-ascorbic acid and its sodium or calcium salts, ascorbyl palmitate, propyl gallate, octyl gallate, dodecyl gallate, butylated hydroxytoluene (BHT), and butylated hydroxyanisole (BHA). In one embodiment, the antioxidant is BHT or BHA.

Preferred dosage forms for the pharmaceutical compositions of the present invention are prepared by compression methods. Such tablets may be film-coated such as with a mixture of hydroxypropylcellulose and hydroxypropylmethylcellulose containing titanium dioxide and/or other coloring agents, such as iron oxides, dyes, and lakes; a mixture of polyvinyl alcohol (PVA) and polyethylene glycol (PEG) containing titanium dioxide and/or other coloring agents, such as iron oxides, dyes, and lakes; or any other suitable immediate-release film-coating agent(s). The coat

provides taste masking and additional stability to the final tablet. A commercial film-coat is Opadry® which is a formulated powder blend provided by Colorcon.

Finally, a sweetening agent and/or flavoring agent may be added if desired.

In one embodiment of the present invention, the pharmaceutical compositions contain about 3 to 20% by weight of a DPP-4 inhibitor as one of the two pharmaceutically active ingredients; about 25 to 94% by weight of metformin hydrochloride as the second pharmaceutically active ingredient; about 0 to 35% by weight of a binding agent; and about 0.1 to 10% by weight of a lubricant. In a class of this embodiment the binding agent is polyvinylpyrrolidone or hydroxypropylcellulose, and the lubricant is magnesium stearate or sodium stearyl fumarate. In a subclass of this class, the binding agent is polyvinylpyrrolidone, and the lubricant is sodium stearyl fumarate. In another class the pharmaceutical compositions optionally contain about 0 to 3% by weight of a surfactant and/or about 0 to 70% by weight of a diluent. In a subclass of this class, the surfactant is sodium lauryl sulfate and the diluent is microcrystalline cellulose.

In a second embodiment the pharmaceutical compositions of the present invention are prepared by wet granulation methods and comprise about 5 to 18% by weight of a DPP-4 inhibitor as one of the two pharmaceutically active ingredients; about 65 to 77% by weight of metformin hydrochloride as the second pharmaceutically active ingredient; about 4 to 9% by weight of a binding agent; and about 1 to 2% by weight of a lubricant. In a class of this embodiment the binding agent is polyvinylpyrrolidone or hydroxypropylcellulose, and the lubricant is magnesium stearate or sodium stearyl fumarate. In a subclass of this class, the binding agent is polyvinylpyrrolidone. In another class the pharmaceutical compositions optionally contain about 0.5 to 1% to by weight of a surfactant and/or about 5 to 15% by weight of a diluent. In a subclass of this class, the surfactant is sodium lauryl sulfate and the diluent is microcrystalline cellulose.

In a further embodiment of the present invention, the pharmaceutical compositions as envisioned for commercial development are as follows:

Tablets of 50 mg DPP-4 Inhibitor/500 mg Metformin HCl Potency:

About 9% by weight of the DPP-4 inhibitor; about 73% by weight of metformin hydrochloride; about 7% by weight of a binding agent; about 1 to 2% by weight of a lubricant; and optionally about 10% by weight of a diluent and/or about 0.5% by weight of a surfactant. In a class of this embodiment the DPP-4 inhibitor is sitagliptin, vildagliptin, or saxagliptin; the binding agent is polyvinylpyrrolidone, the lubricant is magnesium stearate or sodium stearyl fumarate, the diluent is microcrystalline cellulose, and the surfactant is sodium lauryl sulfate. In a subclass of this class, the DPP-4 inhibitor is sitagliptin.

Tablets of 50 mg DPP-4 Inhibitor/850 mg Metformin HCl Potency:

About 6% by weight of the DPP-4 inhibitor; about 76% by weight of metformin hydrochloride; about 7% by weight of a binding agent; about 1 to 2% by weight of a lubricant; and optionally about 10% by weight of a diluent and/or about 0.5% by weight of a surfactant. In a class of this embodiment the DPP-4 inhibitor is sitagliptin, vildagliptin, or saxagliptin; the binding agent is polyvinylpyrrolidone, the lubricant is magnesium stearate or sodium stearyl fumarate, the diluent is microcrystalline cellulose, and the surfactant is sodium lauryl sulfate. In a subclass the DPP-4 inhibitor is sitagliptin.

US 8,414,921 B2

7

Tablets of 50 mg DPP-4 Inhibitor/1000 mg Metformin HCl Potency:

About 5% by weight of the DPP-4 inhibitor; about 77% by weight of metformin hydrochloride; about 7% by weight of a binding agent; about 1 to 2% by weight of a lubricant; and optionally about 10% by weight of a diluent and/or about 0.5% by weight of a surfactant. In a class of this embodiment the DPP-4 inhibitor is sitagliptin, vildagliptin, or saxagliptin; the binding agent is polyvinylpyrrolidone, the lubricant is magnesium stearate or sodium stearyl fumarate, the diluent is microcrystalline cellulose, and the surfactant is sodium lauryl sulfate. In a subclass the DPP-4 inhibitor is sitagliptin.

Tablets of 100 mg DPP-4 Inhibitor/500 mg Metformin HCl Potency:

About 17% by weight of the DPP-4 inhibitor; about 65% by weight of metformin hydrochloride; about 7% by weight of a binding agent; about 1 to 2% by weight of a lubricant; and optionally about 9% by weight of a diluent and/or about 0.5% by weight of a surfactant. In a class of this embodiment the DPP-4 inhibitor is sitagliptin, vildagliptin, or saxagliptin; the binding agent is polyvinylpyrrolidone, the lubricant is magnesium stearate or sodium stearyl fumarate, the diluent is microcrystalline cellulose, and the surfactant is sodium lauryl sulfate. In a subclass the DPP-4 inhibitor is sitagliptin.

Tablets of 100 mg DPP-4 Inhibitor/850 mg Metformin HCl Potency:

About 11% by weight of the DPP-4 inhibitor; about 75% by weight of metformin hydrochloride; about 7% by weight of a binding agent; about 1 to 2% by weight of a lubricant; and optionally about 4% by weight of a diluent and/or about 0.5% by weight of a surfactant. In a class of this embodiment the DPP-4 inhibitor is sitagliptin, vildagliptin, or saxagliptin; the binding agent is polyvinylpyrrolidone, the lubricant is magnesium stearate or sodium stearyl fumarate, the diluent is microcrystalline cellulose, and the surfactant is sodium lauryl sulfate. In a subclass the DPP-4 inhibitor is sitagliptin.

Tablets of 100 mg DPP-4 Inhibitor/1000 mg Metformin HCl Potency:

About 10% by weight of the DPP-4 inhibitor; about 77% by weight of metformin hydrochloride; about 7% by weight of a binding agent; about 1 to 2% by weight of a lubricant; and optionally about 4% by weight of a diluent and/or about 0.5% by weight of a surfactant. In a class of this embodiment the DPP-4 inhibitor is sitagliptin, vildagliptin, or saxagliptin; the binding agent is polyvinylpyrrolidone, the lubricant is magnesium stearate or sodium stearyl fumarate, the diluent is microcrystalline cellulose, and the surfactant is sodium lauryl sulfate. In a subclass the DPP-4 inhibitor is sitagliptin.

The pharmaceutical tablet compositions of the present invention may also contain one or more additional formulation ingredients selected from a wide variety of excipients known in the pharmaceutical formulation art. According to the desired properties of the pharmaceutical composition, any number of ingredients may be selected, alone or in combination, based upon their known uses in preparing tablet compositions. Such ingredients include, but are not limited to, diluents, compression aids, glidants, disintegrants, lubricants, flavors, flavor enhancers, sweeteners, and preservatives.

The term "tablet" as used herein is intended to encompass compressed pharmaceutical dosage formulations of all shapes and sizes, whether coated or uncoated. Substances which may be used for coating include hydroxypropylcellulose, hydroxypropylmethylcellulose, titanium dioxide, talc, sweeteners, colorants, and flavoring agents.

In one embodiment the pharmaceutical compositions of the present invention are prepared by wet granulation (high shear and/or fluid bed). Granulation is a process in which binding agent is added either through the granulating solution

8

or through addition to the granulating bowl to form granules. The steps involved in the wet granulation method comprise the following:

(1) the active pharmaceutical ingredients metformin hydrochloride and the DPP-4 inhibitor are added to the granulating bowl;

(2) optional disintegrants are added to step 1;

(3) for high shear granulation, the binding agent (such as polyvinylpyrrolidone or hydroxypropylcellulose) is added dry to the granulating bowl and dry mixed for a short period followed by the addition of water with or without a surfactant (such as sodium lauryl sulfate). For fluid bed granulation, both active pharmaceutical ingredients are added to the granulator bowl and the granulating solution comprised of binding agent with or without surfactant in water is added upon fluidization;

(4) granules prepared by high shear granulation are tray-dried in an oven or dried in a fluid bed dryer. For granules prepared by fluid bed granulation, granules are dried in a fluid bed dryer;

(5) dried granules are resized in suitable mill;

(6) optional diluents (such as microcrystalline cellulose and dibasic calcium phosphate dihydrate) are blended with dried granules in a suitable blender;

(7) lubricants or glidants (such as magnesium stearate and sodium stearyl fumarate) are added to the blend from step 6 in a suitable blender;

(8) lubricated granule mixture from step 7 may be filled into bottles, sachets, or capsules or compressed into desired tablet image;

(9) and if desired, the resulting tablets may be film-coated.

The steps involved in the dry processing (direct compression or dry granulation) methods comprise:

(1) the active pharmaceutical ingredients metformin hydrochloride and the DPP-4 inhibitor are added to a suitable blender;

(2) optional disintegrants are added to step 1;

(3) optional binders and/or diluents are added to step 2;

(4) lubricants or glidants are added to step 3;

(5) mixture from step 4 may be filled into bottles, sachets, or capsules or compressed into desired tablet image, or processed through a roller compactor;

(6) if processed through a roller compaction, granules may be resized in a suitable mill, if necessary;

(7) optional diluents may be added to the resulting granules, in a suitable blender to improve compaction properties;

(8) optional lubricants or glidants are added to the blend from step 7;

(9) lubricated granule mixture from step 8 may be filled into bottles, sachets, or capsules or compressed into desired tablet image;

(10) and if desired, the resulting tablets from step 5 or step 9 may be film-coated.

The present invention also provides methods for treating Type 2 diabetes by orally administering to a host in need of such treatment a therapeutically effective amount of one of the fixed-dose combination pharmaceutical compositions of the present invention. In one embodiment the host in need of such treatment is a human. In another embodiment the pharmaceutical composition is in the dosage form of a tablet. The pharmaceutical compositions comprising the fixed-dose combination may be administered once-daily (QD), twice-daily (BID), or thrice-daily (TID).

The following examples further describe and demonstrate embodiments within the scope of the present invention. The examples are given solely for the purpose of illustration and are not intended to be construed as limitations of the present

JTX-002.0005

US 8,414,921 B2

| 9 | 10 |

invention as many variations thereof are possible without departing from the spirit and scope of the invention.

EXAMPLE 1

Fixed-Dose Combination of 50 Milligrams
Sitagliptin and 500 Milligrams Metformin
Hydrochloride/Per Tablet—Wet Granulation

| Sitagliptin phosphate monohydrate | 64.25 | mg* |
| Metformin hydrochloride | 500 | mg |
| Polyvinylpyrrolidone | 48.2 | mg |
| Sodium lauryl sulfate (SLS) | 3.45 | mg |
| Microcrystalline cellulose (Avicel PH-102) | 59.3 | mg |
| Sodium stearyl fumarate | 13.8 | mg |
| Purified water for granulation step** | 39.8 | mg for high shear or |
| | | 354 mg for fluid bed |
| Opadry ◑ II | 17.2 | mg |
| Purified water for coating step** | 68.9 | mg |

*Equivalent to 50 mg of sitagliptin free base anhydrate.
**Removed during processing.

Method of Manufacture:

Sitagliptin phosphate monohydrate and metformin hydrochloride were loaded into a high shear granulator or a fluid bed granulator. In the case of high shear granulation, purified water containing sodium lauryl sulfate was added to the APIs, in addition to the polyvinylpyrrolidone binding agent over a period of 3-5 minutes. The wetted mass was either tray dried at 40° C. or dried in a fluid-bed dryer at an inlet temperature of 45-60° C. for 3-6 minutes. In the case of fluid bed granulation, purified water containing polyvinylpyrrolidone and sodium lauryl sulfate was added to APIs over a period of 30-60 minutes. The wetted mass was dried in a fluid-bed dryer at an inlet temperature of 45-60° C. The dried material was then milled using a co-mill to achieve fine granules. After milling, microcrystalline cellulose was added to the granules and blended in a twin shell-blender for 200 revolutions. The lubricant (sodium stearyl fumarate) was then added and blended an additional 100 revolutions. The lubricated mixture was compressed using a rotary tablet press to provide a 689 mg uncoated tablet. The tablets were optionally coated with Opadry ◑ II suspension (polyvinyl alcohol, polyethylene glycol, titanium dioxide, and talc, with or without colorants) to an approximate 2.5% weight gain to provide a 706 mg coated tablet.

EXAMPLE 2

Fixed-Dose Combination of 50 Milligrams
Sitagliptin and 850 Milligrams Metformin
Hydrochloride/Per Tablet—Wet Granulation

| Sitagliptin phosphate monohydrate | 64.25 | mg* |
| Metformin hydrochloride | 850 | mg |
| Polyvinylpyrrolidone | 78.2 | mg |
| Sodium lauryl sulfate (SLS) | 5.60 | mg |
| Microcrystalline cellulose (Avicel PH-102) | 96.1 | mg |
| Sodium stearyl fumarate | 22.3 | mg |
| Purified water for granulation step** | 64.9 | mg for high shear or |
| | | 573 mg for fluid bed |
| Opadry ◑ II | 27.9 | mg |
| Purified water for coating step** | 112 | mg |

*Equivalent to 50 mg of sitagliptin free base anhydrate.
**Removed during processing.

Method of Manufacture:

Tablets were prepared by wet-granulation using essentially the procedure of Example 1 to provide a 1117 mg uncoated tablet. The tablets were optionally coated with 27.9 mg of a standard Opadry II◑ film-coat formula to provide a 1145 mg coated tablet.

EXAMPLE 3

Fixed-Dose Combination of 50 Milligrams
Sitagliptin and 1000 Milligrams Metformin
Hydrochloride/Per Tablet—Wet Granulation

| Sitagliptin phosphate monohydrate | 64.25 | mg* |
| Metformin hydrochloride | 1000 | mg |
| Polyvinylpyrrolidone | 91.0 | mg |
| Sodium lauryl sulfate (SLS) | 6.50 | mg |
| Microcrystalline cellulose (Avicel PH-102) | 112.3 | mg |
| Sodium stearyl fumarate | 26 | mg |
| Purified water for granulation step** | 75.5 | mg for high shear or |
| | | 667 mg for fluid bed |
| Opadry ◑ II | 32.5 | mg |
| Purified water for coating step** | 130 | mg |

*Equivalent to 50 mg of sitagliptin free base anhydrate.
**Removed during processing.

Method of Manufacture:

Tablets were prepared by wet-granulation using essentially the procedure of Example 1 to provide a 1300 mg uncoated tablet. The tablets were optionally coated with an Opadry◑ II suspension (polyvinyl alcohol, polyethylene glycol, titanium dioxide, and talc, with or without colorants) to an approximate 2.5% weight gain to provide a 1333 mg coated tablet.

EXAMPLE 4

Fixed-Dose Combination of 50 Milligrams
Sitagliptin and 500 Milligrams Metformin
Hydrochloride/Per Tablet—Wet Granulation

| Sitagliptin phosphate monohydrate | 64.25 | mg* |
| Metformin hydrochloride | 500 | mg |
| Polyvinylpyrrolidone | 48.2 | mg |
| Microcrystalline cellulose (Avicel PH-102) | 69.6 | mg |
| Magnesium stearate | 6.89 | |
| Purified water for granulation step** | 39.8 | mg for high shear or |
| | | 354 mg for fluid bed |
| Opadry ◑ II | 17.2 | mg |
| Purified water for coating step** | 68.9 | mg |

*Equivalent to 50 mg of sitagliptin free base anhydrate.
**Removed during processing.

Method of Manufacture:

Sitagliptin phosphate monohydrate and metformin hydrochloride were loaded into a high shear granulator or a fluid bed granulator. In the case of high shear granulation, purified water was added to the APIs, in addition to the polyvinylpyrrolidone binding agent over a period of 3-5 minutes. The wetted mass was either tray dried at 40° C. or dried in a fluid-bed dryer at an inlet temperature of 45-60° C. for 3-6 minutes. In the case of fluid bed granulation, purified water containing polyvinylpyrrolidone was added to APIs over a

US 8,414,921 B2

**11**

period of 30-60 minutes. The wetted mass was dried in a fluid-bed dryer at an inlet temperature of 45-60° C. The dried material was then milled using a co-mill to achieve fine granules. After milling, microcrystalline cellulose was added to the granules and blended in a twin shell-blender for 200 revolutions. The lubricant (magnesium stearate) was then added and blended an additional 100 revolutions. The lubricated mixture was compressed using a rotary tablet press to provide a 689 mg uncoated tablet. The tablet was then optionally film-coated with an Opadry® II suspension (polyvinyl alcohol, polyethylene glycol, titanium dioxide, and talc, with or without colorants) to an approximate 2.5% weight gain to provide a 706 mg coated tablet.

EXAMPLE 5

Fixed-Dose Combination of 50 Milligrams Sitagliptin and 1000 Milligrams Metformin Hydrochloride/Ter Tablet—Wet Granulation

| | |
|---|---|
| Sitagliptin phosphate monohydrate | 64.25 mg* |
| Metformin hydrochloride | 1000 mg |
| Polyvinylpyrrolidone | 91.0 mg |
| Microcrystalline cellulose | 125.25 mg |
| (Avicel PH-102) | |
| Magnesium stearate | 13.0 |
| Sodium lauryl sulfate | 6.5 |
| Purified water for granulation step** | 75.5 mg for high shear or 667 mg for fluid bed |
| Opadry ® II | 32.5 mg |
| Purified water for coating step** | 130 mg |

*Equivalent to 50 mg of sitagliptin free base anhydrate.
**Removed during processing.

Method of Manufacture:

Sitagliptin phosphate monohydrate and metformin hydrochloride were loaded into a high shear granulator or a fluid bed granulator. In the case of high shear granulation, purified water containing sodium lauryl sulfate was added to the APIs, in addition to the polyvinylpyrrolidone binding agent over a period of 3-5 minutes. The wetted mass was either tray dried at 40° C. or dried in a fluid-bed dryer at an inlet temperature of 45-60° C. for 3-6 minutes. In the case of fluid bed granulation, purified water containing polyvinylpyrrolidone and sodium lauryl sulfate was added to APIs over a period of 30-60 minutes. The wetted mass was dried in a fluid-bed dryer at an inlet temperature of 45-60° C. The dried material was then milled using a co-mill to achieve fine granules. After milling, microcrystalline cellulose was added to the granules and blended in a twin shell-blender for 200 revolutions. The lubricant (magnesium stearate) was then added and blended an additional 100 revolutions. The lubricated mixture was compressed using a rotary tablet press to provide a 1300 mg uncoated tablet. The tablet was then optionally film-coated with an Opadry® II suspension (polyvinyl alcohol, polyethylene glycol, titanium dioxide, and talc, with or without colorants) to an approximate 2.5% weight gain to provide a 1333 mg coated tablet.

**12**

EXAMPLE 6

Fixed-Dose Combination of 100 Milligrams Sitagliptin and 1000 Milligrams Metformin Hydrochloride/Per Tablet—Wet Granulation

| | |
|---|---|
| Sitagliptin phosphate monohydrate | 128.5 mg* |
| Metformin hydrochloride | 1000 mg |
| Polyvinylpyrrolidone | 91.0 mg |
| Sodium lauryl sulfate (SLS) | 6.50 mg |
| Microcrystalline cellulose (Avicel PH-102) | 48 mg |
| Sodium stearyl fumarate | 26 mg |
| Purified water** | 667 mg |

*Equivalent to 100 mg of sitagliptin free base anhydrate.
**Removed during processing.

Method of Manufacture:

Tablets were prepared by fluid-bed granulation using essentially the procedure of Example 1 to provide a 1300 mg uncoated tablet.

EXAMPLE 7

Fixed-Dose Combination of 100 Milligrams Sitagliptin and 500 Milligrams Metformin Hydrochloride/Per Tablet—Wet Granulation

| | |
|---|---|
| Sitagliptin phosphate monohydrate | 128.5 mg* |
| Metformin hydrochloride | 500 mg |
| Polyvinylpyrrolidone | 53.8 mg |
| Sodium lauryl sulfate (SLS) | 3.84 mg |
| Microcrystalline cellulose (Avicel PH-102) | 66.5 mg |
| Sodium stearyl fumarate | 15.4 mg |
| Purified water** | 394 mg |

*Equivalent to 50 mg of sitagliptin free base anhydrate.
**Removed during processing.

Method of Manufacture:

Tablets were prepared by fluid-bed granulation using essentially the procedure of Example 1 to provide a 768 mg uncoated tablet.

What is claimed is:

1. A pharmaceutical composition comprising:
(a) about 3 to 20% by weight of sitagliptin, or a pharmaceutically acceptable salt thereof;
(b) about 25 to 94% by weight of metformin hydrochloride;
(c) about 0.1 to 10% by weight of a lubricant;
(d) about 0 to 35% by weight of a binding agent;
(e) about 0.5 to 1% by weight of a surfactant; and
(f) about 5 to 15% by weight of a diluent.

2. The pharmaceutical composition of claim **1** additionally comprising one or more excipients selected from the group consisting of (a) a disintegrant; (b) a wetting agent; and (c) an anti-oxidant.

3. The pharmaceutical composition of claim **1** comprising:
(a) about 5 to 18% by weight of sitagliptin, or a pharmaceutically acceptable salt thereof;
(b) about 65 to 77% by weight of metformin hydrochloride;

US 8,414,921 B2

13

(c) about 1 to 2% by weight of a lubricant;
(d) about 4 to 9% by weight of a binding agent;
(e) about 0.5 to 1% by weight of a surfactant; and
(f) about 5 to 15% by weight of a diluent.

**4**. The pharmaceutical composition of claim **3** wherein said lubricant is magnesium stearate or sodium stearyl fumarate, and the binding agent is polyvinylpyrrolidone.

**5**. The pharmaceutical composition of claim **3** comprising:
(a) about 9% by weight of sitagliptin, or a pharmaceutically acceptable salt thereof;
(b) about 73% by weight of metformin hydrochloride;
(c) about 1 to 2% by weight of a lubricant;
(d) about 7% by weight of a binding agent;
(e) about 0.5 to 1% by weight of a surfactant; and
(f) about 5 to 15% by weight of a diluent.

**6**. The pharmaceutical composition of claim **5** additionally comprising about 0.5% by weight of a surfactant and about 10% by weight of a diluent.

**7**. The pharmaceutical composition of claim **3** comprising
(a) about 5% by weight of sitagliptin, or a pharmaceutically acceptable salt thereof;
(b) about 77% by weight of metformin hydrochloride;
(c) about 1 to 2% by weight of a lubricant;
(d) about 7% by weight of a binding agent;
(e) about 0.5 to 1% by weight of a surfactant; and
(f) about 5 to 15% by weight of a diluent.

**8**. The pharmaceutical composition of claim **7** additionally comprising about 0.5% by weight of a surfactant and about 10% by weight of a diluent.

**9**. The pharmaceutical composition of claim **1** wherein the salt is the dihydrogenphosphate salt.

**10**. A pharmaceutical composition comprising:
(a) sitagliptin present in a unit dosage strength of 25 to 200 milligrams;
(b) metformin hydrochloride present in a unit dosage strength of 250, 500, 625, 750, 850, or 1000 milligrams;
(c) about 1 to 2% by weight of a lubricant;
(d) about 7% by weight of a binding agent;
(e) about 10% by weight of a diluent; and
(f) about 0.5% by weight of a surfactant.

**11**. The pharmaceutical composition of claim **10** wherein said lubricant is sodium stearyl fumarate, said binding agent is polyvinylpyrrolidone, said diluent is microcrystalline cellulose, and said surfactant is sodium lauryl sulfate.

**12**. The pharmaceutical composition of claim **10** wherein sitagliptin is present in a unit dosage strength of 25, 50, 75, 100, 150, or 200 milligrams, and said metformin hydrochloride is present in a unit dosage strength of 500, 850, or 1000 milligrams.

**13**. The pharmaceutical composition of claim **12** wherein sitagliptin is present in a unit dosage strength of 50 milligrams, and said metformin hydrochloride is present in a unit dosage strength of 500, 850, or 1000 milligrams.

**14**. The pharmaceutical composition of claim **12** wherein said sitagliptin is present in a unit dosage strength of 50 milligrams, and said metformin hydrochloride is present in a unit dosage strength of 500 or 1000 milligrams.

**15**. The pharmaceutical composition of claim **1** wherein said composition is in the dosage form of a tablet.

**16**. A method of treating Type 2 diabetes in a human in need thereof comprising orally administering to said human a pharmaceutical composition of claim **1**.

**17**. The pharmaceutical composition of claim **1** further comprising one or more agents selected from the group consisting of flavoring agents, colorants, and sweeteners.

**18**. The pharmaceutical composition of claim **1** prepared by wet granulation methods.

14

**19**. The pharmaceutical composition of claim **12** wherein said composition is in the dosage form of a tablet.

**20**. A method of treating Type 2 diabetes in a human in need thereof comprising orally administering to said human a pharmaceutical composition of claim **12**.

**21**. A pharmaceutical composition consisting essentially of:
(a) about 3 to 20% by weight of sitagliptin, or a pharmaceutically acceptable salt thereof;
(b) about 25 to 94% by weight of metformin hydrochloride;
(c) about 0.1 to 10% by weight of a lubricant;
(d) about 0 to 35% by weight of a binding agent;
(e) about 0.5 to 1% by weight of a surfactant; and
(f) about 5 to 15% by weight of a diluent.

**22**. A pharmaceutical composition in the form of a tablet comprising:
a) 64.25 mg[*] of sitagliptin phosphate monohydrate, which is equivalent to 50 mg of sitagliptin free base anhydrate;
b) 500 mg of metformin hydrochloride;
c) 48.2 mg of polyvinylpyrrolidone;
d) 3.45 mg of sodium lauryl sulfate;
e) 59.3 mg of microcrystalline cellulose;
f) 13.8 mg of sodium stearyl fumarate; and
g) 17.2 mg of a film coating.

**23**. A pharmaceutical composition in the form of a tablet comprising:
a) 64.25 mg[*] of sitagliptin phosphate monohydrate, which is equivalent to 50 mg of sitagliptin free base anhydrate;
b) 850 mg of metformin hydrochloride;
c) 78.2 mg of polyvinylpyrrolidone;
d) 5.60 mg of sodium lauryl sulfate;
e) 96.1 mg of microcrystalline cellulose;
f) 22.3 mg of sodium stearyl fumarate; and
g) 27.9 mg of a film coating.

**24**. A pharmaceutical composition in the form of a tablet comprising:
a) 64.25 mg[*] of sitagliptin phosphate monohydrate, which is equivalent to 50 mg of sitagliptin free base anhydrate;
b) 1000 mg of metformin hydrochloride;
c) 91.0 mg of polyvinylpyrrolidone;
d) 6.50 mg of sodium lauryl sulfate;
e) 112.3 mg of microcrystalline cellulose;
f) 26 mg of sodium stearyl fumarate; and
g) 32.5 mg of a film coating.

**25**. A pharmaceutical composition in the form of a tablet comprising:
a) 64.25 mg[*] of sitagliptin phosphate monohydrate, which is equivalent to 50 mg of sitagliptin free base anhydrate;
b) 500 mg of metformin hydrochloride;
c) 48.2 mg of polyvinylpyrrolidone;
d) 69.6 mg of microcrystalline cellulose;
e) 6.89 mg of magnesium stearate; and
f) 17.2 mg of a film coating.

**26**. A pharmaceutical composition in the form of a tablet comprising:
a) 64.25 mg[*] of sitagliptin phosphate monohydrate, which is equivalent to 50 mg of sitagliptin free base anhydrite;
b) 1000 mg of metformin hydrochloride;
c) 91.0 mg of polyvinylpyrrolidone;
d) 125.25 mg of microcrystalline cellulose;
e) 13.0 mg of magnesium stearate;

JTX-002.0008

US 8,414,921 B2

**15**

f) 6.5 mg of sodium lauryl sulfate; and

g) 32.5 mg of a film coating.

**27**. A pharmaceutical composition in the form of a tablet comprising:

  a) 128.5 mg[*] of sitagliptin phosphate monohydrate, which is equivalent to 100 mg of sitagliptin free base anhydrite;

  b) 1000 mg of metformin hydrochloride;

  c) 91.0 mg of polyvinylpyrrolidone;

  d) 6.50 mg of sodium lauryl sulfate;

  e) 48 mg of microcrystalline cellulose; and

  f) 26 mg of sodium stearyl fumarate.

**16**

**28**. A pharmaceutical composition in the form of a tablet comprising:

  a) 128.5 mg[*] of sitagliptin phosphate monohydrate, which is equivalent to 100 mg of sitagliptin free base anhydrate;

  b) 500 mg of metformin hydrochloride;

  c) 53.8 mg of polyvinylpyrrolidone;

  d) 3.84 mg of sodium lauryl sulfate;

  e) 66.5 mg of microcrystalline cellulose; and

  f) 15.4 mg of sodium stearyl fumarate.

* * * * *

JTX-002.0009

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.          : 8,414,921 B2                                                    Page 1 of 1
APPLICATION NO.     : 12/085722
DATED               : April 9, 2013
INVENTOR(S)         : Ashkan Kamali et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

On the Title Page:

The first or sole Notice should read --

Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 587 days.

Signed and Sealed this
Ninth Day of July, 2013

*Teresa Stanek Rea*

Teresa Stanek Rea
*Acting Director of the United States Patent and Trademark Office*

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.          : 8,414,921 B2                                              Page 1 of 1
APPLICATION NO.  : 12/085722
DATED                   : April 9, 2013
INVENTOR(S)       : Ashkan Kamali et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

In the Claims

1. Claims 6 & 8 delete "additionally"

2. Claims 22 - 28 - delete "[*]"

3. Claims 25, 26, 27 - replace "anhydrite" with "anhydrate"

Signed and Sealed this
Twenty-first Day of February, 2017

*Michelle K. Lee*

Michelle K. Lee
*Director of the United States Patent and Trademark Office*

JTX-002.0011

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

I hereby certify that the foregoing complies with the word limitation of Fed. Cir. R. 32(b)(1) because it contains 13,941 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Fed. Cir. R. 32(b)(2). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it was prepared in Microsoft Word 2016 using a proportionally spaced typeface (Book Antiqua) in 14-point font.

Dated: January 19, 2023            /s/ Deepro R. Mukerjee

## CERTIFICATE OF COMPLIANCE WITH FED. CIR. R. 25.1

I hereby certify that the foregoing complies with Federal Circuit Rule

25.1 because 7 unique words are marked confidential in the confidential and

redacted in the non-confidential version of this brief.

Dated: January 19, 2023                    /s/ Deepro R. Mukerjee

## CERTIFICATE OF SERVICE

I hereby certify that I caused a copy of the foregoing document to be filed on January 19, 2023, with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit using the Court's electronic filing system, which will send a notice of electronic filing to all attorneys appearing in this matter.

/s/ Deepro R. Mukerjee